UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-CV-22405-MORENO/LOUIS

ROLAND CORPORATION,

      Plaintiff,

vs.

INMUSIC BRANDS, INC.,

      Defendant.

_____/

## REPORT AND RECOMMENDATION ON CLAIM CONSTRUCTION

THIS CAUSE came before the Court for claim construction of the patents forming the basis of the instant infringement action pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). The Parties each presented an opening brief and response to the other. Additionally, the Court conducted an evidentiary *Markman* hearing on September 16, 2018. The Court has carefully considered the Parties' briefing, arguments and evidence presented during the *Markman* hearing, and the pertinent portions of the record.

## I.      BACKGROUND

Plaintiff Roland Corporation brings this action against Defendant inMusic Brands, Inc. for infringement of eight patents issued by the United States Patent and Trademark Office ("PTO"). The patents relate to three different inventions. The first family of patents are for an electronic percussion instrument: U.S. Patent No. 6,121,538 (the "'538 Patent"),[1] U.S. Patent No. 6,271,458 (the "'458 Patent"), U.S. Patent No. 6,756,535 (the "'535 Patent"), U.S. Patent No. 6,921,857 (the

---

[1] The Parties filed a Joint Appendix, to which all of the Patents are attached. ECF No. 107. Citations herein to the patents are by the short name of the patent, followed by the column and line number of the portion cited.

"'857 Patent"), U.S. Patent No. 7,385,135 (the "'135 Patent"). The Parties collectively refer to these as the "Drum Patents."

In the second family of patents are two Cymbal Patents directed to electronic cymbals and similarly share a common specification: U.S. Patent No. 6,632,989 (the "'989 Patent"), U.S. Patent No. 6,881,885 (the "'885 Patent"). The Cymbal Patents disclose an electronic cymbal that has improved accuracy for detecting strikes to the cover.

Finally, U.S. Patent No. 7,459,626 (the "'626 Patent"), the "Displacement Patent," relates to a hi-hat cymbal and discloses an improved sensor for detecting displacement of the position of the upper cymbal from the lower cymbal.

## II.   PRINCIPLES OF CLAIM CONSTRUCTION

It is well settled that "the construction of a patent, including terms of art within its claim, is exclusively within the province of the court." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). The role of the court is "to give meaning to the limitations actually contained in the claims, informed by the written description, the prosecution history if in evidence, and any relevant extrinsic evidence." *Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1331 (Fed. Cir. 2011).

The words of a claim "are generally given their ordinary and customary meaning." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). In defining words in a claim, "courts should look to 'those sources available to the public that show what a person of skill in the art would have understood [the] disputed claim language to mean.'" *Id.* at

1314 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

"[I]n interpreting an asserted claim, the court should look first to the intrinsic evidence of record, *i.e.,* the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics*, 90 F.3d at 1582. The specification of a patent "is always highly relevant to the claim construction analysis" and is usually dispositive. *Id*. It is viewed as "the single best guide to the meaning of a disputed term." *Id*.

Courts may also look to extrinsic evidence to determine the meaning of a disputed term. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries and learned treatises." *Phillips*, 415 F.3d at 1317 (citation omitted). A dictionary definition can be useful "so long as it does not contradict any definition found in or ascertained by a reading of the patent documents." *Id*. at 1322. When utilizing extrinsic evidence, courts must be mindful that it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id*. at 1317 (citation omitted).

With these principles in mind, the Court now turns to the claims at issue.

## III.   CLAIMS AT ISSUE

### A.   The Patents and the Person of Ordinary Skill in the Art

At issue are 8 different patents, from which the Parties advance 17 claim terms for construction. At the hearing the Parties represented that they could not reach an agreement as to any of the terms at issue.

The claim terms in dispute each appear in several claims of the many patents at issue and are co-related, stemming from the same parent applications. The Parties advance consistent

construction of the terms across the related patents. Therefore, for purposes of claim construction, the Court will rely on the specification and prosecution history of all of the related patents to construe the claim terms at issue. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1333–34 (Fed. Cir. 2003) (noting that "prosecution disclaimer may arise from disavowals made during the prosecution of ancestor patent applications" and that when construing a common term in dispute in related patents, the court will "presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning."); *see also NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005) ("where multiple patents 'derive from the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents.'").

The Parties differ on what qualifies a person of ordinary skill in the art, but both contend that such a person would have a bachelor's degree in the field of mechanical or electrical engineering (or related science); and have approximately five years of relevant experience in the field of electromechanical devices. From this base of common qualification, Plaintiff's expert, Dr. Paul Lehrman, additionally opines that the necessary experience would be more specifically designing and building electronic percussion instruments. Plaintiff's expert further opines that one skilled in the art may have a higher-level degree and fewer years of experience, noting that the descriptions of required qualifications here are "approximate." ECF No. 108-2 ¶ 4.

Plaintiff's expert disputes that Defendant's expert, Dr. Harri Kytomaa, is one skilled in the art because Dr. Kytomaa fails to describe any relevant experience he has in designing and building musical instruments. Dr. Lehrman does not explain why, in his opinion, the relevant field of experience would be so narrow, or how Dr. Kytomaa's disclosed experience is insufficient to qualify him as one skilled in the art. Dr. Kytomaa's disclosed experience includes research at MIT

that involved methods for taking measurements of acoustic vibrations, using piezoelectric transducers, as well as developing signal processing techniques for application in medicine and engineering, though not specifically for musical instruments. As will be discussed more below, the patents at issue revolve around a system for converting vibration into a musical tone using transducers and signal processing techniques. The Court accepts the qualifications advanced by both experts as those possessed by one skilled in the art.

**B.     Drum Patents**

The five Drum Patents share a common specification. The object of the invention is to provide an electronic drum that simulates the feeling of an acoustic drum "which is excellent in percussion feeling," yet is "extremely quiet." The invention generates a music tone based on its detection of percussion as electric signal. '538 Patent 2:1-5. Prior to this invention, a player had available the choice of either an acoustic drum, which offered the player the good percussion feeling of striking the drum surface (or "head"), but made a loud sound associated with the strike; or alternatively,  the electronic drum, which used a "percussion pad" to simulate the acoustic drum, but the percussion surface, characterized by a plate covered by a soft high-molecular compound, resulted in the feeling of striking the pad "repulsive." '538 Patent 1:37-43.

In addition to combining excellent feeling with small percussive sounds, other objects of the invention, in light of the problems with the prior art, include an easily tunable head, which is capable of detecting the position of percussion point and displaying that information to the player on a display. The invention at issue is thus "characterized by an electronic percussion instrumental system which detects percussion as electric signal and generates musical tone based on the electric signal thus detected comprising a tunable head; a means for detecting a position of percussion point for detecting the position of percussion point upon aforesaid head; and a display means for

effecting a display in response to the results detected by the aforesaid means for detecting the position of percussion point; a percussion point positional mark for tuning being provided on the aforesaid head." '538 Patent 3:4-16 (Objects and Summary of the Invention).

1.      **"transducer"**

The Parties seek consistent construction of this term as it is used in four of the five Drum Patents: the '135 Patent (Claims 1, 8, 9, 15, 21 and 22); '857 Patent (Claims 1 and 8); '535 Patent (Claims 1, 13 and 14); and the '538 Patent (Claims 1, 6, and 39). Plaintiff's proposed construction is "a device that generates electrical signals in response to vibrations." Defendant's construction is "one piezoelectric element wherein the top of the piezoelectric element is in direct mechanical contact with the cushioning member or cushioning material."

Plaintiff characterizes its definition as the ordinary meaning of the term. Plaintiff supports its proposed construction with citation to multiple extrinsic sources. First, Plaintiff avers that its construction is consistent with how the term is used in an unrelated patent of Defendant's.[2] Plaintiff further defends its construction as consistent with deposition testimony by one of Defendant's witnesses in this case. And finally, Plaintiff relies on its expert, who opines that the construction is correct.

Defendant supports its proposed construction with reference to the intrinsic evidence: the specification and prosecution history, both of which uniformly describe the piezoelectric element, always in the singular and in physical contact with the cushioning material that separates it from the drum head material. Notwithstanding, Plaintiff opposes every facet of the proposed construction, beginning with the letter "a."

---

[2] There is no basis to construe the terms of unrelated patents similarly. *Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1369 (Fed. Cir. 2016) (finding error in affording similar construction of term used in unrelated patent families).

Plaintiff opposes Defendant's construction of the transducer as a single element and avers that "one *or more*" transducers may be used in the invention. Plaintiff's argument is premised on a general rule of construction that use of the transitional word "comprising" connotes an open-ended claim and carries the meaning "one or more." For context, patent claims generally contain three sections: a preamble, the transition, and the body.[3] The preamble sets forth the type of invention being claimed (i.e., "[a]n electronic percussion instrumental system"). The body of the claim sets forth the structural limitations, elements, or steps in the invention, and is most frequently the focus of claim construction. Between the preamble and body, the transition is the phrase that links the two. "Comprising" is open-ended, meaning that the invention can include additional elements, but must include at least all of the elements listed in the claim.

