**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 17-CV-22405-MORENO/LOUIS

ROLAND CORPORATION,

      Plaintiff,

v.

INMUSIC BRANDS, INC.,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

**THIS CAUSE** is before the Court on Plaintiff Roland Corporation's ("Roland") and Defendant inMusic Brands, Inc.'s ("inMusic") Motions for Partial Summary Judgment. ECF Nos. 358, 361. The Motions were referred to the undersigned by the Honorable Federico A. Moreno, United States District Judge, for resolution on all pretrial matters and for report and recommendation for dispositive motions. ECF No. 425. Upon consideration of the Motions, Responses, Replies, and being otherwise duly apprised in the matter, the undersigned hereby recommends that Plaintiff's Motion for Summary Judgment be **DENIED**, and Defendant's Motion for Summary Judgment be **GRANTED, in part**, and **DENIED, in part**.

### I.    FACTUAL BACKGROUND

Plaintiff Roland Corporation brings this action against Defendant inMusic Brands, Inc. for infringement of eight patents issued by the United States Patent and Trademark Office ("USPTO"). The patents relate to three different inventions, all revolving around a system for converting vibration into a musical tone using transducers and signal processing techniques.

1

### a. Patents at Issue

#### i. Drum Patents

The first family of patents are for an electronic percussion instrument: U.S. Patent No. 6,121,538 (the "'538 Patent"), U.S. Patent No. 6,271,458 (the "'458 Patent"), U.S. Patent No. 6,756,535 (the "'535 Patent"), U.S. Patent No. 6,921,857 (the "'857 Patent"), U.S. Patent No. 7,385,135 (the "'135 Patent"). The Parties collectively refer to these as the "Drum Patents."

The five Drum Patents share a common specification. The object of the invention is to provide an electronic drum that simulates the feeling of an acoustic drum "which is excellent in percussion feeling," yet is "extremely quiet." The invention generates a musical tone based on its detection of percussion as electric signal. '538 Patent 2:1-5. Prior to this invention, a player had available the choice of either an acoustic drum, which offered the player the good percussion feeling of striking the drum surface (or "head"), but made a loud sound associated with the strike; or alternatively, the electronic drum, which used a "percussion pad" to simulate the acoustic drum, but the percussion surface, characterized by a plate covered by a soft high-molecular compound, resulted in the feeling of striking the pad "repulsive." '538 Patent 1:37-43.

In addition to combining excellent feeling with small percussive sounds, other objects of the invention, in light of the problems with the prior art, include an easily tunable head, which is capable of detecting the position of percussion point and displaying that information to the player on a display. The invention at issue is thus "characterized by an electronic percussion instrumental system which detects percussion as electric signal and generates musical tone based on the electric signal thus detected comprising a tunable head; a means for detecting a position of percussion point for detecting the position of percussion point upon aforesaid head; and a display means for effecting a display in response to the results detected by the aforesaid means for detecting the

position of percussion point; a percussion point positional mark for tuning being provided on the aforesaid head." '538 Patent 3:4-16 (Objects and Summary of the Invention).

ii.   Cymbal Patents

In the second family of patents are two Cymbal Patents directed to electronic cymbals: U.S. Patent No. 6,632,989 (the "'989 Patent"), and U.S. Patent No. 6,881,885 (the "'885 Patent"). The Cymbal Patents disclose an electronic cymbal that has improved accuracy for detecting strikes to the cover.

The Cymbal Patents too share a common specification. As set forth in the Abstract of the specification, the "invention is intended to provide an electronic cymbal having improved accuracy for detecting a striking force and a striking position without hampering a striking sensation and an appearance." '885 Patent, Abstract. The Abstract furthers describes the invention as equipped with multiple different sensors: a "piezoelectric sensor"; "a cup portion sheet sensor" on the first frame, and an "edge lower portion sheet sensor" on a second frame. *Id.*

iii.   Displacement Patent

Finally, U.S. Patent No. 7,459,626 (the "'626 Patent"), the "Displacement Patent," relates to a hi-hat cymbal and discloses an improved sensor for detecting displacement of the position of the upper cymbal from the lower cymbal. The disclosed invention is intended for use in electronic musical instruments, like cymbals, to detect the amount of displacement in the foot pedal, or other movable member. As the player depresses the pedal, the sensor detects the depression and more precisely, the degree of depression, resulting in an electrical current relative to the force applied to the pedal. The invention is characterized by its improved mechanical durability compared to prior art, which utilized a rubber sensor to interact with a sensor sheet, and that changed shape proportionate with the amount that the pedal was stepped on. '626 Patent, Abstract & 1:20-26.

### b. Procedural History

On August 1, 2019, the undersigned submitted a Report and Recommendation ("R&R") on Claim Construction interpreting 17 claim terms for construction that extended from the same parent applications of the patents at issue.

The Parties tentatively reached a settlement as to both the claims at issue here and those situated in the District of Rhode Island, filing a Joint Notice of Settlement in Principle on December 5, 2019, ECF No. 281, after which the Court entered a Final Order of Dismissal, closing the case, and retaining jurisdiction to enforce the Parties' settlement agreement. ECF No. 282. Several months later, Plaintiff sought to enforce the settlement agreement on the basis that Defendant refused to abide by its terms.  ECF No. 290.  Defendant in response argued no binding agreement was ever reached and that in the midst of prolonged but earnest efforts to negotiate a final settlement agreement following the mediation, Plaintiff abandoned those efforts in an attempt to enforce the settlement agreement.  ECF No. 293.  Plaintiff argued the term sheet was binding but the undersigned found it was merely an agreement to agree.  The Parties' post mediation conduct demonstrated that the execution of a final settlement agreement was a condition precedent to settlement and that not all of the essential terms of the settlement had been reached at the time they executed the term sheet in question.  ECF No. 325. Accordingly, Plaintiff's Motion to Enforce was denied in late September 2020.

The Court reopened the case in June 2021, after which the Parties filed their cross Motions for Summary Judgment and ten motions *in limine* (seven by Plaintiff and three by Defendant).  A hearing was conducted on January 13, 2022 on the Parties' motions for summary judgment and, at the request of the Parties, a subsequent hearing was conducted on the various motions *in limine* (ECF Nos. 433, 437). With respect to Claim Construction, the Court has adopted in full the

4

recommendations set forth in the R&R (ECF No. 439), and those constructions have been accordingly applied herein.

## II.    LEGAL STANDARD

### a.    Summary Judgment

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To discharge this burden, the movant must identify an absence of evidence to support the nonmoving party's case. *Id.* at 325.

After the movant has met its burden under Rule 56(c), the burden of production shifts, and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must support its assertion that a genuine material fact remains in dispute by citing to specific parts of the record. *Sutton v. Royal Caribbean Cruises Ltd.*, 285 F. Supp. 3d 1349, 1351 (S.D. Fla. 2018) ("In opposing a motion for summary judgment, the non-moving party may not rely solely on the pleadings, but must show by affidavits, answers to interrogatories, and admissions that a specific fact exist demonstrating a genuine issue for trial."), *aff'd*, 774 F. App'x 508 (11th Cir. 2019). A fact or issue is material for purposes of summary judgment only if it might affect the outcome of the suit under the governing law.  *Webb v. Carnival Corp.*, No. 15-CV-24230, 2017 WL 10795681, at *2 (S.D. Fla. Jan. 13, 2017).  Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to

the party's case and on which that party will bear the burden of proof at trial." *Id.* (citing *Celotex Corp.*, 477 U.S. at 323).

In considering a motion for summary judgment, a court must evaluate the evidence and make all inferences in the light most favorable to the nonmoving party. *Sutton*, 285 F. Supp. at 135 (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 586). However, the nonmoving party may not merely point to a scintilla of evidence that creates a metaphysical doubt about an issue; instead, the evidence must be sufficient to allow a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co*., 475 U.S. at 586-87. Evidence is required; conclusory and unsubstantiated averments will not do, *Leigh v. Warner Bros., Inc*., 212 F.3d 1210, 1217 (11th Cir. 2000), and citations to specific record evidence are necessary, *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116-17 (11th Cir. 1993).