Each of the asserted Drum Patents include the transition "comprising." The '135 Patent is illustrative:

> An electronic percussion instrumental system *comprising*:
> a housing;
> a head composed of a flexible material having openings therethrough and supported by the housing to define a percussion surface; and
> a percussion detector having a cushioning material and <u>a transducer</u> for detecting a percussion impact on the percussion surface and producing an electric signal responsive to the percussion impact.

'135 Patent Claim 1. Generally, a claim that pairs an indefinite article with the transition "comprising" does not limit the invention from including additional elements; *i.e.*, "a" should be construed to mean "one or more." Application of this general rule prevents an accused infringer from avoiding literal infringement simply by adding a second (or more) element to an accused device.

There are recognized exceptions to this legal principle. "When the claim language and

---

[3] *Anatomy of a Patent Case*, Ch. 9 Claim Construction—The *Markman* Hearing, at 97.

specification indicate that 'a' means one and only one, it is appropriate to construe it as such even in the context of an open-ended 'comprising' claim." *Harari v. Lee*, 656 F.3d 1331, 1341 (Fed. Cir. 2011). The "exceptions to this rule are extremely limited: a patentee must evince a clear intent to limit 'a' or 'an' to 'one.'" *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008); *Frac Shack Inc. v. Fuel Automation Station, LLC*, No. 16-CV-02275-STV, 2018 WL 5792613, at *4 (D. Colo. Nov. 5, 2018) ("the use of 'a' before 'controller' shall be construed as meaning 'one or more,' absent a showing of a 'clear intent' that the patentee intended to limit the controller to 'one.'").

Plaintiff contends that no exception to the general rule is applicable here and accordingly advances the ordinary and customary meaning for the term transducer. Defendant contends that the Patent teaches a single head sensor, of which the transducer is a component. Defendant urges that because there can only be one head sensor, there can only be one transducer, and a single cushioning material.[4] At the center of the rivaling constructions proposed by the Parties lies the question of whether the Drum Patents at issue claim a single percussion detecting apparatus (or "head sensor"—the terms are functionally equivalent for purposes of this analysis) centrally located and in direct contact with the drum head material; or if that is a preferred embodiment, which should not be imputed on the claims to limit their scope.

To resolve this dispute, the Court again begins its analysis with the intrinsic evidence. *Insituform Techs., Inc. v. Cat Contracting, Inc.*, 99 F.3d 1098, 1105 (Fed. Cir. 1996) (relying on claims, specification, and drawings to construe disputed term in the singular form); *See Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1369 (Fed. Cir. 2016). Beginning with the claim language, nothing in the text of the asserted claims suggests the use of

---

[4] As discussed below, "cushioning material/member" is a term for which the parties also seek construction. The analysis here of Plaintiff's proposed construction of "one or more" applies equally to that element.

more than one transducer. The asserted claims recite a "percussion detector" having a cushioning material and *a transducer*, "wherein the cushioning material is arranged between *the transducer* and the flexible material of the head;" ('135 Patent Claims 1, 8). Similarly, the '535 Patent recites "a head sensor comprising a cushioning member and *a transducer*," the head sensor there "in contact with a portion of, but not the entire, second surface of the head" ('535 Patent Claim 13). Defendant observes that the patentee intentionally specified those elements that are taught in the plural ("a plurality of net-like materials") in meaningful contrast to the exclusively singular use of the terms "a cushioning member" (or "a cushioning material"), and "a transducer". This consistent presentation of the element is not, standing alone, sufficient evidence of clear intent to limit to the singular use of the element. In these patents, however, that intent is clear as the object of the invention as taught is limited to utilization of a single transducer.

Turning next to the common specification, the Abstract explains that the patent is "characterized by a percussion detecting apparatus in electronic percussion instrumental system comprising a head the percussion surface … and a percussion detecting means being in contact with the center position of the aforesaid head..." *Id.* at 2:33-40. The Abstract similarly describes the subject invention as provided with "a head sensor which is in contact with the center position of the under side in the head" to detect percussion applied to the head. *Id.*; (Ex. A, '135 Patent).

The percussion detector, of which the transducer is an element, is described in the Summary as a singular element, in direct contact with the center of the drum head. This accomplishes one of the express objects of the invention: accurate detection of the position of the percussion. The invention includes "a means to detect percussion point positional information" which is displayed to the user and "detected by the aforesaid means for detecting a position of the percussion point." '135 Patent at 2:54-61.

In the preferred embodiment, the common specification explains how the positional detection functions and perceives a wavelength calculated from respective positions on the drum head. *Id*. at 12:11. The explanation assumes a common point from which these respective percussive strikes are measured. The invention functions only in the manner taught if the percussion detector, or transducer, is affixed in one location and the only place taught is the center. *See, e.g.*, ECF No. 110-13 at ¶ 26 (Decl. of Dr. Kytomaa). As in *Insituform*, the placement of the percussion detector, of which the transducer is a part, in a particular location is "inconsistent with the use of more than one" of the element "at any given time." *Insituform,* 99 F.3d at 1105. Beyond the preferred embodiment, the specified location of the percussion detector is expressed, as noted above, in the summary of the invention and Abstract. Statements that describe the invention as a whole, as in the Summary of the Invention, are more likely to support a limiting definition of a claim term than statements that describe only preferred embodiments. *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004) (recognizing limitation on term based on its consistent description in specification).

Defendant further supports its position with citation to the prosecution history, in which the patentee consistently described the percussion detector and its components ("a cushioning material and a transducer") in the singular. ECF No. 109 at 7-8. Patentee's statements to the patent office do not constitute express disavowal of an invention that utilizes more than a single transducer. However, the prosecution history of the '135 Patent is consistent in its description of a single percussion detecting means, repeated throughout the specification and claims. Nothing in the specification, history, or critically the claims, teach a construction of the system that employs multiple transducers.

Both Parties advance the extrinsic evidence of their respective experts, to whom the Court

looks for guidance on the technical field but not for legal construction of the claims. "Experts may explain terms of art and the state of the art at any given time, but they cannot be used to prove the legal construction of a writing." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1339 (Fed. Cir. 2015). Defendant relies on its expert for the opinion that the invention is not capable of a construction using multiple head sensors, an opinion he supports with an explanation of how multiple head sensors would interfere with the claimed advantages of the invention. Plaintiff's expert offers his opinion that Plaintiff's proposed construction is valid; however, adding a second transducer requires more modification than the Patent teaches in order to function. ECF No. 123-2 at ¶ 14-15. Dr. Lehrman opines that multiple transducers could be utilized by incorporating a digital signal processing chip to distinguish the electrical signals received. Whether or not it is possible to implement multiple transducers by also incorporating another element (a digital signal processing chip), it is not taught in the Patent. In light of the substantial intrinsic evidence, Dr. Lehrman's conclusion, that nothing in the asserted patents "prohibit or even discourage the use of multiple transducers," is insufficient to overcome the clear intent by the patentee to recite a single transducer.

Having carefully considered the record, the asserted claims recite a single transducer. The competing constructions advanced by the Parties additionally require the Court to determine whether the transducer here is limited to a "piezoelectric element in direct contact with the cushioning member/material" or should otherwise be afforded it ordinary meaning. The undersigned recommends that the term be construed without the additional limitations, consistent with its ordinary meaning.

Defendant's proposed construction would impart limitations on the term for which Defendant draws entirely from the preferred embodiment. As noted by both Parties, the term

"transducer" is not used in the common specification. Rather, the element is identified in the preferred embodiment as element **76** and described consistently as "the piezoelectric" or "the piezoelectric element." The figures moreover explain that the "piezoelectric element **76**" is bonded to the cushioning member. The fact that this is the single preferred embodiment is insufficient for the Court to read into the claims the limitations here urged by Defendant. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) ("Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction."). The evidence that the patentee intended to so limit the term fails to persuade the undersigned that the transducer claimed is limited either to a piezoelectric element or that it be construed as "in direct mechanical contact" with the cushioning member or material.

Rather, the Court should adopt a construction for "transducer" that affords it its ordinary meaning, as understood by one skilled in the art and applicable to this invention. Both Parties advance in their respective briefs an understanding that a transducer converts energy into another form and recognize that the transducer here converts the vibration or pressure resulting from percussion to electrical energy.[5]

Accordingly, the Court should apply the following definition for this disputed term: "one device that generates electrical signal in response to vibration."

2.      **"cushioning material;" "cushioning member"**

Each of the Drum Patents (except the '458 Patent) uses this disputed term in both independent and dependent claims. The '135 Patent is illustrative, which claims: a percussion

---

[5] *See e.g.*, ECF No. 108 at 10; ECF No. 109 at 13 & n. 12; *see also* Decl. Dr. Kytomaa ¶ 23 (ECF No. 110-13) (describing the necessity of physical contact between head material and head sensor for sensor to record the "vibration" of the head).

detector having "a cushioning material and a transducer for detecting a percussion impact on the percussion surface and producing an electric signal responsive to the percussion impact." The dependent claims recite an instrumental system as claimed above, "wherein the cushioning material is arranged in contact with the flexible material of the head" (Claim 5) and more specifically, "in contact with the central area of the flexible material of the head" (Claim 6); "between the transducer and the flexible material of the head" (Claim 8) permitting the transducer "to receive an impact transmitted by the cushioning material" (Claim 9). The '135 Patent additionally claims an instrument system as claimed in Claim 1 above, wherein the head is comprised of a first and second surface and "wherein the cushioning member is arranged in contact with the second surface" (Claim 10). The dependent claims further teach that the "cushioning member comprises an elastic material" (Claim 11) and "a material selected from the group consisting of rubber and sponge material" (Claim 12).