Additionally, "cross motions for summary judgment may be probative of the nonexistence of a factual dispute, but this procedural posture does not automatically empower the court to dispense with the determination whether questions of material fact exist." *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1345-46 (11th Cir. 2015). Indeed, even where the issues presented on motions for summary judgment overlap, a court must consider each motion on its own merits, "resolving all reasonable inferences against the party whose motion is under consideration." *S. Pilot Ins. Co. v. CECS, Inc*., 52 F. Supp. 3d 1240, 1243 (N.D. Ga. 2014) (citing *Am. Bankers Ins. Grp*., 408 F.3d at 1331). In particular, where "the parties respond[] to each respective summary judgment motion with disputes as to the 'undisputed' facts, add[] 'material facts' of their own, and then repl[y] with subsequent objections to the other party's additional facts," the mere filing of cross motions for summary judgment is not conclusive. *Id*. Thus, where the parties disagree as to the facts, summary judgment cannot be entered unless one

of the parties meets its burden of demonstrating that "there is no dispute as to any material facts with the evidence and all inferences drawn therefrom viewed in the light most favorable" to the non-moving party. *Shook v. United State*s, 713 F.2d 662, 665 (11th Cir. 1983) (citing *M/V Nan Fung*, 695 F.2d 1294, 1296-97 (11th Cir. 1983)).

### b.  Patent Act of 1952

Under 35 U.S.C. § 2(a)(1), the USPTO is charged with examining patent applications and issuing patents where "it appears that the applicant is entitled to a patent under the law." *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 95 (2011) (citing 35 U.S.C. § 131).  In order to receive patent protection, the USPTO must determine through the examination process that the claimed invention, among other things, (1) falls within a category of patentable subject matter, § 101; (2) is novel, § 102; and (3) is nonobvious, § 103.  *Id.* at 96.  During the examination, the USPTO renders a series of factual determinations in determining whether the criteria of the Patent Act have been met, including "the state of the prior art in the field and the nature of the advancement embodied in the invention." *Id.* (citing *Dickinson v. Zurko*, 527 U.S. 150, 153 (1999)).

Claimed inventions that clear this threshold as determined by the USPTO receive a patent, which confers upon the holder certain exclusive rights, including the "exclusive right to use the invention during the patent's duration." *Id*. Patentees may bring civil actions for infringement to enforce this exclusive right where another "without authority makes, uses, offers to sell, or sells any patented invention, within the United States."  *Id*. (quoting § 270(a)) (internal quotations omitted).  After the court has determined the meaning and scope of the patent claims being asserted to be infringed, the court next compares the properly construed claim to the device accused of infringing upon the patent.  *Stryker Corp. v. Davol Inc*., 234 F.3d 1252, 1258 (Fed. Cir. 2000). When comparing the claim as construed to the allegedly infringing device, the court considers

whether all of the claim limitations are present, either literally or by a substantial equivalent. *Innovention Toys, LLC v. MGA Entm't, Inc.*, 637 F.3d 1314, 1318 (Fed. Cir. 2011). Unlike claim construction, which is a matter of law for the court to decide, infringement presents a question of fact. *CommScope Techs. LLC v. Dali Wireless Inc.*, 10 F.4th 1289, 1295 (Fed. Cir. 2021). The court may render an infringement determination on summary judgment "when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device." *Id*. at 1319.

## III.   ANALYSIS

### a.  The Drum Patents

Plaintiff moves for summary judgment on infringement with respect to the '535 Patent, claim 19; and the '458 Patent, claim 6.[1]  Defendant both opposes Plaintiff's Motion and moves for summary judgment with respect to the Drum Patents on three bases:  (1) on those claims Plaintiff asserted but where it advanced no evidence that, applying the Court's claim construction, the accused products infringe;[2] (2) on the claims that include the element of a "sensor," construed to mean "head sensor," which the evidence shows the accusing products lack;[3] and (3) the claims requiring a mesh drum head[4] are invalid as anticipated or obvious by the prior art.

### i.  Claims for Which No Evidence of Infringement is Advanced

Defendant first moves for summary judgment on what it characterizes as Plaintiff's "conceded" claims, meaning those originally asserted by Plaintiff, but on which Plaintiff has advanced no evidence that the accused products infringe, when applying the Court's Claim

---

[1] Plaintiff's Motion purports to move for summary judgment on infringement of all asserted claims, but only analyzes (and advances evidence) with respect to these two asserted claims.
[2] '538 Patent, claims 1, 2, 6, 8-10, 12-15, 29, 31,  32, 35, and 39; '458 Patent, claims 5, 10-13, and 15-16; '535 patent, claims 1-5, 7-9, 13-15, and 17; '857 Patent, claims 1-5, 8, 9, 12-17, 20, 21, 23 and 24; and '135 Patent, claims 1-6, 8-13, 15-19, 21-26, 28-32, 24 and 35.
[3] '458 Patent, claims 6-7 and 9; '535 Patent, claim 23.
[4] Claims 1, 2, 4, and 17 of the '458 Patent and Claims 19-21 of the '535 Patent.

Construction.  Though Plaintiff rejects the characterization as a concession, it acknowledges that its expert offered no opinion as to infringement with respect to these claims applying the Court's construction.

It is without meaningful dispute that Plaintiff's expert, Dr. Paul Lehrman, offered no opinion that the Accused Products infringe on these asserted claims applying the Court's Claim Construction. ECF No. 362 ¶ 25. Lehrman's Report lists the claims originally asserted and analyzed in his first report on infringement, followed by this redirection: "Based on the current, objected to claim construction, the claims Roland now asserts are identified in paragraph 171." ECF No. 359-9 at ¶ 11. And again, at paragraph 171, Lehrman explicitly lists only those asserted claims for which he has offered an opinion of infringement. *Id*. at ¶ 171.

The only evidence advanced by Plaintiff in support of infringement on these claims is the opinions rendered by Dr. Lehrman before the R&R on Claim Construction, and his opinion does not apply the constructions recommended therein. Plaintiff's Corrected Statement of Material,ECF No. 385 ¶ 100, "address[ed] claims under Roland's proposed claim construction and provides evidence of inMusic's infringement of the asserted claims" applying Roland's proposed construction). At the hearing, Plaintiff's counsel acknowledged that evidence of infringement was not advanced with respect to these claims, but rather, Plaintiff's opposition to summary judgment was dependent upon the Court's rejection of the R&R construing certain terms.[5] The Court has since adopted the recommended term constructions. Because there is no evidence to support Plaintiff's accusation of infringement on these claims as construed, I recommend that summary judgment on non-infringement be entered on the following:

'538 Patent, claims 1, 2, 6, 8-10, 12-15, 29, 31,  32, 35, and 39;
'458 Patent, claims 5, 10-13, and 15-16;

---

[5] "Once 'transducer' and 'cushioning material/cushioning member' are properly construed, inMusic has no valid non-infringement arguments, as explained in Dr. Lehrman's original expert report." ECF No. 363 at 12.

'535 patent, claims 1-5, 7-9, 13-15, and 17;
'857 Patent, claims 1-5, 8, 9, 12-17, 20, 21, 23 and 24; and
'135 Patent, claims 1-6, 8-13, 15-19, 21-26, 28-32, 24 and 35.

ii.   Invalidity

As a defense against claims of infringement, an alleged infringer may argue that the patent he is accused of infringing is invalid and thus never should have been issued by the USPTO to begin with.  As a defense against Plaintiff's allegations of infringement, Defendant asserts an invalidity defense, arguing that the prior art renders Plaintiff's drum head claims[6] invalid as anticipated and/or obvious.  Defendant moves for summary judgment, arguing that its invalidity claim is entitled to judgment as a matter of law and thus defeats Plaintiff's allegations of infringement.

Defendant raises two bases upon which it avers the Drum Head Patents are invalid:  first, that the patents were anticipated; and second, that the patents were obvious.  Though anticipation and obviousness each carry their own independent legal standard, in all meaningful respects the Parties address them simultaneously in their briefing on the matter.  Accordingly, the Court will consider them together here, but first must briefly address the respective law tied to each.