Plaintiff advances a construction it avers is based on the ordinary meaning of the terms, drawing from the dictionary to define "cushion": "An/the/said elastic body for reducing vibration." ECF No. 108 at 22. Plaintiff purports to draw from a dictionary definition of "cushion" but without explanation replaces the word "shock," present in the dictionary definition, with "vibration" to arrive at its proposed construction "an elastic body for reducing vibration." ECF 108 at 23. Plaintiff offers no argument to justify its resort to an extrinsic source to apparently distinguish the intrinsic.

Defendant contends that the term "cushioning material" is indefinite, but provides neither argument nor evidentiary support for its contention, which the Court rejects. To succeed on a defense of indefiniteness, Defendant must show "by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area." *LD Tech., LLC v.*

*Impeto Med. SAS*, No. 15-20109-CIV, 2016 WL 70458, at *4 (S.D. Fla. Jan. 6, 2016) (quoting

*Halliburton Energy Serv., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008)). "Indefiniteness

is a legal determination; if the court concludes that a person of ordinary skill in the art, with the

aid of the specification, would understand what is claimed, the claim is not indefinite." *Biosig

Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1381 (Fed. Cir. 2015). Defendant's expert

offered no opinion that the term is indefinite, while Plaintiff's expert offered his opinion that one

skilled in the art would understand the ordinary meaning of the term. *See id.* at 1384 (relying on

expert's testimony for conclusion that a skilled artisan would understand scope of disputed term).

Alternatively, Defendant proposes that the cushioning material/member be construed to

mean "one member [or material] with a frustoconical, truncated pyramid, or otherwise upwards

tapered shape and a bottom surface with a diameter larger than the transducer to which the bottom

of the cushioning member [or material] is in direct mechanical contact." Defendant's construction

imposes a series of limitations: that the member be limited to a single member ("one"); that it be

defined by a specific shape and size relative to the transducer; and that it be in "direct mechanical

contact" with the transducer. Unlike Plaintiff's proposal, Defendant's proposed construction offers

no limitation on the characteristic of the material or member ("elastic") and in fact includes the

contested terms themselves. The undersigned has considered each of the proposed limitations.

The intrinsic evidence reviewed above with respect to the term "transducer" applies with

equal force to the Court's construction of the disputed term. Both the "cushioning

material/member" and "transducer" are recited components of the percussion detector. The

asserted claim language modifying this term even more expressly specifies the placement of the

cushioning material/member (between the underside of the head material and the transducer); in

the center of the head, and not in contact with the entire surface. For the same reasons analyzed above, the Patents recite a single cushioning material/member.

The specification teaches that the purpose of the cushioning member/material—reduction in vibration from the head reaching the piezoelectric element—is fulfilled by two characteristics of the cushioning member: that it is elastic, and that it is tapered upward. The specification lauds the benefit of the tapered shape, which minimizes damage to the "piezoelectric element" that would otherwise result from the vibrations of percussion in the head, but are "hardly transmitted" directly to the "piezoelectric element" via the "small area" of "the frustoconical extreme end of the cushioning member." '135 Patent 8:8-14.

The specification teaches that the cushioning member "is not limited to the frustoconical shape, but a truncated pyramid shape may be adopted." *See, e.g.*, '135 Patent 17:31-33. Whether frustoconical or truncated pyramid, the cushioning member taught is tapered upward. No other shape is taught, and no other shape accomplishes its purpose. *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006) ("[W]hen the scope of the invention is clearly stated in the specification, and is described as the advantage and distinction of the invention, it is not necessary to disavow explicitly a different scope.").

Plaintiff advances the opinion of its expert, who opines that the "shape of the cushioning member could be, for example, rectangular, cylindrical, U-shaped, or any number of other shapes." ECF 123-2 at ¶ 30. This flatly conclusory statement provides the Court with no additional understanding of the art and thus has no value to the claim construction. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005).

Though Plaintiff opposes the limitations proposed by Defendant, Plaintiff's proposed construction similarly recognizes the necessity of vibration reduction by the cushioning

member/material. Plaintiff contends the function of reducing vibration is addressed adequately by the specification that the member be "elastic," citing to the portion of the specification that teaches that the "frustoconical cushioning member 80 is made from an elastic material such as rubber, sponge, and the like." '538 Patent 6:65-66. The specification continues: "The cushioning member 80 has a bottom surface of a larger diameter than that of the piezoelectric element 76, the cross section of which tapers off upwardly, and it is in contact with the second net 58 at the extreme end of the cushioning member 80 of a thin diameter." To the same extent this passage supports Plaintiff's importation of "elastic" into the construction, it would coextensively support construction that identifies the general shape (tapered upwardly).

That the Drum Patents limit the cushioning member or material to "direct mechanical contact" with the transducer is less clear from the intrinsic record. Defendant's argument in this respect is limited to citation to the preferred embodiment, which notes that the top of the piezoelectric element is "bonded" to the cushioning member, thereby suppressing the percussion vibrations transmitted to the transducer and the resultant damage thereto. *E.g.*, '135 Patent 8:14. However, Defendant's expert offers the unrebutted explanation that it is only through physical contact between head material and transducer that the percussion vibration is transmitted to the transducer to generate electrical signal. ECF No. 110-3 at ¶ 23. Accepting Dr. Kytomaa's explanation does not, however, compel Defendant's proposed construction, as it runs contrary to the claims themselves, which recite (at least) three possible relationships between transducer and cushioning member: "the cushioning member located between the head and the transducer" ('538 Patent Claim 1); "the cushioning member being arranged between the head and the transducer (*id.* Claim 5); and "the cushioning member in contact with the flexible material [of the head] and the transducer" (Claim 6). Accordingly, the undersigned declines to adopt that limitation urged in

16

Defendant's proposed construction of the term that would limit the cushioning member or material to "direct mechanical contact with the transducer."

The undersigned recommends that the Court adopt the following construction for "cushioning member" and "cushioning material": "one elastic body with an upwards tapered shape and a bottom surface with a diameter larger than the transducer."

### 3.        "producing/providing an electric signal;" "an electronic signal"

Four of the five Drum Patents include some variation of this term, for which the Parties seek consistent construction across all four Patents. The '458 Patent claims "[a]n electronic percussion instrument, comprising: a generally hollow body…; a generally flexible, net-like material…; a sensor supported by said generally hollow body, for providing an electronic signal in response to a percussion impact on the percussion surface of the generally flexible, net-like material." '458 Patent Claim 6.[6]

Plaintiff urges a construction based on the ordinary meaning of the words, for which Plaintiff again draws support from the dictionary to define "provide," "electric/electronic," and "signal" to propose its construction: "making available an electrical voltage or current by which information can be transmitted."

Defendant notes that each claim in which the term is used includes the further limitation "percussion surface," or drum head, and always appears in the singular form. ECF No. 109 at 15. Defendant advances the prosecution history of the '135 Patent (the latest to issue in this family of patents) in which, similarly, the patentee described the electric signal in the singular form. ECF

---

[6] The '535 Patent claims identical language with respect to this disputed term at Claim 23. The '538 Patent similarly claims "a head sensor comprising a cushioning member and a transducer…, the transducer for providing an electric signal in response to a percussion impact on the percussion surface." The '135 Patent finally claims "a transducer for detecting a percussion impact on the percussion surface and producing an electric signal responsive to the percussion impact." '135 Patent Claim 1.

No. 109 at 7. Accordingly, Defendant avers that the term should be construed to mean "one electronic signal output by the transducer per percussion impact."

The dispute between the Parties over this term depends on whether it is capable of plural construction, or if the patent teaches a single signal produced by each percussion impact. Plaintiff has the better argument here. As noted above, the open transition "comprising" denotes a meaning of "one or more" of the ensuing elements, and the limitation proposed by Defendant should be imposed only upon a finding of clear intent to limit to the singular.

In this respect, this term differs from "transducer" and "cushioning material/member." Beginning with the claims themselves, the term is not always recited in the singular; the '538 Patent recites "a transducer for transducing percussion upon said [drum] head to <u>electric signal</u>," without use of the article on which Defendant's argument so heavily depends.[7] The common specification similarly omits the singular article in describing this term ("the present invention is characterized by an electronic percussion instrumental system which detects percussion <u>as electric signal</u> and generates musical tone…." ('135 Patent 2:48-51; 3:14-16) (Summary of the Invention). The preferred embodiment expressly uses the term in the plural form, in the context of the element "which detects the percussion applied to the head **12**, the intensity thereof, the position of the percussion from the detected <u>signals</u> which are derived from the head sensor **14**…" '135 Patent 5:3-6.