Section 102 of the Patent Act requires that the claimed inventions be a novel one, and thus where those claims are anticipated by prior art, any patent issued is invalid.  For a finding of invalidity on the basis of anticipation, "every element of the claimed invention must be identically shown in a single reference."  *Diversitech Corp. v. Century Steps, Inc*., 850 F.2d 675, 677 (Fed. Cir. 1988) (citing *Hybritech Inc. v. Monoclonal Antibodies, Inc*., 802 F.2d 1367, 1379 (Fed. Cir. 1986), *cert. denied*, 480 U.S. 947 (1987)).  While the prior art reference must disclose every limitation of the claimed invention, it may do so either explicitly or inherently.  *In re Schreiber*,

---

[6] Claims 1-2, 4, and 17 of the '458 Patent, and Claims 19-21 of the '535 Patent.

128 F.3d 1473, 1477 (Fed. Cir. 1997) (citing *Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1047 (Fed. Cir. 1995)).  Even a reference that does not expressly spell out all limitations arranged or combined as in the claim, a reference may nevertheless anticipate a claim  if a person of ordinary skill in the art would "at once envisage" the arrangement or combination.  *See Microsoft Corp. v. Biscotti, Inc.*, 878 F.3d 1052, 1069 (Fed. Cir. 2017) (citation omitted); *Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1346 (Fed. Cir. 2009) ("[E]very element of the claimed invention [must be described], either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation.").  Anticipation is not proven through "multiple, distinct teachings that the artisan might somehow combine to achieve the claimed invention." *Id.* (citations omitted).

Anticipation is a question of fact that considers whether the findings of the PTO are supported by substantial evidence.  *Id.* at 1068 (citing *Busch v. Jones*, 184 U.S. 598, 604 (1902); *Reckendorfer v. Faber*, 92 U.S. 347, 352 (1876); *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1381 (Fed. Cir. 2015)).  The court first construes the claims, and then compares them against the prior art. *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1332 (Fed. Cir. 2010).  Judgment as a matter of law is appropriate when no reasonable juror could dispute the clear text of a prior art reference.  *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1334 (Fed. Cir. 2008).

Under 35 U.S.C. § 103, a claim is obvious and thus invalid "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious." *See also Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966) ("Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art

11

resolved.").  The obviousness requirement "extends the field of unpatentable material beyond that which is known to the public under § 102, to include that which could readily be deduced from publicly available material by a person of ordinary skill in the pertinent field of endeavor."  *Bonito Boats, Inc. v. Thunder Craft Boats, Inc*., 489 U.S. 141, 150 (1989); *see Custom Accessories, Inc. v. Jeffrey-Allan Indus*., 807 F.2d 955, 962 (Fed. Cir. 1986) (explaining that the phrase "person of ordinary skill" is a legal construct applied to as a proxy for a hypothetical person who is placed in the position of being aware of all relevant prior art).

Obviousness is a question of law derived from underlying facts.  *Arctic Cat Inc. v. Bombardier Recreational Products Inc*., 876 F.3d 1350, 1358 (Fed. Cir. 2017); *see also Microsoft Corp*., 564 U.S. at 97 (explaining that certain basic factual inquiries form the background for considering obviousness (internal quotations and citations omitted)).  The Supreme Court in *Graham* set forth the framework for the inquiry, consisting of four questions of fact to be reviewed for substantial evidence:  "(1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the art; and (4) objective considerations of nonobviousness."  *See Arctic Cat Inc.*, 876 F.3d at 1358 (noting that the requirement to consider "[o]bjective indicia of nonobviousness" guards against the potential for hindsight bias" (quoting *Graham*, 383 U.S. at 36) (internal quotations and citations omitted)). Though the *Graham* four-factor test recognized a "need for uniformity and definiteness," the Supreme Court's jurisprudence has since rejected the notion of the test as one rigidly applied, instead favoring an "expansive and flexible approach" in which the court applies its common sense.  *KSR Intern. Co. v. Teleflex Inc*., 550 U.S. 398, 415, 421 (2007) (citations omitted).  This approach invites the court to consider any potentially instructive "secondary considerations," where appropriate.  *Id*.

12

Many years ago, the Court of Customs and Patent Appeals established a test that a challenger demonstrate a teaching, suggestion, or motivation to combine to establish the combination as an obvious one. *Id.* at 418 (citing *Application of Bergel*, 48 C.C.P.A. 1102, 292 F.2d 955, 956–957 (1961)). This test may produce helpful insights because an obvious patent is not simply one composed of several elements independently known in the prior art; after all, most inventions "rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known." *Id.* at 418-419. In considering whether the combination of two known elements according to their established functions rises to the level of innovation as required under patent law, it "can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does." *Id.*

The point of the teaching, suggestion, and motivation test is that it be employed as a tool to determine whether the advancement is the type that would "occur in the ordinary course without real innovation." *Id.* (noting that granting patent protection in such instances "retards progress and may, in the case of patents combining previously known elements, deprive prior inventions of their value or utility"). And in considering whether the prior art leads in the natural course to the technology at issue, the court must not be limited to the assumption that a person of ordinary skill working to solve a problem will incorporate only elements of prior art intended to solve the same problem. *Id.* at 420 (finding that "[c]ommon sense teaches [] that familiar items may have obvious uses beyond their primary purposes . . . [a] person of ordinary skill is also a person of ordinary creativity, not an automaton").

Patent claims are entitled to a presumption of validity that can be rebutted by clear and convincing evidence by the party asserting that the patent is invalid. *Microsoft Corp.*, 564 U.S. at

97 (citing § 282); *see also id.* at 102 (observing a "universal understanding that a preponderance standard of proof was too "dubious" a basis to deem a patent invalid" (citations omitted)).  This burden of proof does not change when a challenger advances references previously considered by the USPTO in granting the patent, but where evidence is advanced that was not previously considered by the USPTO, that evidence may be entitled to more weight.  *Sciele Pharma Inc. v. Lupin Ltd*., 684 F.3d 1253, 1259-61 (Fed. Cir. 2012).

The story of the drum heads, as Defendant tells it, reveals a long line of prior art comprised of heads for drums that would allow air to pass through and impact sound output.  First came U.S. Patent No. 4,282,793 to Muchnick ("Muchnick '793") in August of 1981.  Designed to be an improvement upon the prior material, Mylar, Muchnick '793 utilized woven Kevlar designed to mimic the "microporosity of the best natural drum heads."  The fabric contained "interstitial voids forming air passing micropores in the drum head"; the microporosity or air permeability permitted a truer vibration response as compared to Mylar, which was impervious to air.  Defendant proffers in support the deposition testimony of REMO's designee, the drum fabric company co-founded by Samuel Muchnick, who testified that REMO's Kevlar drum heads were developed prior to July 1996, were made of Kevlar, and permitted air to pass through.  Defendant avers that Muchnick '793 discloses a head that can be used on multiple drum types and was not considered by the USPTO during the prosecution of any of the drum head patents at issue here.

Following Muchnick '793 is U.S. Patent No. 4, 828, 907 to Hayashi ("Hayashi '907") issued in May 1989, which teaches multiple layers of woven fabric for a drum head or diaphragm. Defendant avers that Hayashi '907 too can be applied to a variety of drums.

In 1990 came Japanese publication No. H2-117569 to Ishida ("Ishida '569"), which teaches a drum head with a "net-like" head with either one or two layers that reduce or mute sound.  Ishida

'569 sought to improve the prior act by providing a strike feeling that was similar to that provided by an actual head while still exerting an excellent muting effect and could be attached to a drum cylinder like a standard head would.  The figures accompanying Ishida '569 disclose a drum head with a plurality of longitudinal and transversally arranged fiber sections interwoven, and this drum head was tensioned over the opening of a drum permitting air to pass through.