Both Parties advance the extrinsic evidence of their respective experts, to whom the Court looks for guidance on the technical field but not for legal construction of the claims. Defendant's expert Dr. Kytomaa opines that "[w]hen describing the electrical signal output from a piezoelectric element [transducer], a person of ordinary skill in the art would refer to the time varying voltage

---

[7] The singular article is absent in non-asserted claims 1 and 5. Asserted Claims 6 and 39 both recite "an electric signal."

from a piezoelectric element as an electrical signal (singular)." ECF No. 110-13 ¶ 22.

Plaintiff's expert Dr. Lehrman offers his opinion that a construction limiting this term to a single signal would fail to account for how the transducer functions in the invention, explaining that "the electrical signal resulting from contact with a transducer is not instantaneous but can be continuous for a period of time, and may vary during that time as the pressure applied to the transducer changers." The Court may rely on Dr. Lehrman to "shed useful light on the relevant art," *Phillips*, 415 F.3d at 1317–18; and accepts his unchallenged opinion that a transducer is not limited to producing just one signal per percussion. Accordingly, the extrinsic evidence here is consistent with the intrinsic record and the undersigned's conclusion that the proper construction of "electric signal" is not limited to a single signal per percussion.

For this term, the ordinary meaning should be applied and the Court should adopt Plaintiff's proposed construction, "making available an electrical voltage or current by which information can be transmitted."

### 4. "openings therethrough;" "material through which air may pass;" "plurality of openings through which air may pass"

The Parties seek construction of these related terms, which appear in Claim 1 of the '135 patent ("openings therethrough"), '857 patent ("head material through which air may pass"), and '535 patent ("the head having a plurality of openings through which air may pass").

Defendant advances a single construction for all three: "permeable." In defense of its proposed construction, Defendant explains that the dictionary definition of "permeable" means "having pores or openings that permit liquids or gases to pass through." Defendant justifies its reliance on this extrinsic source because it is consistent, Defendant contends, with the intrinsic evidence.

In its briefs, Plaintiff contends the term(s) should be afforded their ordinary meaning, for

which Plaintiff draws from the dictionary, and proposes the following constructions:

(a) "openings therethrough": An aperture, [open width or open span] that extends into one side and out the opposite side of a material, *sufficient to reduce percussion sound upon percussing the material*.

(b) "material through which air may pass": An element or constituent with openings that permit air to move into from one side and out from the opposite side, *sufficient to reduce percussion sound upon percussing the element or constituent*.

(c) "plurality of openings through which air may pass": At least two apertures, [open width or open span] that extend into one side and out the opposite side, *sufficient to reduce percussion sound upon percussing the element or constituent*.

The disputed term is used in the '857 Patent in the description of the drum head, which is "disposed in a tensioned state …to define a percussion surface for receiving a percussion impact… the head having a head <u>material through which air may pass</u>." '857 Patent Claim 1. The '535 Patent similarly describes the drum head as "disposed in a tensioned state… to define a percussion surface for receiving a percussion impact…the head having a <u>plurality of openings through which air may pass</u>." '535 Patent Claim 1. The final Patent in the family claims "a head composed of a flexible material having <u>openings therethrough</u>." '135 Patent Claim 1.

Plaintiff's proposed construction for these three terms all include a modifying phrase – "*sufficient to reduce percussion sound upon percussing the element or constituent* – that imposes as a requirement satisfaction of a purpose of the disclosed element. Plaintiff avers this construction is the ordinary meaning consistent with the specification, which teaches that the purpose for the openings in the head material is to minimize the percussion sound. At the hearing, Plaintiff's counsel argued that unless the material utilized for the head reduces the percussion sound, the

instrument would be as loud as an acoustic drum, thus defeating the object of the invention. Plaintiff relies on the common specification and its preferred embodiment, which emphasizes the "extremely small" percussion sound that is the result of air passing through the openings of "stitches" in the net-like material of the surface to be percussed. '135 Patent 2:45-47 (Summary of the Invention). Indeed, the necessity of air passage sufficient to accomplish sound reduction is apparent in the language of the claim itself; independent Claim 1 of the '857 Patent further describes the extent of contact required between the cushioning material of the head sensor with the head, specifying that "a portion of the second surface of the head is out of contact with the cushioning member to allow air to pass through the openings in the head." '857 Patent 19:4-9.

Defendant objects to Plaintiff's inclusion of the modifying phrase "sufficient to reduce percussion sound," because it adds a dimensional aspect of size to the "openings" that is not disclosed in the specification. It does not. The specification explicitly recognizes a range of opening sizes that will result in varying effects on the apparatus. The specification describes the balance that must be struck between increasing the ratio of openings—which brings about the smaller percussion sound, but deteriorates the percussion feeling. "Accordingly, it is preferred to suitably keep a balance between the percussion feeling and the ratio of openings." '135 Patent 8:31-33. Thus, no specific dimension for the openings through which air may pass is taught, nor required for the invention to meet its objects, so long as those openings are sufficient to reduce the percussion sound upon percussing the drum head.

Plaintiff challenges Defendant's construction as overbroad, and improper resort to extrinsic evidence, all in an effort to advance a construction that supports Defendant's imminent invalidity challenge based on prior art. Defendant's argument at the hearing similarly accused Plaintiff of advancing a construction to avoid the invalidity challenge. ECF No. 221 at 166. The competing

positions with respect to invalidity here do not aid the Court's claim construction, and Defendant's potential challenge to invalidity does not support its proposed construction of "permeable." At the hearing, defense counsel acknowledged that "permeable" is not the best construction, but defended its proposal as better than that advanced by Plaintiff.

The undersigned agrees with Plaintiff that all of these terms should be afforded their ordinary meaning and will largely adopt Plaintiff's proposed constructions for these related terms. However, there is neither need nor value in replacing the claim words with those from the dictionary. Courts question the need to consult a dictionary to determine the meaning of well-known terms. *See C.R. Bard, Inc. v. U.S. Surgical Corp.,* 388 F.3d 858, 863 (Fed. Cir. 2004) (rejecting need to apply dictionary definition for "conformable," "pliable", and "controlling the duration."). There is similarly no reason to resort to the dictionary to replace the words "opening" or "material." These are plain and ordinary terms a jury will understand. Indeed, Plaintiff's proposed construction of "material through which air may pass" includes the word "openings" ("an element or constituent with openings"); no replacement for this common and comprehensible term is warranted.

Accordingly, the Court should construe these related, though not identical, terms as follows:

(a)     Openings therethrough: openings that extend into one side and out the opposite side of a material, sufficient to reduce percussion sound upon percussing the material.

(b)     Material through which air may pass: material that permits air to move from one side and out from the opposite side, sufficient to reduce percussion sound upon percussing the material.

(c)     Plurality of openings through which air may pass: at least two openings that permits air to move from one side and out from the opposite side, sufficient to reduce percussion sound upon percussing the material.

### 5.     "net-like material;" "net member"

The Parties seek consistent construction of these terms as they are used in the '857 Patent (Claim 3) and the '535 Patent (Claims 2, 8, 9, 19, 23). The '857 Patent, for example, in dependent Claim 3 recites "An electronic percussion instrument system as recited in claim 2, wherein the head material comprises a <u>net-like material</u>." The '535 Patent similarly, in its dependent claims, recites a head comprising a "net-like material" (Claims 2, 8); multiple layers of net-like material (Claim 9); "net-like material comprising multiple net members... said net-like material having openings through which air may pass" (Claim 19); and "net-like material having openings of a size sufficient to allow air to pass therethrough" (Claim 23).[8]

Plaintiff proposes that each use of the term be construed to mean "An element that is similar in appearance, to an open meshed fabric with openings through which air passes sufficient to reduce sound when the element is percussed." Defendant proposes that these terms be construed as "permeable."

Plaintiff draws from the specification to support its inclusion of the element's purpose in its proposed construction: the specification establishes that the purpose of the net-like material is to provide for sufficient passage of air to minimize the acoustic sound when struck. ECF No. 108 at 21. The Summary of the Invention explains the characteristics and attendant benefits of "net-

---

[8] In both Parties' briefing, the phrase "each net member having a plurality of openings sufficient to allow air to pass therethrough" is listed as an additional iteration of the disputed term. This presentation of the term does not appear in either of the two Patents (or Claims) identified by the parties for which they seek construction. It does appear in the '458 Patent, Claim 11, but neither side asserted that Claim for construction.

like" material to the invention. "[E]xtremely good percussion feeling can be obtained because of the elasticity of the net-like raw material." '535 Patent 2:34-37. "Besides, since air passes through the openings of stiches in the net-like raw material, percussion sound in case of percussing the head becomes extremely small." *Id.* at 2:37-39. In describing the preferred embodiment, the specification characterizes the net-like material as "elastic": "when the head is percussed with the stick, extremely good percussion feeling closely resembling the percussion feeling in the case when the head of an acoustic drum is percussed can be obtained because of the elasticity of a net-like raw material composed of the first net and the second net." '535 Patent 7:34-40. In the specification, the net-like material is further characterized by the patterns into which its fibers may be woven. *See*, *e.g.*, '535 Patent 5:51-58; 7:41-45.

As with "material through which air may pass," Plaintiff's proposed construction for the term "net" is derived from the ordinary meaning of the word: "an open-meshed fabric." As already noted, an object of the invention—that the sound resulting from percussion be very small—is here obtained by utilizing a material for the drum head that is characterized by the presence of openings in the material to allow air to pass, sufficient to reduce the percussion sound. Plaintiff's proposed construction is consistent in all respects with the claim language and the common specification.