Because Ishida '569 notes that the invention "may be applied to any other percussion instrument on which a vibration film is stretched" and is "not limited to a snare drum, a tom-tom, a bass drum," Defendant avers that it would have been obvious to a person of skill in the art to combine the Ishida '569 head with an electronic drum.  Defendant cites a number of electronic drums that predate the Drum Patents, including one from Yamaha dating back to the mid-1980s, one from Syndrum dating back to the 1970s, the U.S. Patent No. 4,479,412 to Klynas ("Klynas '412") in 1984, and U.S. Patent No. 5,042,356 to Karch ("Karch '356") in 1991.  Defendant, relying on *In re Singhal*, 602 Fed. Appx. 826, 830-31 (Fed. Cir. 2015), argues that the electronic drums and the Ishida '569 drum head would have "*logically* commended itself to an inventor's attention." (emphasis in original).

In rebuttal, Plaintiff insists that the Drum Head Patents are neither obvious or anticipated by the prior art, noting that the USPTO considered Ishida, Karch, and Hyashi during the prosecution of the '458 and '535 Patents, and again considered Karch and Hyashi during the reexamination of the '135 Patent, ultimately finding patentability of Plaintiff's patent claims over the prior art of record.  Plaintiff avers that the USPTO's prior consideration of Ishida, Karch, and Hyashi weigh against a finding that Defendant cleared the clear and convincing evidentiary threshold applied here.  ECF No. 363 at 15 (citing *Hewlett-Packard Co. v. Bausch & Lomb Inc*., 909 F.2d 1464, 1467 (Fed. Cir. 1990)).

Plaintiff argues that Defendant's argument fails to address each limitation of the claimed invention[7] in effort to identify how each element is shown in any reference; specifically, the asserted claims include the limitation that the net members be supported by a frame. Plaintiff proffers that Ishida '569 indeed does not disclose that the net members are each supported by a frame. Plaintiff further argues that Ishida '569 references only a *single* layer of net-like fabric and that any references to "doubling layers" or a "two-layer structure" are ambiguous and lacking in further explanation. Though Defendant advances evidence of a certified translation of Ishida '569 in which the layers are described as a "two-layer structure," Plaintiff notes that this translation is not of record in the USPTO history.

Plaintiff also disputes Defendant's claim that Ishida '569 teaches to combine its drum head with an electronic drum, noting that it exclusively contemplates its application to acoustic drums and reducing the resonance sounds that acoustic, not electric, drums produce when beaten. '458 Patent Claims 1 and 17, by contrast, require electric drums. Plaintiff avers that Defendant fails to demonstrate how the acoustic drum head of Ishida '569 would be analogous to the aforementioned Syndrum electronic drum or the Klynas electronic synthesizer. As compared to acoustic drums, electronic drums employ electronic sensors, and Ishida '569 does not teach how that sensor might be coupled with a drum head having a net-like fabric while maintaining feel and responsiveness; Plaintiff's Drum Head Patents are innovative, argue Plaintiff, because they are the first to do this. And Plaintiff argues that Ishida '569 teaches *away* from combining with Karch, given that Karch's description of a conversion kit containing foam material—that does not permit air to pass through the drum head—placed inside the drum body to press against the drum head and muffle sound would adversely impact the player's "feel" of the drum head—a problem that Ishida '569 pointedly

---

[7] '458 Patent Claims 1 and 17, and '535 Patent Claim 19.

endeavors to solve.  Karch also describes two transducers attached to the plywood disk beneath the foam dampening pad and teaches no other way to connect the transducers to the drum head.

As to Muchnick '793, Plaintiff argues that like Ishida '569, it does not disclose net members that are supported by a frame and, in only disclosing a head for an acoustic drum designed to be tuned by tensioning the head to produce variations in sound, does not disclose a head for an electronic percussion instrument designed to *dampen* sound.  While Muchnick's resin-impregnated fabric membrane refers to micropores formed when curing the resin, Plaintiff argues that the term micropore refers to pore sizes of 2 nanometers or less, which would be too small to teach or suggest a net-like material.  Further, Plaintiff avers that Defendant fails to demonstrate that the micropores in Muchnick's drum head permit the passage of air and affirmatively argues that the micropores would not be sufficient to reduce percussion sound, offering Dr. Lehrman's opinion in support of the latter point.

Plaintiff lastly argues that the secondary considerations at play here create an issue of material fact that should preclude summary judgment, citing commercial success, recognition, praise, and copying by others, and the fact that Plaintiff's technology addressed a long-felt need in the industry.  ECF No. 363 at 13 (citing *Apple Inc. v. Int'l Trade Com'n*, 725 F.3d 1356, 1365 (Fed. Cir. 2013) (requiring that the court consider secondary considerations in the *Graham* analysis)).  Plaintiff cites in support *Pro-Mold & Tool Co., Inc. v. Great Lakes Plastics, Inc*., 75 F.3d 1568, 1575 (Fed. Cir. 1996), a case contemplating the obviousness of a patent for a card holder in which affidavits from fourteen distributors of sports cards and card holders asserted that the patented card holder was extremely popular with customers.

Defendant has not carried its burden to show that, as a matter of law, the Drum Head Patents are invalid as anticipated.  For an anticipation argument to succeed on summary judgment,

the proponent must demonstrate that there are no issues of material fact as to whether every element of the claim is described in a single reference; meaning a single instance of prior art. This requires a comparison of the instant claim against the prior art, and the comparison here raises certain prefatory factual questions, chief among them in terms of materiality being the nature of Ishida's net-like drum head. The Court has construed the Drum Head Patent claim's reference to "net-like material" and "net member" to mean "an element that is similar in appearance to an open meshed fabric with openings through which air passes sufficient to reduce sound when the element is percussed." ECF No. 439 (adopting ECF No. 252 at 25). The Parties do not dispute that the Ishida teaches a drum head designed to reduce sound and that the Drum Head Patents reference the weaving of first and second net members, but they do dispute as a factual matter whether Ishida teaches a drum head with two layers. Defendant argues that it does, while Plaintiff argues that Ishida describes a *single* layer of net-like fabric and characterizes any references by Ishida to multiple layers as ambiguous and unexplained.

The disagreement here largely arises from dueling translations of Ishida, with Plaintiff's translation of Ishida referencing a net-like head that has a "double structure," while Defendant's translation references a net-like head that has a "two-layer structure." Lehrman, whose opinion Plaintiff proffers in support, relied on Plaintiff's translation to conclude that the phrase "double structure" was ambiguous and lacking in further explanation. Upon being presented with Defendant's certification of Ishida at his deposition and its reference to the "two-layer structure," however, Lehrman testified that if relying on Defendant's translation, he would need to "change" his statement in paragraph five of the report that Ishida does not describe or show in any further detail what was meant by the phrase "double structure." ECF No. 368-5, Lehrman Deposition Excerpts, at 75:20-76:3.

Lehrman neither adopts Defendant's translation, responding instead in the conditional, nor does he elaborate on what is meant by the acknowledgement that *if* relying on that translation he would need to "change" his statement in paragraph five.  Discerning which translation is proper and what exactly Lehrman meant in his response invites this Court to wade into the water of weighing the respective evidence advanced to render a factual determination, an invitation the Court must decline at summary judgment.  Accordingly, there is an issue of disputed material[8] fact as to whether Ishida teaches a drum head with two layers, and this provides a basis for denying summary judgment.

Factual disputes notwithstanding, Defendant does not explain how each element or limitation of Plaintiff's claims can be found in Ishida, nor how each can be found in Muchnick. For example, '458 Patent Claim 17 describes the net members and net like material as being supported by a frame; Defendant addresses neither in its Motion nor in its Reply how Ishida or Muchnick address this element of the claim.

More glaringly, Defendant has not demonstrated how the prior art anticipates the Drum Head Patents without an electronic drum limitation.  In arguing that Ishida does anticipate the claims absent the electronic drum limitation, Defendant focuses entirely on issue of whether Ishida references a multi-layer mesh drum head and fails to explain how a person of ordinary skill in the art could, without undue experimentation, practice the multi-layer mesh drum head with an electronic drum limitation. *See Callaway Golf Co.*, 576 F.3d at 1346.  It is Defendant's charge to make this demonstration to the Court on summary judgment, and it has not done so here.  The failure to address each element of Plaintiff's claim as compared to the prior art and demonstrate

---

[8] To the extent Defendant might argue that this fact is not material, meaning that Ishida would render the Drum Head Patents obvious even if Plaintiff's translation is used, Defendant does not present this argument and travels entirely on the disputed fact that Ishida references a two-layer structure.

that each was contemplated in the prior art cited precludes a finding that Defendant is entitled to judgment as a matter of law that the Drum Head Patents are invalid as anticipated.