Defendant opposes Plaintiff's proposed construction as "unwieldy and unsupported." The support offered for Defendant's construction is a single figure in the specification, showing the pattern of spacing taught in the preferred embodiment. Defendant's proposed construction of "permeable" is untethered to the claim or specification and, for the reasons already stated above, rejected.

Accordingly, the undersigned recommends that the Court adopt Plaintiff's proposed construction of "An element that is similar in appearance to an open meshed fabric with openings through which air passes sufficient to reduce sound when the element is percussed."

### 6.      "barrel section;" "housing"

Each of the Drum Patents[9] includes one of these two terms: the original '538 Patent and next two continuation Patents ('535 and '857) each describe a "barrel section." The latest Drum Patent ('135 Patent) uses the term "a housing." The parties seek consistent construction of these related terms across all four Patents.

Plaintiff contends that the terms are commonly used and do not warrant special construction. Plaintiff proposes a construction of "an enclosure that covers or protects parts of the instrument." ECF No. 108 at 13. Plaintiff supports its proposed construction with reference to extrinsic evidence, including use of the term in Defendant's patent; testimony from one of Defendant's witnesses demonstrating his understanding of the term "housing;" and testimony of Plaintiff's expert, who opined that one skilled in the art would understand the term.

Defendant proposes that "barrel section" be construed to mean "cylindrical structure open on both ends." Defendant further avers that the term "housing," which is neither included in the specification nor included in any antecedent patent, is indefinite. Alternatively, Defendant proposes that "housing" be construed the same as "barrel section."

In support of their respective proposals, both Parties draw support from the patent figures and description of the preferred embodiment, which identifies a "barrel section **50**." The barrel section **50** is illustrated by Figure 22:

---

[9] Except for the '458 Patent, which uses the term "generally hollow body," for which the Parties also seek construction, analyzed below.

## FIG. 22



The specification explains Figure 22 as a possible modified method of practice, wherein "the head **12** is fixed to either side of the opening of the barrel section **50**, which the head of an acoustic drum (cannot be found in FIG. **22**) may be fixed to the other side of the opening of the barrel section." '535 Patent 16:60-63. Defendant relies on the words "the other side of the opening" to urge a construction that would require the barrel section to be open at both ends. This singular reference in the preferred embodiment is insufficient to impose such a limitation on the term. The undersigned rejects Defendant's proposed limitation that the barrel section be "open at both ends."

The barrel section is, however, cylindrical as Defendant urges. This is apparent both from the figures on which Plaintiff relies for its proposed construction and the consistent characterization of the element in the claims and specification. Beginning with the claim language, two of the asserted claims of the '538 Patent[10] recite an "annular frame" and an "annular rim" that

---

[10] Dependent Claims 13 & 14.

comprises the head, which is disposed over the first end of the barrel section; the specified ring-shape of the frame or rim teaches that the barrel section to which it is affixed is similarly round and open ended. More concisely, it is cylindrical. The common specification describes the "barrel section" as cylindrical, and it is so illustrated in the figures. *E.g.*, '538 Patent 5:38-40 ("The percussion detecting apparatus **10** contains a cylindrical barrel section **50**, and around the outer circumference of the barrel section **50**…"); Figures 2, 22-23.

Finally, Plaintiff advances a construction that specifies the purpose of the element ("covers or protects part of the instrument"). While Defendant generally opposes Plaintiff's proposed construction as overly broad, it raises no specific objection to this aspect of the proposed construction. Plaintiff does not offer how it selected its proposed words "covers or protects" for its construction, and points to no evidence in the record that the element serves to protect the instrument parts. The undersigned recommends that the element's purpose be incorporated into the claim construction as Plaintiff urges, but that the language be more tethered to the Patent claims.

The claims teach that the barrel section (or housing) is a structure within which other elements are enclosed or supported by. The '538 Patent recites "a barrel section having a first end; a head … disposed in a tensioned state across the first end of the barrel section…; a support member disposed within the barrel section; and a head sensor … supported by the support member within the barrel section…". '538 Patent Claim 6 (Independent). The '135 Patent does not recite placement of elements "within" the housing, but does claim a housing that supports the head material (Claim 1), in a tensioned state (Claim 4), to create a central area with which the cushioning material of the percussion detector is in contact (Claim 6). Thus, the element provides both structure and enclosure to the other Patent elements.

Consistent with the claim language, figures and specification, the undersigned recommends that the Court adopt for the terms "barrel section" and "housing," the following construction: "a cylindrical structure that encloses parts of the instrument."

### 7.    "generally hollow body"

Two of the Drum Patents utilize the term "generally hollow body." Claim 6 of the '458 Patent is illustrative of both, and recites: "An electronic percussion instrument, comprising: a *generally hollow body* having an opening into a body interior; a generally flexible, net-like material disposed in a tensioned state across the opening of the *generally hollow body*" and "a sensor supported by said *generally hollow body*…". Independent Claim 23 of the '535 Patent recites substantially identical language.

Plaintiff avers that the term "generally hollow body" consists of ordinary words which require no special construction, and proposes the following construction based on the patent drawings: "An enclosure that, for the most part, has an interior cavity, and that covers or protects parts of the instrument." ECF No. 108 at 15. For this construction, Plaintiff refers again to the figures on which it draws support for its construction of "housing" and "barrel section," and draws support from the preferred embodiment described in the specification, in which the "percussion detecting apparatus **10** contains a cylindrical barrel section **50**…" '535 Patent 5:39-40. Finally, Plaintiff offers dictionary definitions for the words "hollow" ("having a cavity within") and "generally" ("for the most part").

Defendant contends that this term, which again is not used in the specification, is indefinite as it fails to inform one skilled in the art about the scope of the invention. In the absence of any guidance from the specification, Defendant avers that the term is confusing because the Claims teach "a sensor supported by said generally hollow body," a physical  impossibility if the "body"

is generally hollow. ECF No. 109 at 20-21. Alternatively, Defendant proposes the following construction: "cylindrical structure open on both ends with a predominantly hollow interior."

The analysis applicable to the term "housing" guides the undersigned's recommendation that the Court adopt a consistent construction for this term. The term "generally hollow body" is indeed not used in the specification. Plaintiff again avers that the term is defined by its appearance in the preferred embodiment and figures, it corresponds to element **50**, which is consistently described as "a cylindrical barrel section." The terms should be similarly construed, and indeed Defendant urges, if not found to be indefinite, an identical construction for this element as for "housing" and "barrel section." ECF No. 109 at 20-21.

This term is not however identical to those construed above; the Court should recognize the inclusion of the modification "generally hollow" rather than assume no meaning intended from those words. Accordingly, the undersigned recommends that the Court adopt the following construction: "a generally hollow cylindrical structure that encloses parts of the instrument."

### 8. "disposed in a tensioned state"

Each of the Drum Patents uses this term in some variation. For example, the '535 Patent claims "An electronic percussion instrument system compromising: a barrel section having a first end; a head disposed in a tensioned state across the first end of the barrel section to define a percussion surface for receiving a percussion impact…" Claim 1. Other Independent Claims recite similar variations of the "tensioned state" terms, such as "the head being disposed in a tensioned state" ('535 Patent Claim 13) and "a generally flexible, net-like material tensioned state across the opening of the generally hollow body…." ('535 Patent Claim 23). The '135 Patent similarly claims "An electronic percussion instrumental system … wherein the flexible material is *supported in a tensioned state* by the housing" (Claim 4); "An electronic percussion instrumental system

comprising: … a head composed of a flexible material having openings therethrough and *supported in a tensioned state* over the open end of the housing" (Claim 15); and "An electronic percussion instrumental system … wherein the flexible material of the head has a central area when *supported in the tensioned state*" (Claim 19). The Parties agree that the term has equivalent meaning across all five Patents and claims.

Plaintiff avers that this phrase should be construed to have its ordinary meaning, for which Plaintiff draws from the dictionary to arrive at its proposed construction: "placed or held up in a condition of being taut."

Defendant proposes the following construction: "tension created by pins attached to exterior of the barrel section, housing, or generally hollow body."

The Parties apparently agree that the word "tension" may be afforded its ordinary meaning, as Defendant incorporates the term in its proposed construction, and the Court agrees that no construction is warranted of that common term. At issue in the competing proposals is whether the term is properly construed to specify how and where the tension is created.

Drawing from the preferred embodiment, Defendant contends that the specification teaches one method for creating a tensioned state: with engaging pins. Plaintiff accuses Defendant of improperly importing limitations from the preferred embodiment and insists that the "words of the claim themselves do not require pins." ECF No. 108 at 17.