Defendant's argument more meaningfully addresses the matter of whether the Drum Head Patents are obvious, which, as described above, is a legal question predicated on underlying facts. Obviousness does not necessarily consider a single prior reference, but rather may examine whether the present claim is obvious based on a combination of two or more items of prior art. Like anticipation, this requires a comparison of the instant claim against the prior art using the factors articulated by the Court in *Graham* and further expounded upon in *KSR*.

Because all disputes over the requisite material facts must necessarily be resolved before the court can render a determination as to the legal questions at issue, the same factual dispute over the net heads in Ishida preclude summary judgment as to obviousness as well. With respect to those claims that reference an electric drum, Defendant's Motion additionally fails to show that the prior art teaches coupling the net head with an electronic sensor, an issue that extends past Ishida and to the prior art of Muchnick and Hyashi.

Defendant takes for granted that attaching a sound-reducing woven drum to an electronic rather than an acoustic drum is obvious and requires no innovation, noting almost in passing that a number of electronic drums existed prior to Plaintiff's and thus it would be only natural to apply the Ishida particular drum head to an electronic drum.  But this mischaracterizes the nature of Plaintiff's Drum Head Patents—because of the inherent differences in acoustic versus electronic sound, Ishida's drum head could not simply be attached without further effort to work with an electronic drum body.  The motivation to develop a drum head that would reduce sound while maintaining a realistic striking sensation for an electronic drum is apparent, and Defendant's argument, in ways both implicit and explicit, invokes the sentiment that this is simply common

sense, but as the Supreme Court explained in *KSR*, while the motivation test may be instructive, it is meant to be but one aspect of a flexible and comprehensive inquiry into whether the claimed patent is innovative.

The Drum Head Patents teach how to couple an electronic sensor to the drum head with net-like fabric while still maintaining the feel and responsiveness in the drum head accomplished by Ishida.  While the Drum Head Patents call for the application of the drum head to an electronic percussion instrument, Ishida had no—and required none, given that it contemplated only acoustic sound—technology that would detect electronic strikes.  Though Defendant argues correctly that Ishida and the Drum Head Patents both seek to reduce sound while maintaining a realistic striking sensation, Defendant ignores the presence of disparities in *how* each seeks to do this.  Defendant has thus not carried its burden on summary judgment—which is heavier still here in rebutting the presumption that the Drum Head Patents are valid—to demonstrate that the prior art renders the Drum Head Patents obvious.

        iii.  <u>Infringement</u>

Defendant moves for summary judgement on Plaintiff's Drum Patent infringement claims on the basis that none of the Accused Products have a "sensor" as that term has been construed by the undersigned in the R&R on Claim Construction.  Plaintiff, on the other hand, urges this Court to find that, as a matter of law, Defendant's Accused Products infringed on '535 Patent Claim 19, and '458 Patent Claim 6.  If Defendant's Motion prevails, it would defeat Plaintiff's Motion on Claim 6 of the '458 Patent. Thus, the Court begins its analysis with Defendant's Motion.

A.  Defendant's Motion for Summary Judgment on Existence of a "Sensor"

The Drum Head Patents describe "an electronic percussion instrumental system which detects percussion as electric signal and generates musical tone based on the electric signal . . .; a

21

means for detecting a position of percussion point for detecting the position of percussion point upon aforesaid head[.]"  ECF No. 252 at 5.  As noted in the R&R on Claim Construction, the five Drum Patents all share a common specification; however, the claim language differs slightly among them. Meaningfully for purposes of this analysis, only four of the five Patents claim "a transducer" as an element of the invention. *See, e.g.,* '135 Patent, Claim 1 ("An electronic percussion instrumental system comprising a housing; a head composed of a flexible material….to define a percussion surface [and] a percussion detector having a cushioning material and <u>a transducer</u> for detecting percussion impact on the percussion surface and producing an electric signal responsive to the percussion impact.").

The term transducer was submitted for claim construction and the Parties sought consistent construction across the four Patents that used it. The Court has construed "transducer" to mean "one device that generates electrical signal in response to vibration." The Court's construction rejects Plaintiff's proposal for a construction capable of using one or more transducers: as explained in the R&R, the common specification in the preferred embodiment explains the way in which the positional detection functions to perceive a wavelength calculated from respective positions on the drum head.  *Id*. at 10.  The explanation assumed one common point from which the percussive strikes are measured, observing that the invention functions in the manner taught only if the transducer is affixed in a single location, and the only location taught is the center.  *Id*. (citing ECF No. 110-13 at ¶ 26 (Decl. of Dr. Kytomaa)).  A particularized location is inconsistent with the use of more than one of the element at any given time, and to add a second transducer would require more modification than taught by the patent in order to be functional.  *Id.* at 10-11. The Court's construction also rejected Defendant's proposed construction for the term transducer ("piezoelectric element in direct contact with the cushioning member/material"), which would

have applied limitations based on the preferred embodiment but not required by the claim itself. *Id*. at 12.

The term "transducer" is not used in the '458 Patent. Rather, the '458 Patent recites "[a]n electronic percussion instrument, comprising: a generally hollow body…; a generally flexible, net-like material…; a <u>sensor</u> supported by said generally hollow body, for providing an electronic signal in response to a percussion impact on the percussion surface of the generally flexible, net-like material." *Id*. at 31-32 (emphasis added) (citing '458 Patent Claim 6; '535 Patent Claim 23). The term "sensor" was also submitted for claim construction, as it is used in these two Patents ('458 and '535). Plaintiff advanced a construction of "a device that is capable of providing an electronic signal in response to percussion." Defendant argued that the term was indefinite: because the common specification identifies two different sensors, a "head sensor" and a "rim shot sensor," Defendant argued the failure to specify which is taught in the asserted claims rendered "sensor" so broad as to be meaningless, or indefinite. The Court rejected the indefiniteness argument in favor of recognizing that the Patent Abstract defines the "percussion detecting means" as a "head sensor," as does the preferred embodiment, and accordingly, adopted a construction defining the term "sensor" as the "<u>head</u> sensor." "Because the asserted Claim specifically teaches that this particular sensor perceives percussion impact to the head, it should not be construed so broadly as to include the rim-shot sensor taught in the preferred embodiment." ECF No. 252 at 34. The R&R further observed that the '535 Patent includes claims that recite both a "head sensor" and a "sensor," and found that "both claims teach that this element provides electric signal in response to a percussion impact on the head material." *Id*.

In adopting this construction, the Court also rejected Defendant's proposal that "sensor" should be further limited to the head sensor depicted in the preferred embodiment, identified by

figure number [14], and described therein as made up of "the cushioning member [80] bonded to the top of the piezoelectric [76]" and "in contact with the second net" of the head. *See* '458 Patent 7:66-8:1.[9] Neither Party objected to the undersigned's analysis of the disputed term "sensor," which the Court has since adopted.

The term "head sensor" was <u>not</u> submitted for claim construction by the Court. Notwithstanding, Defendant's Motion for Summary Judgment is predicated on Defendant's position that none of the Accused Products contains a "head sensor" as that term has been construed by this Court. *See, e.g.*, Reply (ECF No. 375) at 3-4 ("The R&R made clear that the 'head sensor' includes a 'transducer,' as a different limitation."). Defendant's Motion further advances a construction, purportedly made by this Court, of a "head sensor" defined as "a singular part including one transducer and one cushioning member/material." ECF No. 361 at 5. No citation to the R&R follows this assertion, tellingly, but the discussion from the R&R on which Defendant here relies (ECF No. 252 at 8-9) relates to the analysis of the term "transducer," not "sensor." While Defendant would impart more significance to the Court's discussion of the "head sensor" than was there intended,[10] its argument fails to consider that the discussion did not even relate to the Patent claims on which it would now impart that meaning—to reiterate, the analysis of the term "transducer" considered *none* of the claims on which Defendant seeks summary judgment on this basis because none of those claims use that term, but rather, claim a "sensor."