Plaintiff argues that the asserted Claims do not recite use of pins[11] or otherwise conscribe a method for creating the tension and Plaintiff accordingly resists importing this limitation from

---

[11] The '538 Patent does in fact recite the use of pins ("a barrel section equipped with a plurality of engaging pins which provide a tension on said drum head") (Claim 1). Plaintiff's brief identifies Claim 1 as one in which the disputed term appears (ECF No. 108 at 16), though Defendant's brief omits this Claim from the list of those asserted as infringed. ECF No. 109 at 17. Neither Party addressed Claim 1 in its respective arguments.

the preferred embodiment. Defendant contends that Plaintiff's proposed construction is inconsistent with the intrinsic record, drawing support for its construction from the preferred embodiment in the specification. Specifically, Defendant cites to the specification's teaching that the "engaging portions 52" are attached to the barrel section 50 at a "prescribed interval." '857 Patent 5:47-57.

The undersigned agrees with Plaintiff that Defendant's proposed construction would improperly limit this term to the preferred embodiment, without support from the intrinsic record that the Drum Patents are clearly so limited. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004). Undoubtedly, the portion cited describes use of engaging pins to create the subject tension in the flexible head material. *See, e.g.*, '135 Patent 5:47-57. The specification does not, however, teach a preference for the use of engaging pins, or disavow any other method, for affixing the flexible head material to the barrel section or housing to form the percussion surface. For example, in relation to the rim and outer circumference, the specification states that engaging pins "can be inserted" ('135 Patent 6:16-17). The specification further states that when assembled in this manner, "the tension of the first net 56 and the second net 58 can be arbitrarily controlled, whereby tuning of the head 12 can be carried out." (Col. 6:50-52). The permissive use of "can" to describe the use of engaging pins is instructive.

The proper construction of the term "tensioned state" is the ordinary meaning, and the undersigned recommends applying Plaintiff's proposed construction to all iterations in which the phrase appears ("Placed or held up in a condition of being taut").

### 9.    "**sensor**"

Two of the five Drum Patents recite the term "sensor" and the Parties dispute its construction in those particular claims. The '535 and '458 Patent both recite "[a]n electronic

percussion instrument, comprising: a generally hollow body…; a generally flexible, net-like material…; a sensor supported by said generally hollow body, for providing an electronic signal in response to a percussion impact on the percussion surface of the generally flexible, net-like material." '458 Patent Claim 6; '535 Patent Claim 23.

Defendant avers that the term is indefinite as used in these two claims. Defendant's indefiniteness argument draws from the specification, which differentiates between a "head sensor," which detects a strike to the percussion of the drum head, and a "rim shot sensor," which detects a strike to the rim. ECF No. 124 at 9. Because the specification identifies two types of sensors, but the claims at issue fail to specify which "sensor" is taught, Defendant avers the Court should find the term "sensor" indefinite pursuant to 35 U.S.C. § 112. In the alternative, Defendant proposes that the term be construed to mean "the head sensor [14]"; the bracketed 14 here included as part of the proposed construction, as it is identified in the specification figures.

Plaintiff challenges Defendant's indefiniteness argument and proposes a construction of the term as "a device that is capable of providing an electronic signal in response to percussion." The Parties' arguments here are talking past each other. Defendant's proposal seeks a construction that specifies that the unmodified "sensor" claimed in the '458 and '535 Patents describes the "head sensor," as distinguished from the "rim shot sensor." What distinguishes these two types of sensors is their placement and purpose. Both detect percussion and provide electric signal in response thereto: one detects (and signals) percussion received to the head; the other, as the name implies, to the rim. The constitution of both sensors, to the extent described in the preferred embodiment, is the same. ('535 6:57-63, 7:5-14). Thus, Plaintiff's objection that "the patent claims are not limited to a specific type of sensor" (ECF No. 108 at 19) misses the point. Defendant's proposed construction would specify *which* of the two sensors described in the embodiment is

claimed by the unmodified word "sensor" in these two Patents.

It bears repeating here that all five Drum Patents share a common specification, though claim terms of the respective Patents vary to some degree. The Abstract explains that the invention is characterized by "a head prepared from a net-like raw material" and "a head sensor which …detects percussion with respect to the head as electric signal."[12] The Summary of the Invention similarly states that in order to achieve the objects of the invention, it is characterized by "a percussion detecting means …detecting percussion with respect to the aforesaid head as electric signal." '458 Patent 2:28-31. While the Abstract explicitly defines the "percussion detecting means" as a "head sensor," the Summary describes the element just as plainly, without using the term "head sensor," but it is the same element.

The description of the preferred embodiment similarly uses the term "head sensor" to describe the percussion detecting means that detects percussion to the head, as it explains that the apparatus is "provided with a head sensor **14** functioning as a percussion detecting means for detecting percussion applied to a head **12** the surface of which is composed of a net-like raw material which will be described hereunder, and a rim-shot sensor **18** for detecting percussion applied to a rim **16**…" '458 Patent 4:51-56. Defendant correctly observes that there are two different sensors taught in this embodiment, and a construction that would embrace both sensors would render the term impermissibly broad, or meaningless; or more specifically, indefinite in violation of 35 U.S.C. § 112.

The undersigned is not, however, persuaded by Defendant's argument that the Claim is indefinite; viewing the specification and prosecution history, I find it informs a person of ordinary skill about the scope of the invention. *Tinnus Enterprises, LLC v. Telebrands Corp.*, 733 F. App'x

---

[12] The language quoted appears in the first paragraph on the first page of each of the five Drum Patents.

1011, 1018 (Fed. Cir. 2018). In the asserted Patent Claims, the disputed term is a "sensor" that is "supported by said generally hollow body, for providing an electronic signal in response to a percussion impact on the percussion surface of the generally flexible, net-like material." '535 Patent, Claim 23. The characteristics recited here make plain that the "sensor" claimed is the head sensor.

Plaintiff's counsel acknowledged at the hearing that the term "sensor" should be construed to have the same meaning across all five Drum Patents. Indeed, the '535 Patent itself recites a "head sensor" (Claim 6) in addition to the unmodified "sensor" (Claim 23), and both claims teach that this element provides electric signal in response to a percussion impact on the head material. Because the asserted Claim specifically teaches that this particular sensor perceives percussion impact to the head, it should not be construed so broadly as to include the rim-shot sensor taught in the preferred embodiment.

Accordingly, the undersigned recommends adoption of Defendant's proposed construction of the term "sensor": "head sensor."

### 10. "supporting structure;" "support member;" "supporting material"

Three of the Drum Patents use some iteration of these related terms, for which the Parties seek consistent construction. The '538 Patent, for example, claims "a support member disposed with the barrel section; and a head sensor comprising a cushioning member and a transducer supported by the support member within the barrel section, with the transducer located between the head and the support member and with the cushioning member in contact with the flexible material and the transducer…" '538 Patent, Claim 6 (independent). The '857 and '535 Patents utilize iteration of these terms in their dependent claims; for example, "[a]n electronic percussion instrument system of Claim 1, further comprising supporting structure for supporting the

transducer and the cushioning member." '857 Patent, Claim 8.

Plaintiff advances ordinary meaning for its construction of the disputed "supporting member" terms and proposes "a thing or element that holds up or serves as a foundation or prop." Defendant argues that "supporting structure /member" should be construed to mean "structure that directly bears the weight of the transducer and the cushioning member." Defendant advances for "supporting material" a construction of "[m]aterial that directly bears the weight of the transducer and the cushioning member."

Plaintiff defends its construction on the grounds that no special definition is provided by the patentee; and resists Defendant's construction as improperly incorporating into the construction embodiments in the specification.

Plaintiff's construction is largely consistent with the intrinsic evidence but as proposed would afford a broader meaning than that supported by the claim language or specification. There is no use of the terms uncoupled from their purpose: to support the percussion detector. Further, Plaintiff elsewhere recognizes that the "supporting material" claimed is that which supports the head sensor: in explaining the term "generally hollow body", Plaintiff, drawing from the common specification, explains that "[t]he 'generally' hollow body supports the sensor by use of 'head sensor supporting material.'"

The undersigned recommends that the Court adopt Plaintiff's proposed construction, with modification: "a thing or element that holds up or serves as a foundation or prop for the head sensor."

### C.    Cymbal Related Patents

The Parties submit three terms from the family of Cymbal Patents, which share a common specification. As set forth in the Abstract of the specification, the "invention is intended to provide

an electronic cymbal having improved accuracy for detecting a striking force and a striking position without hampering a striking sensation and an appearance." '885 Patent, Abstract. The Abstract furthers describes the invention as equipped with multiple different sensors: a "piezoelectric sensor;" "a cup portion sheet sensor" on the first frame, and an "edge lower portion sheet sensor" on a second frame. *Id*.

### 1.  "striking sensor"

The Parties seek construction of this term as it is used in both the '989 Patent (Claim 1) and the '885 Patent (Claims 28-30, 33, 34). Claim 30 of the '885 Patent is illustrative, and claims "a striking sensor supported on the frame for providing an electronic signal corresponding to a strike on the striking surface."

Plaintiff proposes "A device that detects pressure and transmits a resulting signal." Defendant's construction is "a piezoelectric sensor that detects vibration resulting from a strike to anywhere on the strike surface of the frame." In its Responsive Brief, Plaintiff notes its agreement with Defendant's construction to the extent it would be limited to "a device that detects vibration resulting from a strike." What remains at dispute is whether the "striking sensor" taught is a piezoelectric sensor; and whether the striking sensor is required to detect a strike anywhere on the strike surface of the frame.