In sum, Defendant's Motion for Summary Judgment on all claims that include the element "sensor" is doomed by its assumption that the Court construed that term to require the inclusion

---

[9] The Patents are filed at ECF No. 107. The '458 Patent is Exhibit 3. The cited language appears on page 29 of 33, using the court's docketed pagination.

[10] It also bears noting that the cited discussion summarizes *Defendant's* contention and does not even memorialize any finding by this Court. ECF No. 252 at 8 ("Defendant contends that the Patent teaches a single head sensor, of which the transducer is a component.").

24

of a cushioning member/material and a single transducer.  It did not.  Nor is Defendant's Motion saved by the deposition testimony of Dr. Lehrman, who agreed that "the accused products do not meet the head sensor limitation when applying" the Court's claim construction;[11] as noted, the Court *did not* construe that term, rendering Dr. Lehrman's answer ambiguous at best.  As the moving Party, Defendant is not entitled to a favorable inference that his answer effectively negated his affirmative opinion: that the accused products *do* identify the sensor element, as further discussed below.

Because Defendant's argument is predicated on a construction not adopted by this Court, I recommend that Defendant's Motion for Summary Judgment on non-infringement on Claims 6-7, 9 of the '458 Patent and Claim 23 of the '535 Patent be denied.

B.  Plaintiff's Motion for Summary Judgment on '458 Patent Claim 6

Plaintiff avers that it has carried its burden to show that there is no genuine issue of disputed material fact as it pertains to '458 Patent Claim 6 and is thus entitled to summary judgment on infringement.  Plaintiff advances evidence of, and Defendant does not dispute, certain elements of Plaintiff's infringement claim; for example, ownership over the patent, and the fact that Defendant sold the Accused Products.  Defendant, however, avers that Plaintiff has not carried its burden to prove that the Accused Products meet each and every limitation of the '458 Patent Claim 6.  The elements in dispute are whether the Accused Products meet (1) the "generally hollow body" limitation, and (2) the "sensor" limitation.

As to the "generally hollow body" limitation, Defendant points to the image proffered by Plaintiff of the Accused Products, in which Plaintiff ostensibly identifies the generally hollow body element as part 110 of the Accused Product:

---

[11] ECF No. 362-5, Lehrman Deposition Excerpts, at 47:19-48-5.



Pictured: 8" Mesh Kick Pad from DM10 MKII Studio Kit disassembled

ECF No. 365 at 11.  Defendant avers, citing Dr. Kytomaa's opinion in support, that the part on the right is plainly not "generally hollow." *Id.* (citing SAF, ¶¶ 83-84).  Plaintiff effectively characterizes Defendant's argument as myopic, arguing that the image depicts a *disassembled* singe-zone drum product meant to show the interior elements of the product, noting that the body interior indisputably reflects a hollow body; when the elements are combined (as they are in the Accused Product as sold by Defendant), Plaintiff avers that element 110 depicts a "generally hollow body" and thus meets the limitation of Claim 6.  ECF No. 373 at 4 (proffering in support Dr. Kytomaa's own acknowledgement that part 110 has a generally hollow cylinder).

Defendant has not raised a triable issue of fact as to whether the Accused Products meet the "generally hollow body" limitation.  Though infringement is a question of fact, it is undisputed that part 110a is a hollow cylinder; even Dr. Kytomaa acknowledges this in his deposition testimony. Thus, when the 110 parts are assembled, the body—meaning the cylinder—is generally hollow.  Defendant has not advanced argument or evidence that the Court should consider these parts in isolation when disassembled and thus fails to raise an issue of fact for the jury on this point.

With respect to the "sensor" element, Plaintiff advances evidence that it has identified "a sensor (350) supported by said generally hollow body (110), for providing an electronic signal (510) in response to a percussion impact on the percussion surface (230) of the generally flexible, net-like material (220)." ECF No. 358 at 12. Plaintiff supports this statement with citation to its expert's supplemental report, ECF No. 359-11, and offers the following illustration:



Pictured: Sensor on 8" Mesh Kick Pad from DM10 MKII Studio Kit



Pictured: Testing sensor response on 8" Mesh Kick Pad from DM10 MKII Studio Kit

ECF No. 358 at 18.

Defendant disputes, however, that the evidence cited supports Plaintiff's identification of a "sensor," labeled above as (350). Defendant notes that the images above, drawn from Plaintiff's Motion for Summary Judgment, do not exactly match those presented in Dr. Lehrman's opinion. The difference is in certain labels added by counsel and represented in green text. Critically, it is counsel, not its expert, that has identified and labeled part 350 as the "sensor."

As Defendant notes, the portion of Lehrman's supplemental report cited in support of Plaintiff's Motion fails to identify an element (350) but rather identifies the sensor as (330, 330a, and 330b):

| 6.3 | a sensor supported by said generally hollow body, for providing an electronic signal in response to a percussion impact on the percussion surface of the generally flexible, net-like material. | Each of the '458 accused products comprises a sensor (**330**, **330a**, **330b**) supported by said generally hollow body (**110**), for providing an electronic signal (**510**) in response to a percussion impact on the percussion surface (**230**) of the generally flexible, net-like material (**220**). |

ECF No. 359-11 at 5.  Dr. Lehrman then including the following image with labeled elements:



ECF No. 359-39 at 3.  Dr. Lehrman then elsewhere in his report refers to the "transducer/sensor" as part 330.  *Id*. at 9.

Plaintiff attempts to explain the inconsistency by arguing that part 350 and part 330 are "each a head sensor," noting that part 330 is subsumed within the 350 reference tag.  ECF No. 373 at 8.  Plaintiff argues that there is "no true confusion" as to whether the Accused Products have "a sensor (i.e., a head sensor). They do, and it is shown at 350, and, more specifically, at the transducer 330 within the circle shown at 350." *Id*. Roland's argument assumes that the elements "transducer" and "sensor" are synonymous and depends on a consistent construction of those terms. Indeed, Dr. Lehrman's supplemental report reveals that he applied, in his infringement analysis, Roland's proposed construction for the term "sensor:" "a device that is capable of providing an electronic signal in response to percussion." Lehrman Supplemental Report, page 41 of 66 (ECF No. 359-11). This is not the construction the Court has adopted, and Dr. Lehrman acknowledged that he

28

did not apply the Court's construction in his infringement analysis. *Id.* at ¶ 144. As noted above, Dr. Lehrman's testimony suggests that applying the Court's construction, the Accused Products do not infringe. Suffice to say, differing potential inferences may be drawn from the evidence Plaintiff advances in support of its Motion, and as movant, Plaintiff is not entitled to such inferences being drawn in its favor. Accordingly, Plaintiff has failed to carry its burden and demonstrate the absence of material dispute on its entitlement to summary judgment on Claim 6 of the '458 Patent.

C.  Plaintiff's Motion for Summary Judgment on '535 Patent Claim 19

Plaintiff additionally argues that it is entitled to summary judgment on the matter of whether Defendant infringed upon '535 Patent Claim 19. Plaintiff advances certain undisputed elements of its infringement claim; for example, Plaintiff's ownership, the fact that Defendant sold and/or imported the products, and the fact that the Accused Products meet the preamble for Claim 19, which describes "[a] head for a percussion instrument, the head comprising." ECF No. 358 at 8. The Parties contest, however, whether an issue of disputed material fact exists as to whether the Accused Product meets the limitation of Claim 19 that the product is comprised of a "frame (250) and a net-like material (220) comprising first and second (multiple) net members (220a, 220b), each supported by said frame (250), said net-like material (220) having openings through which air may pass (the net-like material 220 includes small openings therethrough)," as identified in the following image:



**Pictured: Mesh head representative of mesh heads on all
Accused Drum Products (Lehrman Rep. Ex. KK)**

ECF No. 358 at 13-14 (citing Lehrman Ex. 3 at 19.1 (EX. 10); Ex. G at 3.5, 3.6 (EX. 20)). The

Court has construed the term "net-like material" to be "an element that is similar in appearance to

an open meshed fabric with openings through which air passes sufficient to reduce sound when

the element is percussed." ECF No. 252 at 25.