Defendant urges that the striking sensor taught is the piezoelectric sensor, and opposes a construction without that limitation on the grounds that it would expand the term "striking sensor" to include the sheet sensor, which Defendant contends is a distinct element. The specification, as Defendant notes, repeatedly and consistently uses the term "piezoelectric sensor **5**" to describe a sensor for detecting a strike and outputting a signal. Defendant also notes the specification's use of "piezoelectric sensor" is synonymous with the functionality attributed in the Claims to the

striking sensor, as compared to that of the "sheet sensor **7**" which "detects pressure generated by the striking of the outer peripheral edge portion". '989 Patent 7:65-8:14. Plaintiff acknowledges that there "at least two other sensors that conceivably could detect strikes" but insists that nothing in the claim language limits the "strike sensor" to a "piezoelectric" sensor, and contends that no evidence supports Defendant's proposed construction of the element as piezoelectric (ECF No. 108 at 30).

It is without dispute that the specification distinguishes between the piezoelectric sensor and the sheet sensors. These are distinct elements that are identified by different numbers in the figures and are capable of different functions. For example, in explaining one embodiment, the specification describes an output jack and cable "for transmitting respective output signals from the piezoelectric sensor **5**, the edge lower portion sheet sensor **6**, the edge upper portion sheet sensor **7** and the cup portion sheet sensor **8**" to a sound generating device. '885 Patent 9:10-14. In one embodiment, the Patent further specifies that the "sheet sensor **6** detects pressure generated by the silencing operation of the player <u>but does not detect a strike</u>." *Id.* 8:3-5 (emphasis added). This stands in contrast to the "piezoelectric sensor **5**" which "can accurately detect vibration generated at the first frame after the surface and the surface and the peripheral edge of the surface of the electronic pad **1** are struck." *Id.* 7:59-62.

However, the term "striking sensor" is not synonymous with "piezoelectric sensor **5**." Rather, the specification teaches that the function of detecting vibration from the strike may be fulfilled by the sheet sensor. Indeed, the Summary of the Invention shows that the electronic pad taught in the second embodiment "comprises a sheet sensor formed on the first frame" for "detecting a strike applied to the cup portion." *Id.* 3:50-55. The preferred embodiment similarly teaches that sheet sensors [**7**, **8**] detect pressure generated from a strike applied to the peripheral

edge or cup portion, respectively. *Id.* 8:10, 23. The differentiation between these sensors across the multiple embodiments does not thus teach that one is the "striking sensor," to the exclusion of the other.

Defendant notes that in this description of the relationship between the two sensors, the specification teaches that the piezoelectric sensor detects strikes and the sheet sensors, which detect pressure, identify where on the surface the strike landed. Thus, Defendant argues, the striking sensor must be capable of detecting vibration resulting from the strike, anywhere that strike lands on the striking surface. The specification describes an embodiment that supports Defendant's position, wherein "the piezoelectric sensor **5** outputs a signal if any of the cup portion **30**, the bow portion **31** and the edge portion **32** shown in FIG. 1 is struck…." *Id.* 10:28-30. The three portions of the striking surface here described, illustrated by elements **30**, **31**, and **32**, collectively comprise the entire surface. Thus in this embodiment, the specification teaches a striking sensor capable of detecting and providing output corresponding to a strike to any portion of the surface.

However, the specification also touts the benefit of the rotation stopper member, which prevents rotation and makes it possible to restrict a striking range; "[b]y thus restricting the striking range, it is possible to dispense with a sensor to be provided out of the striking range and to thereby decrease manufacturing cost." '885 Patent 7:33-36. The Patent thus teaches an embodiment that expressly limits the range of the striking surface that the striking sensor must be capable of detecting. Thus, Defendant's proposed limitation, that the striking sensor detect a strike "anywhere" on the frame, is not supported by the specification.

The intrinsic evidence supports Defendant's construction to the extent that it specifies that the "striking sensor" detects vibration "on the strike surface of the frame." Accordingly, the Court

should construe the term to mean "a device that detects vibration resulting from a strike to the strike surface of the frame."

### 2. "second frame supporting said first frame"

The single use of this term appears in the '989 Patent, Claim 1, which claims "[a]n electronic pad receiving a strike, detecting the strike and outputting a signal representative of the strike comprising: a first frame; a striking sensor detecting the strike transmitted to said first frame; and a second frame supporting said first frame from below, having an attachment hole with a pivotal joint…." Roland proposes that the term be construed to mean "[a]n underlying structure that supports the first frame." Defendant advances a construction of "second frame provides support to the first frame with both a shoulder portion and an arm portion."

The Parties agree that the right construction is one that specifies that it is something that supports the first frame. Defendant's proposed construction further specifies that the second frame provides said support with both a shoulder portion and an arm portion, which Defendant supports with reference to the first embodiment detailed in the specification. ECF No. 109 at 29. The characterization in the preferred embodiment of the respective portions as "shoulder" and "arm," as distinguished from the "head" portion. '989 Patent 6:38-44.

This alone does not evidence a clear intent to limit the second frame to Defendant's proposed construction. Notwithstanding Defendant's warning that a construction missing this limitation would "read out the support apparatus as disclosed and taught," ECF No. 109 at 30, the asserted Claim expressly recites a second frame "with a pivotal joint." The second frame taught, accordingly, is one that includes a pivotal joint, but nothing in the intrinsic record supports the further limitation proposed by Defendant.

39

Accordingly, the undersigned recommends for this disputed term, "second frame supporting a first frame," that the Court adopt Plaintiff's proposed construction: "an underlying structure that supports the first frame."

### 3. "rotation stopper"

The Cymbal Patents each use this term for which the Parties seek consistent construction as it is used in the '989 Patent (Claim 1) and the '885 Patent (Claim 30). Roland advances a construction of "one or more elements that prevent rotation." Defendant advances "a single structure that inhibits rotation of the cymbal." The Parties' dispute centers around whether the term discloses a one-piece body, or should be afforded broader construction. The record evidence does not support Defendant's contention that a single structure is claimed and that the disputed term should be so limited.

Defendant's argument relies on the Patent figures, which depict a single (striated) element that is identified as the rotation stopper member; and characterization of the member as having a "tip end portion." ECF No. 109 at 27. Defendant further cites to *NewRiver, Inc. v. Mobular Techs., Inc.*, 478 F. Supp. 2d 158, 163 (D. Mass. 2007), for that court's construction of "portion" to mean "a part of any whole." Another court's construction of an unrelated patent is not evidence this Court may look to in construing these asserted claims. *See Trustees of Columbia Univ. in City of New York*, 811 F.3d at 1369.

Nothing in the record evidence supports Defendant's contention that the rotation stopper taught is limited to a single structure. Nor is the functionality of the invention dependent on utilization of a single structure to inhibit rotation of the cymbal. As described above, in the absence of clear evidence of contrary intention by the patentee, an indefinite article is construed to mean "one or more," and the undersigned finds no such evidence warranting departure from that rule of

40

construction.

Accordingly, the undersigned recommends that the Court adopt Plaintiff's proposed construction and the term "rotation stopper" be construed to mean "one or more elements that prevent rotation."

### D. The Displacement Patent

The Displacement Patent discloses an improved sensor for detecting displacement of the upper cymbal from the lower cymbal. '626 Patent. The disclosed invention is intended for use in electronic musical instruments, like cymbals, to detect the amount of displacement in the foot pedal, or other movable member. As the player depresses the pedal, the sensor detects the depression and more precisely, the degree of depression, resulting in an electrical current relative to the force applied to the pedal. The invention is characterized by its improved mechanical durability compared to prior art, which utilized a rubber sensor to interact with a sensor sheet, and that changed shape proportionate with the amount that the pedal was stepped on. '626 Patent, Abstract & 1:20-26.

> All asserted claims depend from independent Claim 3 of this Patent, which claims:
>
> A sensor device for detecting displacement of a movable object, comprising:
> **a member providing a detectable electrical characteristic** that has a value;
> and a **spring** that, upon displacement of the movable object, is compressed and acts with
> the **member providing the detectable electrical characteristic**;
> wherein action between the **spring** and the **member providing the detectable electrical**
> **characteristic** causes the value of the electrical characteristic to change.

'626 Patent, Claim 3 (disputed terms in bold).

### 1.    "member providing the/a detectable electrical characteristic"

The Parties seek construction of this term, as it is used in independent claim 3 of the '626 Patent, as well as dependent claims 4, 8, 10, 11 and 17-9.

Roland avers that the term should be afforded its ordinary meaning and proposes a construction that utilizes dictionary-derived words: "A part of a whole that makes available a distinguishing trait in terms of movement of electrons." ECF 108 at 33. Defendant proposes a construction it defends as supported by the intrinsic evidence and consistent with the claim: "a sensor sheet furnished with a sheet material with electrical conductivity and an electrode pattern." ECF 109 at 30. At the hearing, Plaintiff agreed that Defendant's proposal of "electrical conductivity" was an adequate alternative construction for "movement of electrons." The crux of the Parties' dispute over this term then is whether the patent is limited to use of a sensor sheet, or whether, as Plaintiff contends, other sensors may be used, for example, a force sensor resistor.