Plaintiff argues that Defendant has effectively conceded that the Accused Products meet

the net-like material limitation, citing the testimony of David Gill, Defendant's representative, and

Dr. Kytomaa. ECF No. 358 at 14 (citing Gill Tr. 92:21-93:6; 92:5-11 (EX. 55); Kytomaa Tr.

123:19-23; 106:2-16 (EX. 56)).  Defendant retorts that the testimony of these witnesses does not

support the proposition for which it is proffered by Plaintiff. ECF No. 365 at 21 (citing its

Opposition to Plaintiff's Statement of Material Facts, ¶¶ 22-26).

The excerpt of Mr. Gill's testimony cited by Plaintiff implicitly asks the Court to infer that

Mr. Gill has been asked to hold up the drum head material from the Accused Products and (1) is

asked to state whether he can feel air moving through material (he confirms that he does); (2) that

the material is flexible (he confirms that it is "very flexible now that it's cut"; (3) states that

Defendant refers to the material as "mesh"; and (4) confirms that the mesh has openings throughout the material.  ECF No. 359-55 at 92:5-11;92:21-93:6.

The first cited excerpt from Dr. Kytomaa's testimony asks if Dr. Kytomaa recalls a prior discussion of part 230 in which Dr. Kytomaa and Plaintiff's counsel "discussed that it has holes and it allows air to pass," to which Dr. Kytomaa responds in the affirmative.  ECF No. 359-56 at 123:19-23. In the second cited excerpt, Dr. Kytomaa confirms that the tension of the mesh material on the Accused Products can be adjusted. *Id*. at 106:2-16.

To conclude that the cited testimony from Mr. Gill and Dr. Kytomaa rises to the level of a concession requires inferences not plain from the face of the statements made. Neither witness states or even confirms that the Accused Products meet the limitation of Claim 19, and it is not the proper position for the Court sitting in summary judgment to weigh the evidence and render a factual determination, which is ultimately what Plaintiff seeks here, and I do not find that *no* reasonable fact finder could interpret this testimony in a different manner than the one put forth by Plaintiff.  In moving for summary judgment, Plaintiff carries the burden to demonstrate that there is no issue of material fact in dispute, and it has not done so here.

### b.  The Cymbal Patents

Plaintiff moves for summary judgment on infringement with respect to the '989 Patent, Claim 1; and the '885 Patent, Claim 30.[12]  Defendant cross-moves for summary judgment on the Cymbal Patents, arguing that it is entitled to judgment as a matter of law that the Accused Products to not infringe upon the '989 Patent, Claims 1-3, or the '885 Patent, Claims 43-47.

---

[12] As was the case regarding the Drum Patents, Plaintiff's Motion purports to move for summary judgment on infringement of all asserted claims, but only analyzes (and advances evidence) with respect to these two asserted claims.

i.   Plaintiff's Motion—Pivotal Movement

Plaintiff moves for summary judgment as to the '989 Patent, Claim 1, arguing that the Parties do not dispute that the Accused Products meet the preamble of the claim, which describes "an electronic pad receiving a strike, detecting the strike and outputting a signal representative of the strike comprising." ECF No. 358 at 9. Plaintiff further argues that, as supported by the opinion of Dr. Lehrman, the Accused Products meet the limitations of the Claim, in that they contain:  (1) a first frame; (2) a striking sensor detecting the strike transmitted to said first frame; (3) a second frame supporting said first frame from below, having an attachment hole with a pivotal joint; and (4) a rotation stopper member coupled to the second frame for preventing said first frame from circumferentially rotating about a pole of a stand, said pole being inserted into said attachment hole, said attachment hole located in said rotation stopper member, said pivotal joint being rockably fitted into said rotation stopper member with resulting play. *Id.*

Plaintiff argues the same holds true as to the '885 Patent, Claim 30, which has comparable frame, striking sensor, rotation stopper, and pivotal movement limitations. *Id.* at 4.  Here too supported by the opinion of Dr. Lehrman, Plaintiff avers that the Accused Products meet each one of the limitations referenced in the Patent.

In its Response to Plaintiff's Motion, Defendant raises a series of element-by-element challenges, first to the claim that the Accused Products meet the striking sensor limitation, as well as the second frame, attachment hole with a pivotal joint, and said attachment hole located in said rotation stopper member limitations.  ECF No. 365 at 15, 20.  Defendant additionally urges the Court to find that Plaintiff waived its argument as to the '989 Patent entirely, citing what it characterizes as a lack of clarity in Plaintiff's analysis as to which cymbals are accused of direct infringement '989 Patent, Claim 1 versus which are accused to contributorily infringe.  *Id.* at 19.

The most meaningful of these challenges is Defendant's argument that the Accused Products do not meet the pivotal limitation referenced in both the '989 and '855 Patent.  In support, Defendant proffers Dr. Kytomaa's opinion for the proposition that the identified structures on the accused product do not provide for pivotal movement.  *Id.* at 20.  Dr. Kytomaa opines that the part identifies as attachment hole 140 of the Accused Products has no pivotal joint, and the structures of the Accused Products in fact provide for orbital rather than pivotal movement.  ECF No. 359-60, Kytomaa Rebuttal Opinion, at ¶¶ 146-153.   Dr. Kytomaa references the following representative figure in his rebuttal in opining on the '885 Patent, which Defendant avers contains a pivotal motion limitation akin to the pivotal joint limitation present in the '989 Patent:



ECF No. 359-60, at 50 (¶ 146). Dr. Kytomaa explains that part 270 is a dome-shaped flexible rubber piece that permits the cymbal to rock in any direction—meaning that it is orbital rather than pivotal—like an acoustic cymbal would. *Id*. at ¶ 151 (adding that, similarly, parts 160 and 160b, still permit some degree of orbital rotation about the cymbal while preventing gross rotation of the cymbal about the stand). *Id*. During his deposition, Dr. Kytomaa further elaborated on the nature of the movement permitted, noting that the orbital joint permits the cymbal three principal axes of rotation. ECF No. 359-56 at 115:17-116:5 (explaining the three degrees as a pitching movement (nose up/down), a rolling movement (left and right, up or down), and a yawing movement (which is a circumferential rotation, or rotation about an axis)). As Dr. Kytomaa opines in his report, a person of ordinary skill in the art would understood pivotal movement to mean "the generally one-dimensional rocking of the cymbal that would occur during a strike to the cymbal. ECF No. 359-60 at ¶ 150. Based on these facts, Dr. Kytomaa concluded that the Accused Products do not meet the pivotal limitation.

Plaintiff suggests that Defendant's use of the term orbital rather than pivotal makes a distinction without a difference, averring that Dr. Kytomaa's failure to distinguish the term orbital from the term pivotal renders his argument baseless. ECF No. 373 at 11. Plaintiff also avers that Defendant's argument here is undercut by the testimony of Mr. Gill, who explained the relationship between parts 160a and 160b as a "unipivot," meaning that it pivots in all directions. ECF No. 359-55 at 123:10-25.

Defendant, through the opinion and testimony of Dr. Kytomaa, raises a factual challenge to the claim that the Accused Products provide for pivotal movement, opining instead that as a factual matter, the Accused Products provide for *orbital* movement. Plaintiff critiques Dr. Kytomaa, but this is argument more properly presented to the factfinder in urging them to give Dr.