Defendant opposes Plaintiff's construction and argues that the Patent does not teach a force sensor resistor; only a sensor sheet is taught as the member. While the preferred embodiment utilizes a sensor sheet, the specification expressly recognizes the interchangeability with other sensors. The Summary of the Disclosure begins by observing an object of the invention—superior mechanical durability—is achieved by furnishing the displacement sensor "with a sensor structure, such as a sensor sheet, for which the resistance value changes in conformance with the area that has been pressed and a coil spring that has a conical shape." '626 Patent 1:55-59.

Plaintiff's expert explains that a force sensor resistor may be utilized as the sensor structure. *See* Second Decl. Lehrman (ECF 123-2 at ¶ 26). Dr. Lehrman explains that the force sensor resistor responds to increasing amount of pressure applied and asserts that a person of ordinary skill would understand that this type of sensor may be utilized. *Id*. at ¶ 27. Dr. Lehrman's explanation of the technology is unrefuted by Defendant's expert, who opines without elaboration that one of ordinary skill in the art would understand the disputed term to "include" utilization of a sensor sheet, but he does not challenge Dr. Lehrman's explanation of the technology. ECF No. 110-13 at

42

¶ 37 (emphasis added). This external evidence may be relied upon by the Court to understand the technology, but not as a replacement for the intrinsic evidence, which remains the primary guide for the Court's construction of the terms. Dr. Lehrman's opinion here is corroborated by the specification itself, which expressly teaches that the invention is not limited to use of the sensor sheet utilized in the preferred embodiment: "the sensor sheet in the embodiments of the present invention is not limited to these examples and, for example, a pressure sensitive printed resistor sheet in which the resistance value changes in accordance with the pressing force and the like maybe used." '626 Patent 12:39-43. The record evidence fails to support Defendant's proposed construction to the extent that would include the limitation "sensor sheet."

Accordingly, for the disputed term, the undersigned recommends adopting Plaintiff's proposed construction, with modification: "A part of a whole that makes available a distinguishing trait in terms of electrical conductivity."

### 2. "spring"

The Parties seek consistent construction this term for independent Claim 3, and dependent Claims 6, 8, 10-11, 17-19. Plaintiff proposes no construction for this disputed term and asserts its ordinary meaning should apply. Defendant proposes that the term be construed as "conical coil spring."

Defendant supports its proposed construction based on the consistent and repeated description, in the Specification, of the spring as a conical coil spring; the absence of teaching of any other shape or character spring in the claims or in the Specification; and on extrinsic evidence that the only shape capable of interacting properly in the invention is one that is conical.

Beginning with Defendant's last argument, the undersigned notes the interrelatedness of Defendant's proposed construction of this term with that advanced for "member providing the/a

detectable electrical characteristic." As discussed above, Defendant proposed a construction of that term that would require utilization of a sensor sheet as the member providing the detectable electrical characteristic. If a sensor sheet is utilized, the spring interacting therewith would have to be conical in order to accomplish what the patent teaches, that is, an electrical current from the sensor that increases proportionately to the degree to which the foot pedal is depressed. While the intrinsic evidence does not, I find, support Defendant's construction that would require utilization of the sensor sheet, I nonetheless agree that the intrinsic evidence shows only one spring is taught, and it is a conical coil spring.

Plaintiff urges that Defendant's construction would violate claim differentiation. Asserted Claim 6 recites a "sensor device as recited in claim 3, wherein the spring is a coil spring." '626 Patent Claim 6. Dependent Claim 7, which is not asserted, similarly recites a "sensor device as recited in claim 3, wherein the spring is a coil spring that has a conical shape." If the term "spring" is construed to mean "conical coil" across all claims, Plaintiff avers, this would not only violate claim differentiation but would render Claim 6 broader than Claim 7, as the former does not expressly recite the limitation that the spring's shape is conical.

The written description and prosecution history may overcome the presumption of claim differentiation. It is instructive here that every disclosed embodiment of the invention includes a conical coil spring that interacts with the sensor. *Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1368 (Fed. Cir. 2000) (affirming district court's construction that relied upon consistent characterization of element in all disclosed embodiments).

Indeed, while the independent claim recites a "spring" without limitation that it be either coil or conical, none of the claims expressly recite another type of spring.[13] Thus, while the claims

---

[13] Among the asserted dependent claims, the Patent provides modifiers consistent with Defendant's proposed construction. Dependent Claim 19 recites a "sensor device as recited in claim 3 wherein: the

can be read to imply that "spring" is not limited to a conical coil, "that implication is not a strong one." *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011).

The specification teaches that the improvement over prior art is achieved by use of a coil spring, which unlike the rubber previously used, withstands deterioration. The Summary of the Disclosure specifies that this improvement employs "a coil spring that has a conical shape,"[14] and further touts the benefit of the conical coil spring: durability. Unlike its predecessor, a rubber sensor, the conical coil spring interacts with the sensor sheet by increasing contact thereto in proportion to the amount it is pressed, thereby eliminating the mechanical rubbing that caused abrasion and deterioration to the prior art. '626 Patent 1:64-2:2; *see also id.* 7:7-11 ("since a coil spring that is durable with respect to compression and changes in shape in conformance with degree to which it is compressed is used, the sensor can be used for a long period of time compared to the displacement sensors of the past."). And while multiple embodiments are described, the Patent consistently identifies the contested spring as "the conical coil spring **11**". *E.g.*, *id.* 9:15-20 (describing second preferred embodiment as "furnished with the same conical coil spring and fixing frame as the conical coil spring **11** and fixing frame **14**" shown in Fig. 1).

A construction of "spring" that limits the term to a conical coil spring "is required to tether the claims to what the specifications indicate the inventor actually invented." *Id.* at 1305. Accordingly, the undersigned recommends that the Court adopt Defendant's proposed construction for this term: "conical coil spring."

---

spring is a coil spring composed of a spring material having a length arranged in multiple loops; and upon compression of the spring, one or more of the multiple loops engage the member providing the detectable electrical characteristic such that the length of the spring material engaging the member providing the detectable electrical characteristic changes with an amount of compression of the spring."
[14] *See* '626 Patent 1:58-59.

### 3. "contained within a frame"

This disputed term appears in dependent Claim 8, which recites "The sensor device as recited in claim **3**, wherein the spring and the member providing the detectable electrical characteristic are contained within a frame."

Plaintiff here proposes a construction of "held in a structure." Defendant proposes that the term be construed as "contained within the cylindrical concave portion of the frame." Defendant's construction relies on the preferred embodiment, which teaches that the "fixing frame 14 has a cylindrical concave portion 14e." '626 Patent 3:28; 4:19-24.

Plaintiff contends the terms ordinary meaning should apply, and Plaintiff supplies terms selected from the dictionary for its proposed construction. The American Heritage College Dictionary on which Plaintiff relies (ECF No. 108-9; Ex. H) offers several definitions for the noun form of "frame," and Plaintiff's proposal draws from the definition "[a] structure that gives shape or support." *Id.* at 8. That a "frame" provides a determined shape is apparent even in the external source on which Plaintiff relies, and a construction of the disputed term that omits that attribute would broaden the term beyond that which is claimed.

Plaintiff resists Defendant's construction as violative of the presumption of claim differentiation: because Claim 9 specifies that the spring and the member are "contained within a cylindrical frame that has a concave end surface," construing the disputed term as Defendant proposes would result in both dependent claims having the same scope and thus superfluous.

Claim differentiation is not a "hard and fast rule of construction," and cannot be relied upon to "broaden claims beyond their correct scope." *Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1368, 53 USPQ2d 1814, 1818 (Fed. Cir. 2000). Indeed, the presumption of claim differentiation may be overcome by intrinsic evidence that compels a construction that would

emasculate the presumption. *Albecker v. Contour Prod., Inc.*, 578 F. App'x 969, 971 (Fed. Cir. 2014) (affirming trial court construction and finding presumption of claim differentiation overcome by construction dictated by the written description and prosecution history). As Defendant notes, its proposed construction of the term in claim 8 would not render Claim 9 superfluous, as Claim 9 contains additional limitations and does not result in two identical dependent claims (ECF No. 109 at 35).

Turning to the intrinsic evidence, Defendant observes that the specification "clearly and solely teaches" an invention that places the spring and member within the cylindrical concave portion of the frame. Moreover, both preferred embodiments utilize the same fixing frame, which "has a cylindrical concave portion." '626 Patent 2:28; 9:15-20. No other shape is taught, and as indicated above, an appropriate construction of this term is one that defines the shape of the "structure."

Accordingly, the undersigned recommends that the Court adopt Defendant's proposed construction of the term "contained within a frame": "contained within the cylindrical concave portion of the frame."

**CONCLSUION**

Pursuant to Local Magistrate Rule 4(b), the parties have fourteen (14) days to serve and file written objections, if any, with the Honorable Federico A. Moreno, United States District Judge. Failure to file objections by that date shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report and shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal

conclusions included in the Report. *See* 28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *Patton v. Rowell*, 2017 WL 443634 (11th Cir. Feb. 2, 2017).

RESPECTFULLY SUBMITTED this 1st day August, 2019.

LAUREN FLEISCHER LOUIS
UNITED STATES MAGISTRATE JUDGE