Kytomaa's opinion less weight and is not a basis for the Court to take this matter away from the jury. Mr. Gill's testimony likewise is not a basis for the Court to conclude no material issue of disputed fact exists on the pivotal movement issue. The jury may credit Kytomaa's opinion that a person of ordinary skill in the art would not recognize the movement capability of the accused products as "pivitol."[13]

To reach the conclusion Plaintiff urges, the Court would necessarily need to weigh the facts presented, which is not appropriate on summary judgment; Defendant has placed Dr. Kytomaa's opinion and testimony on the scale, and finding that it weighs more than a scintilla, Defendant has raised a disputed issue of material fact sufficient to preclude summary judgment as to Plaintiff's claims of infringement on '989 Patent, Claim 1, and '885 Patent, Claim 30.

ii. <u>Defendant's Motion</u>

1. *'989 Patent, Attachment Hole Limitation*

The undersigned explained in the R&R on Claim Construction that the specification of the Cymbal Patents "touts the benefit of the rotation stopper member, which prevents rotation" of the cymbal around the stand to "limit[] the range of the striking surface[.]" ECF No. 252 at 38. Defendant avers in its Motion for Summary Judgment that Plaintiff's infringement argument fails as to Claim 1 of the '989 Patent because Plaintiff has not identified any element of the Accused Products that meets the limitation of an "attachment hole located in said rotation stopper member." ECF No. 361 at 20 (citing ECF No. 1-7 at 20 ('989 Patent, Claim 1)). Defendant argues that the element identified by Plaintiff's expert as meeting this limitation is not located *in* the rotation stopper member but rather is located in a separate structure, labeled the support structure; because Plaintiff's patent teaches an attachment hole in the rotation stopper, Defendant contends its

---

[13] This was not a disputed term submitted for claim construction.

accused product does not infringe. *Id.* at 21-22 (proffering annotated images of the Accused Products in support).

Plaintiff avers that Defendant's argument depends on a misconstruction of the claim language, which requires the attachment hole to be part of the "second frame," which is in turn then coupled to the rotation stopper. ECF No. 363 at 21. Plaintiff proffers in support the claim language itself, which describes the second frame limitation as follows:

> a second frame supporting said first frame from below, having an attachment hole with a pivotal joint; and a rotation stopper member coupled to the second frame for preventing said first frame from circumferentially rotating about a pole of a stand, said pole being inserted into said attachment hole, said attachment hole located in said rotation stopper member, said pivotal joint being rockably fitted into said rotation stopper member with resulting play.

*Id.* The attachment hole, then, is indeed part of the second frame, and on this much the Parties agree. But as Plaintiff goes on to explain, the rotation stopper member limitation requires the coupling of the second frame—and its attachment hole—to the rotation stopper, and when coupled, the attachment hole is positioned within the rotation stopper as described in the limitation. Plaintiff avers that Dr. Lehrman opines on this structural relationship and offers the following image as further explanation:



*Id.* Plaintiff avers that the "attachment hole" identified as part 140 above meets the requirements of both the second frame and rotation stopper limitations. *Id.* at 22 (citing *Retractable Techs. v. Becton, Dickinson & Co.*, 653 F.3d 1296 (Fed. Cir. 2011), for the proposition that the Federal Circuit permits a single structure in an accused product to meet the requirements of more than one claim limitation).

The question is whether the coupling of the rotation stopper to the second frame falls within the ambit of the limitation requiring the attachment hole to be "located in" the rotation stopper. This is a matter of claim construction—Defendant argues that a more stringent definition should apply to the term "located in" while Plaintiff argues for a more expansive one. The Parties did not, however, submit this matter to the Court during Claim Construction; the only term construed was "rotation stopper:" "one or more elements that prevent rotation." ECF No. 252 at 41. In adopting Plaintiff's proposed construction of this term, the Court expressly rejected Defendant's proposed construction that would limit the element to a single structure. Plaintiff having advanced

evidence that supports its identification of the attachment hole element, Defendant has failed to show entitlement to summary judgment on this claim.

*2.   '885 Patent*

Defendant moves for summary judgment on the '885 Patent, Claims 43-47. Defendant avers that Claim 43 is the independent claim from which Claims 44-47 flow and argues that if the claim of infringement as to Claim 43 falls, the others necessarily fall with it.  ECF No. 361 at 23. Claim 43 recites "[a] process for mounting an electronic pad on a stand," and it includes the limitation of "coupling a rotation stopper to the frame, for inhibiting rotation of the frame relative to the stand, when the frame is mounted on the stand for pivotal motion." *Id.* at 22-23.

Defendant argues that Plaintiff's claim of infringement should fail here because it cannot identify any evidence that a "single actor" (meaning either Defendant or its users) perform the limitation of coupling the rotation stopper to the frame as is required.  *Id*. at 23 (citing *Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1359 (Fed. Cir. 2007)).  Plaintiff argues in response that it *has* so demonstrated, proffering in support the same figure Defendant advances in its Motion:



**Exhibit I**
**Command Kit (Electronic Cymbal)**

ECF No. 363 at 16 (citing ECF No. 361 at 22).  The figure, which reflects cymbals sold by Defendant, depicts the rotation stopper element 160a coupled to the frame 110.  *Id*. Plaintiff further argues that Dr. Kytomaa acknowledged in his deposition testimony that Defendant provides instructions that direct customers how to assemble kits with cymbals.  *Id*. at 23 (citing ECF No. 359-56, Dr. Kytomaa Deposition Transcript, at 135:19-137:8 (stating that "the user or somebody at the user's direction has to assemble the drum kits and place cymbals on stands and drums on various supporting structures")).  Plaintiff additionally proffers an image from Defendant's Assembly Guide, which it argues reflects coupling the rotation stopper to the frame.  *Id*.

In Reply, Defendant rejects the notion that Dr. Kytomaa so opined, arguing instead that he affirmatively stated that neither Defendant nor its customers couple element 160a to 110. Reply at 10 (citing Rebuttal Expert Report of Harri Kytomaa, ECF No. 362-18 at 17, Section 43.5). Defendant further argues that the image proffered by Plaintiff and depicted above may show the

parts connected but does not demonstrate whether Defendant itself or its users perform the step of coupling the rotation stopper to the frame. *Id.* Defendant urges the Court, in an argument relegated to a footnote, to exclude the Assembly Guide from consideration on the basis that the Guide could not be reduced to an admissible form. *Id.* at 10 n.27.

Rule 56(c), in relevant part here, requires a party to cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. Pro. 56(c)(1)(A). As a practical matter, if the evidence offered is not itself admissible, it must be able to be "reduced to an admissible form." *Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005).

Defendant does not provide a sufficient basis for the Court to conclude that the Assembly Guide cannot be reduced to an admissible form. And the Court need not at the summary judgment phase reject evidence that has not been strictly demonstrated by the proffering party to be admissible. Accordingly, because Plaintiff has advanced evidence that would tend to prove a single actor connects parts 160a and 100, and I recommend that Defendant's Motion for Summary Judgment as to the '885 Patent be denied.

### c.  The Displacement Sensor Patent

Defendant moves for summary judgment as to the '626 Patent for the Displacement Sensor. ECF No. 361 at 24. Defendant avers that Dr. Lehrman's Supplemental Report concedes that when applying the terms as construed by the Court, none of the Accused Products infringe on any of the asserted claims of the '626 Patent. Plaintiff avers in response that is has not conceded noninfringement, but this argument proceeds only on the condition that the District Court reject the undersigned's construction of the terms "spring" and "contained within a frame." ECF No.

363 at 23-24.  No other opposition is advanced by Plaintiff. The Court having adopted the undersigned's recommendation on these terms, and without evidence advanced by Plaintiff that the Accused Products infringe, I recommend that Defendant's Motion be GRANTED on non-infringement of the '626 Patent.

## IV.    CONCLUSION

For the foregoing reasons, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment be **DENIED**, and Defendant's Motion for Summary Judgment be **GRANTED, in part**, and **DENIED, in part**.

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Federico A. Moreno, United States District Court Judge for the Southern District of Florida, within **FOURTEEN (14) DAYS** of being served with a copy of this Report and Recommendation. Failure to timely file objections will bar a *de novo* determination by the District Judge of anything in this recommendation and shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1 (2016); 28 U.S.C. § 636(b)(1)(C); *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191-92 (11th Cir. 2020).

**RESPECTFULLY SUBMITTED** in Chambers in Miami, Florida, this 11th day of February, 2022.

_____

LAUREN F. LOUIS
**UNITED STATES MAGISTRATE JUDGE**