**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**Case No.: 1:17-cv-22405-MORENO/LOUIS**

ROLAND CORPORATION, a Japanese
corporation,

                  Plaintiff,

v.

INMUSIC BRANDS, INC., a Florida
Corporation,

                  Defendant.

**<u>DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE
ALTERNATIVE, FOR A NEW TRIAL ON DAMAGES OR REMITTITUR</u>**

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 1

A.    Legal Standard. ..................................................................................................... 1

B.    The Court Should Grant JMOL of No Damages Because the Jury Did Not Have
Sufficient Evidence to Award Roland Damages. ................................................. 2

      1.    Roland Presented Insufficient Evidence to Support the Lost Profits Award. ......... 4

           a.    Roland Cannot Recover Roland U.S.'s Alleged Lost Profits ...................... 4

           b.    Ms. Heinemann Did Not Perform a Proper *Panduit* Analysis ...................... 8

      2.    No Reasonable Jury Could Award Reasonable Royalties on the Drums. ............ 11

      3.    Roland Did Not Present Sufficient Evidence to Support Royalties on the
Cymbals. ................................................................................................................. 16

C.    The Court Should Grant a New Trial on Damages. ............................................. 18

      1.    The Damages Awarded by the Jury Are Excessive. ............................................. 18

      2.    The Court Erred in Admitting Testimony From Ms. Heinemann. ....................... 19

      3.    The Court's *Sua Sponte* Acceleration of the Damages Trial Was Unfair............. 20

CONCLUSION ................................................................................................................... 21

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AOS Holding Co. v. Bradford White Corp.*
   C.A. No. 18-412-LPS, 2021 WL 5411103 (D. Del. Mar. 31, 2021) ........................................ 2

*Apple Inc. v. Wi-LAN Inc.*
   25 F.4th 960 (Fed. Cir. 2022) ................................................................................................ 11

*Apple, Inc. v. Motorola, Inc.*
   757 F.3d 1286 (Fed. Cir. 2014) (overruled in part on other grounds) ....................................... 2

*BIC Leisure Prods., Inc. v. Windsurfing Int'l*
   1 F.3d 1214 (Fed. Cir. 1993) ................................................................................................. 8

*Chiron Corp. v. Genentech, Inc.*
   363 F.3d 1247 (Fed. Cir. 2004) ............................................................................................. 2

*Collins v. Marriott Int'l, Inc.*
   749 F.3d 951 (11th Cir. 2014) ................................................................................................ 1

*Daubert v. Merrell Dow Pharm., Inc.*
   509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)......................................................... 19

*ePlus, Inc. v. Lawson Software*
   764 F. Supp. 2d 807 (E.D. Va. 2011), *aff'd*, 700 F.3d 509 (Fed. Cir. 2012) ............... 13, 14, 17

*Ericsson, Inc. v. D–Link Sys., Inc.*
   773 F.3d 1201 (Fed. Cir. 2014) ............................................................................................. 11

*Exmark Manu. Co. v. Briggs & Stratton*
   879 F.3d 1332 (Fed. Cir. 2018) ............................................................................................. 11

*Ferguson Beauregard/Logic Controls, Div. of Dover Res., Inc. v. Mega Sys., LLC*
   350 F.3d 1327 (Fed. Cir. 2003) ............................................................................................. 4

*Fiscars, Inc. v. Hunt Mfg. Co.*
   279 F.3d 1378 (Fed. Cir. 2002) ............................................................................................. 20

*Georgia-Pacific Corp. v. United States Plywood Corp.*
   318 F. Supp. 1116 (S.D.N.Y. 1970) ....................................................................................... 3

*Grain Processing Corp. v. Am. Maize-Prods. Co.*
   185 F.3d 1341 (Fed. Cir. 1999) ............................................................................................. 4

*Halo Elec., Inc. v. Pulse Elec., Inc.*
579 U.S. 93 (2016) ................................................................................................................ 7

*Johansen v. Combustion Eng'g, Inc.*
170 F.3d 1320 (11th Cir. 1989) ........................................................................................... 2

*LaserDynamics, Inc. v. Quanta Comput., Inc.*
694 F.3d 51 (Fed. Cir. 2012) ..................................................................................... 11, 13

*Lucent Technologies, Inc. v. Gateway, Inc.*
580 F.3d 1301 (Fed. Cir. 2009) ................................................................................. 14, 16

*M2M Solutions LLC v. Enfora, Inc.*
167 F. Supp. 3d 665 (D. Del. Mar. 9, 2016) ..................................................................... 13

*Mars, Inc. v. Coin Acceptors, Inc.*
527 F.3d 1359 (Fed. Cir. 2008) ...................................................................................... 5, 7

*Mars, Inc. v. Trurx, LLC*
No. 6:13-cv-526-RWS-KNM, 2016 U.S. Dist. LEXIS 121501, at *8 (E.D. Tex. Mar. 14, 2016) ...................................................................................................................................... 5

*McGinnis v. Am. Home Mortg. Servicing, Inc.*
817 F.3d 1241 (11th Cir. 2016) ........................................................................................... 2

*Mentor Graphics Corp. v. EVE-USA, Inc.*
851 F.3d 1275 (Fed. Cir. 2017) ...................................................................................... 4, 8

*Omega Patents, LLC v. Calamp Corp.*
13 F.4th 1361 (Fed. Cir. 2021) ................................................................................... passim

*Polaris Indus., Inc. v. Arctic Cat Inc.*
CV 15-4129 (JRT/TNL), 2019 WL 1118518, at *8 (D. Minn. Mar. 11, 2019) ...................... 5

*Poly-America, L.P. v. GSE Lining Tech., Inc.*
383 F.3d 1303 (Fed. Cir. 2004) ...................................................................................... 5, 7

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*
711 F.3d 1348 (Fed. Cir. 2013) .................................................................................... 7, 16

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*
875 F.3d 1369 (Fed. Cir. 2017) ......................................................................................... 10

*ResQNet.Com, Inc. v. Lansa, Inc.*
594 F.3d 860 (Fed. Cir. 2010) ................................................................................... passim

*SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*
926 F.2d 1161 (Fed. Cir. 1991) ............................................................................... 2, 8, 10

*Spine Sol., Inc. v. Medtronic Samofar Danek USA, Inc.*
620 F.3d 1305 (Fed. Cir. 2010) ........................................................................ 7

*TecSec, Inc. v. Adobe Inc.*
978 F.3d 1278 (Fed. Cir. 2020) ..................................................................... 1, 2

*Uniloc USA, Inc. v. Microsoft Corp.*
632 F.3d 1292 (Fed. Cir. 2011) ................................................................... 3, 18

*Unisplay, S.A. v. American Elec. Sign Co.*
69 F.3d 512 (Fed. Cir. 1995) ........................................................................ 10

*Warsaw Orthopedic, Inc. v. NuVasive, Inc.*
778 F.3d 1365 (Fed. Cir. 2015) ....................................................................... 4

*Wechsler v. Macke Int'l Trade, Inc.*
486 F.3d 1286 (Fed. Cir. 2007) .................................................................. 8, 19

*Whitserve, LLC v. Computer Packages, Inc.*
694 F.3d 10 (Fed. Cir. 2012) ........................................................................ 15

*Wi-Lan Inc. v. Sharp Elec. Corp.*
992 F.3d 1366 (Fed. Cir. 2021) ....................................................................... 7

*Williams v. First Advantage LNS Screening Sols. Inc.*
947 F.3d 735 (11th Cir. 2020) ........................................................................ 1

*Williamson v. Citrix Online, LLC*
792 F.3d 1339 (Fed. Cir. 2015) ....................................................................... 2

*Wordtech Sys., Inc. v. Integrated Network Sols., Inc.*
609 F.3d 1308 (Fed. Cir. 2010) ................................................................. 13, 19

iv

Pursuant to Fed. R. Civ. P. 50(b), Defendant inMusic Brands, Inc. ("inMusic") renews its motion for judgment as a matter of law ("JMOL") that Plaintiff Roland Corporation ("Roland") did not present legally sufficient evidence to allow a reasonable jury to conclude that Roland is entitled to any damages, much less the $4.6 million the jury awarded.  In the alternative, inMusic moves for a new trial or remittitur pursuant to Fed. R. Civ. P. 59 because the damages verdict is contrary to the clear weight of the evidence and based on evidence that should have been excluded under Fed. R. Evid. 702 and *Daubert*.

## INTRODUCTION

In patent cases, "proof of damages" must be "carefully tie[d]" "to the claimed invention's footprint in the market place."  *ResQNet.Com, Inc. v. Lansa, Inc*., 594 F.3d 860, 869 (Fed. Cir. 2010).  Although the Patent Act provides for damages upon a finding of infringement no less than a reasonable royalty, "[t]he statute does not require an award of damages if none are proven that adequately tie a dollar amount to the infringing acts."  *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1291 (Fed. Cir. 2020).  Here, the jury's $4.6 million award is excessive and cannot stand because it is not tied to Roland's lost profits or comparable licenses, nor is it supported by competent fact evidence, expert testimony, or analysis.

## ARGUMENT

### A.    Legal Standard.

A party is entitled to judgment as a matter of law if, after the non-movant has been fully heard, a reasonable jury would not have a legally sufficient evidentiary basis to find for the non-movant.  *Collins v. Marriott Int'l, Inc.*, 749 F.3d 951, 957 (11th Cir. 2014).  The Court must view the evidence and draw all fair inferences in the light most favorable to the non-movant. *Williams v. First Advantage LNS Screening Sols. Inc.*, 947 F.3d 735, 744 (11th Cir. 2020).

The Court may grant a new trial where "the verdict is against the weight of the

evidence, [] the damages are excessive, or [], for other reasons, the trial was not fair to the party moving." *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016); *Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1258 (Fed. Cir. 2004). "A federal court's power to 'order' a remittitur grew out of this authority to grant a new trial. A court which believes the jury's verdict is excessive may order a new trial unless the plaintiff agrees to remit a portion of the jury's award." *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1328 (11th Cir. 1989). The choice between a new trial and remittitur lies with the plaintiff; if the plaintiff does not consent to the remittitur, the court's only alternative is to order a new trial. *See id*. at 1329.

**B.     The Court Should Grant JMOL of No Damages Because the Jury Did Not Have Sufficient Evidence to Award Roland Damages.**

A patentee must prove the amount of its damages by a preponderance of the evidence. *SmithKline Diagnostics, Inc. v. Helena Lab. Corp.,* 926 F.2d 1161, 1164 (Fed. Cir. 1991). Although the Patent Act provides for damages upon a finding of infringement of no less than a reasonable royalty, "[t]he statute does not require an award of damages if none are proven that adequately tie a dollar amount to the infringing acts." *TecSec, Inc.*, 978 F.3d at 1291. Simply put, 28 U.S.C. § 284 does not absolve a patentee of its obligation to meet its burden of proof; where, as here, the patentee fails to do so, nominal damages are the proper award. *AOS Holding Co. v. Bradford White Corp.*, C.A. No. 18-412-LPS, 2021 WL 5411103 (D. Del. Mar. 31, 2021) (citing *Apple, Inc. v. Motorola, Inc*., 757 F.3d 1286, 1328 (Fed. Cir. 2014), overruled in part on other grounds by *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) ("[T]he fact finder must still determine what constitutes a reasonable royalty from the record evidence. Certainly, if the patentee's proof is weak, the court is free to award a low, perhaps nominal, royalty, as long as that royalty is supported by the record.")).

In its rushed, scattered damages presentation, Roland presented insufficient evidence for a reasonable jury to determine damages beyond a non-speculative or nominal amount.[1]  Roland's expert (Suzanne Heinemann) testified before its "key" damages fact witness, which renders her lost profits opinion insufficient and unreliable.  Compounding the issue, Ms. Heinemann never provided a competent, reasoned analysis for a lost profits award: she never identified the specific accused drum kits ostensibly subject to the lost profits calculations, she never identified the Roland "substitute" kits for the analysis, and she ignored the realities of competitive non-mesh products from Roland's documents and trial testimony and internal Roland documents identifying the sound module as the key driver of customer demand (not mesh).  Without a factual predicate or proper analysis, there was no basis for the jury to award Roland lost profits even assuming the inexorable flow doctrine applied which, as discussed *infra*, it does not.

Roland also failed to present sufficient evidence to support the jury's reasonable royalty award of $1.9 million.  After Roland rested, Roland's counsel requested the opportunity to reopen its case so Ms. Heinemann could backfill testimony on apportionment,[2] glaringly missing from Ms. Heinemann's rapid-fire extemporaneous testimony on two hypothetical negotiations spanning different time periods, different products, different patents, and different licenses.  Ms. Heinemann never tied the royalty she proposed to the relevant *Georgia Pacific*[3] factors or explained how she calculated the rate using specific factors, all of which renders her testimony unreliable and insufficient to support the jury's award.  *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011) (expert testimony opining on a reasonable royalty must

---

[1] Roland's counsel did not dispute that the jury could award zero or nominal damages.  Nov. 17, 2022 Trial Tr. at 44:6- 45:21.
[2] Nov. 18, 2022 Trial Tr. at 102:25-104:16.
[3] *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970).

"sufficiently [tie the expert testimony on damages] to the facts of the case.  If the patentee fails to tie the theory to the facts of the case, the testimony must be excluded.").

1.    **Roland Presented Insufficient Evidence to Support the Lost Profits Award.**

  a.    **Roland Cannot Recover Roland U.S.'s Alleged Lost Profits**

To recover lost profits damages for patent infringement, a patentee must show that it would have received the additional profits "but for" the infringement.  *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1349 (Fed. Cir. 1999); *Ferguson Beauregard/Logic Controls, Div. of Dover Res., Inc. v. Mega Sys., LLC*, 350 F.3d 1327, 1346 (Fed. Cir. 2003).  "A patentee cannot obtain lost profits unless it and only it could have made the sale—there are no non-infringing alternatives or, put differently, the customer would not have purchased the product without the infringing feature."  *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1289 (Fed. Cir. 2017).

Here, the testimony was clear that Roland itself did not sell electronic mesh drums to U.S. consumers during the damages period;[4] rather, Roland (Japan) sold to a subsidiary (Roland U.S.) using a contractual arrangement, and the subsidiary then sold mesh drums within the United States to Guitar Center, among others.  Nov. 17, 2022 Trial Tr. at 128:22-129:5.  Roland itself lost no profits as a result of inMusic's allegedly infringing activities.

In 2015, the Federal Circuit issued *Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, which holds that "a patentee may not claim, as its own damages, the lost profits of a related company." 778 F.3d 1365, 1375 (Fed. Cir. 2015)

.  The logic is clear: Federal Circuit law prevents a party, like Roland, from claiming lost profits of a non-party.

---

[4] Nov. 17, 2022 Trial Tr. at 85:19-86:6.

inMusic raised this issue at the pretrial stage, arguing that Roland was impermissibly seeking to recover the lost profits of a non-party subsidiary contrary to Federal Circuit law.  ECF No. 397.  Magistrate Judge Louis agreed that the "inclusion of a patent holder's subsidiary's profits to calculate lost profits run[s] counter to Federal Circuit law, and on this the Parties agree; however, Plaintiff hopes to avail itself of the narrow exception that has been recognized but rarely found: when profits of a subsidiary actually do flow inexorably up to the parent."  ECF No. 505 at 13.[5]

As the Magistrate Judge noted, because a narrow exception is implicated, "[s]howing inexorable flow of profits from one entity to another is an extremely high bar to meet."  *Id.* (citing *Polaris Indus., Inc. v. Arctic Cat Inc.*, CV 15-4129 (JRT/TNL), 2019 WL 1118518, at *8 (D. Minn. Mar. 11, 2019)).  A patentee cannot show inexorable flow by, for example, simply presenting evidence of a 100%-owned subsidiary relationship and/or consolidated financial statements.  *See Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1367 (Fed. Cir. 2008) (recalled and amended on other grounds).[6]  Again, the reasoning is clear: "related companies 'may not enjoy the advantages of their separate corporate structure and, at the same time, avoid the consequential limitations of that structure—in this case, the inability of the patent holder to claim the lost profits of its non-exclusive licensee.'"  *See Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1311 (Fed. Cir. 2004).

---

[5] Roland did not challenge or otherwise appeal that decision.

[6] In *Mars*, the Federal Circuit declined to decide "whether a parent company can recover on a lost profits theory when profits of a subsidiary actually *do* flow inexorably up to the parent."  *Id.* Since that decision, "the Federal Circuit has twice indicated that it would be unwilling to allow a patentee to recover the lost profits of a related company as its own under the inexorable flow doctrine."  *Mars, Inc. v. Trurx, LLC*, No. 6:13-cv-526-RWS-KNM, 2016 U.S. Dist. LEXIS 121501, at *8 (E.D. Tex. Mar. 14, 2016).  The lost profits award relies on an exception to Federal Circuit law that the Federal Circuit has never itself definitively approved.

At the pretrial stage, the Magistrate Judge denied inMusic's motion, allowing Roland the opportunity to adduce evidence at trial sufficient to satisfy the exception, but noting it was "dubious" that Roland could satisfy Federal Circuit precedent.  ECF No. 505 at 14 & n. 5.

And, in fact, Roland did not meet that Federal Circuit bar.  On November 17, 2022, the Court started the damages phase of the trial.  Roland's first witness was not Mr. Tamura, the "key" fact witness it had previewed,[7] but its expert, Suzanne Heinemann, *i.e.*, Roland offered an expert opinion based on a theory of inexorable flow of lost profits <u>without</u> a predicate fact witness first in the damages phase.  Roland introduced no documents or exhibits to evidence that Roland U.S.'s profits associated with the mesh head products covered by the remaining patent claims actually and inexorably flowed to Roland.  In fact, Roland offered no exhibits to support any aspect of Ms. Heinemann's testimony.[8]  Ms. Heinemann admitted she was not offering an opinion on inexorable flow.  Nov. 17, 2022 Trial Tr. at 96:14-19.

Before it rested, Roland did call Mr. Tamura.  Despite the buildup of his importance to Roland's damages case, Mr. Tamura gutted Roland's lost profits claim by agreeing that Roland and Roland U.S. were formed as separate companies in different countries (Japan, U.S.), retain separate corporate structures, and realize advantageous tax benefits as a result; he also acknowledged that Roland U.S., a 100% owned subsidiary of Roland, licenses non-exclusive rights to the patents as part of a Distribution Agreement.  Nov. 18, 2022 Trial Tr. at 6:24-8:16; Plaintiff's Trial Exhibit[9] 497.  He wholesale undercut Roland's damages case and its expert's testimony by admitting that Roland does not even prepare basic financial documents and records

---

[7] At the August Calendar Call, Roland claimed that it needed to move the trial date to accommodate Mr. Tamura, whom Roland characterized as "the key witness." Transcript of August 23, 2022 Calendar Call  at 60:6-8.  The Court moved the trial to October.

[8] *See* Nov. 17, 2022 Trial Tr. at 2 (reflecting no exhibits marked or used with Ms. Heinemann).

[9] Abbreviated "PTX."

in the ordinary course of business.[10]  Nov. 17, 2022 Trial Tr. at 136:12-137:6.  Roland offered no

evidence that Roland U.S.'s profits transfer to Roland's bank accounts on a daily (or otherwise

regular) basis.  *Mars*, 527 F.3d at 1367.  Rather, Mr. Tamura confirmed that Roland sold the

drum kits to Roland U.S. at a transfer price, and the president of Roland made the final decision

how to allocate profits among the various Roland entities.  Nov. 18, 2022 Trial Tr. at 10:9-11:17.

Mr. Tamura's testimony was insufficient to establish that Roland is entitled to recover

Roland U.S.'s lost profits under Federal Circuit precedent.  *See Spine Sol., Inc. v. Medtronic

Samofar Danek USA, Inc*., 620 F.3d 1305, 1319 (Fed. Cir. 2010).[11]  In *Poly-America*, the

patentee sought to recover lost profits on products sold by its sister company based on a license

between the two parties.  383 F.3d at 1310.  The patentee argued it should be permitted to collect

its sister company's lost profits as its own because the two companies operated as a "single

economic unit" for purposes of manufacturing and selling the patented products.  *Id.* at 1310.

In refusing to allow the patentee to do so, the Federal Circuit noted that "[a] patentee

needs to have been selling some item, the profits of which have been lost due to infringing sales,

in order to claim damages consisting of lost profits."  *Id.* at 1311.  It further explained that

companies "may not enjoy the advantages of their separate corporate structure and, at the same

time, avoid the consequential limitations of that structure."  *Id.*  Because the patentee's parent

chose to form the patentee and its sister company as separate entities "to suit its own goals and

---

[10] "[W]hile an expert's data need not be admissible, the data cannot be derived from a manifestly
unreliable source."  *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d
1348, 1373 (Fed. Cir. 2013); *see also Wi-Lan Inc. v. Sharp Elec. Corp.*, 992 F.3d 1366, 1375
(Fed. Cir. 2021)
 ("a party cannot call an expert simply as a conduit for introducing hearsay under the guise that
the testifying expert used the hearsay as the basis of his testimony").
[11] Abrogated on other grounds by *Halo Elec., Inc. v. Pulse Elec., Inc.*, 579 U.S. 93 (2016).

purposes," the court held that the patentee was limited to recovery of its own lost profits and not those of its sister company. *Id.*

Applying that precedent, Roland presented insufficient evidence for the jury to award it $2.7 million in lost profits damages, and inMusic is entitled to JMOL as a result. *Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286, 1293 (Fed. Cir. 2007) ("[o]nly after the court has decided, as a matter of law, that lost profits are available does the jury then get to determine the amount of those lost profits.") (citations omitted).

### b.   Ms. Heinemann Did Not Perform a Proper *Panduit* Analysis

inMusic also is entitled to JMOL of no lost profits damages because Ms. Heinemann's perfunctory testimony on the four *Panduit* factors[12] supplied an inadequate basis for the jury to award lost profits.

As set forth above, to support an award of lost profits, Roland needed to show, based on sound economic proof, that the launch of inMusic's mesh head drums in 2015 – and not competition in the market or other factors – was the "but for" cause for the decline of Roland's sales. *Mentor Graphics Corp..*, 851 F.3d at 1289. "An award of lost profits may not be speculative." *BIC Leisure Prods., Inc. v. Windsurfing Int'l*, 1 F.3d 1214, 1218 (Fed. Cir. 1993).

But according to Roland's witness, Yamaha and its non-mesh drums loomed large as a competitor to Roland's mesh head drums. In 2014, before inMusic launched its redesigned multi-sensor products that included mesh heads, Roland was already "in the red" because it was having trouble anticipating the market's demands for products, and it was losing market share to

---

[12] Under *Panduit*, a plaintiff must prove "(1) demand for the patented product; (2) the absence of acceptable noninfringing substitutes; (3) the marketing and manufacturing ability to exploit the demand; and (4) the amount of profit it would have made" but for the infringement. *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1165 (Fed. Cir. 1991) ("[A] patentee is not entitled to lost profits if the patentee fails to establish any of the above requirements.").

competitors.  Nov. 2, 2022 Trial Tr. at 20:12-21:1.  Mr. Katsuda agreed that "Yamaha was a much bigger competitor" for Roland than inMusic, even without mesh drums.  Nov. 3, 2022 Trial Tr. at 37:18-19.

In assessing the second *Panduit* factor, inMusic's expert (Pauline Booth) analyzed the relevant marketplace.  Using Defendant's Trial Exhibit[13] 1408, a summary of industry information from MI SalesTrak, Ms. Booth explained that Roland's market share dropped in the period from 2013 – 2014 (76.9% to 72.8%) and then went up to 77.3% in 2015, the year inMusic launched the kits with mesh drum heads.  Nov. 18, 2022 Trial Tr. at 49:10-51:12.  That dovetails with the trial evidence establishing at least two commercially acceptable non-infringing alternatives—silicone drums sold by Yamaha and rubber drums sold by inMusic, KAT, and others — in the 2015-2017 period when Roland seeks lost profits, and that Yamaha commanded market share with its commercially acceptable non-mesh drums.  *See* Nov. 8, 2022 Trial Tr. at 94:18-23; DTX-1408.  Roland's internal documents underscore this point, evidencing that in 2016 (a year after inMusic's launch), Roland identified Yamaha's silicone drum kits as its **only** competition.  *See* DTX-1429 at p. 4.  Even Ms. Heinemann admitted "that Yamaha was a key competitor" and KAT was also a competitor.  Nov. 17, 2022 Trial Tr. at 92:14-20, 94:18-25.

Roland also failed to show that consumers would not have purchased inMusic's accused kits without the mesh.  Roland's expert acknowledged that consumers consider a number of variables when selecting a drum kit, including the drum module, as confirmed in Roland's internal documents.  Nov. 17, 2022 Trial Tr. at 88:13-90:25; PTX-589.  Roland elicited testimony from David Gill during its case-in-chief that inMusic designed and brought to market its drum/sound modules that allow the drums to function and drove demand for the electronic

---

[13] Abbreviated as "DTX."

percussion kits.  Nov. 8, 2022 Trial Tr. at 89:24-90:16; 94:24-95:24; 97:17-98:13; 110:11-111:13; PTX-394; PTX-522.  Roland's internal business documents show competitors other than inMusic successfully selling electronic drums without mesh.  PTX-589.  In short, Roland failed to show that consumers were motivated to purchase the accused kits because of mesh, and yet Ms. Heinemann improperly and artificially constructed a two-player market pitting Roland against inMusic alone.[14]  *See SmithKline*, 926 F.2d at 1166 (affirming unavailability of lost profits where patentee's evidence of a two-supplier market was contrary to the commercial realities).

Roland also adduced insufficient evidence to show that it would have made sales "but for" the alleged infringement.  Ms. Heinemann's lost profits testimony has gaping holes: she never listed the specific accused inMusic drum kits ostensibly part of her lost profits calculations and she never identified the specific Roland "substitute" kits paired with each for the lost profits analysis, essentially providing nothing concrete for the jury.  When she did make a pass at giving an "example" of matching up kits by referencing "Roland's TDK, TD-11K,"[15] Mr. Tamura – who was set up to backfill for her – did not know if Roland U.S. was selling those kits to United States consumers during the damages period.  Nov. 18, 2022 Trial Tr. at 9:11-22.  Without a factual predicate or proper analysis, there was no basis for the jury to award Roland lost profits. For this additional reason, inMusic is entitled to judgment as a matter of law that Roland cannot recover lost profits.  *See Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369 (Fed. Cir. 2017) (reversing denial of judgment as a matter of law).

---

[14] Nov. 17, 2022 Trial Tr. at 96:7-13.
[15] Nov. 17, 2022 Trial Tr. at 77:1-12; 95:22-96:2 ("So this is -- the DM10 session essentially became the Command Kit and, yeah, that's mapped to the TD-11K.").

2.      **No Reasonable Jury Could Award Reasonable Royalties on the Drums**.

A "reasonable royalty" derives from a hypothetical negotiation between the patentee and the infringer when the infringement began.  *See, e.g.*, *Unisplay, S.A. v. American Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995).  The analysis requires a hypothetical negotiation, not speculation.  *ResQNet.com*, 594 F.3d at 869.  The trial court must ensure damages are tied to proof of the claimed invention's footprint in the marketplace.  *Id.* (citation omitted).

To that point, Federal Circuit law requires a reasonable royalty award to "be based on the incremental value that the patented invention adds to the end product."  *Ericsson, Inc. v. D–Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).  That means "[T]he patentee must in every case give evidence tending to separate or apportion . . . the patentee's damages between the patented feature and the unpatented features[.]"  *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012).  In other words, "[w]hen the accused infringing products have both patented and unpatented features, measuring this value requires a determination of the value added by such features."  *Ericsson*, 773 F.3d at 1226.

A patentee can apportion a royalty rate to account for the relative value of the invention by doing a proper analysis of the *Georgia-Pacific* factors.  *Exmark Manu. Co. v. Briggs & Stratton*, 879 F.3d 1332, 1348-49 (Fed. Cir. 2018).  Or, "when a sufficiently comparable license is used as the basis for determining the appropriate royalty, further apportionment may not necessarily be required."  *Omega Patents, LLC v. Calamp Corp.*, 13 F.4th 1361, 1377 (Fed. Cir. 2021) (quotation omitted).  But in proposing a third-party license as a basis for a reasonable royalty, Roland is "required" "to account for differences in the technologies and economic circumstances of the contracting parties.  *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 971 (Fed. Cir. 2022); *Omega Patents*, 13 F.4th at 1381 ("[U]se of past patent licenses ... must account for

11

differences in the technologies and economic circumstances of the contracting parties.")  Where licenses are involved, Roland bears "the burden to prove that the licenses were sufficiently comparable." *Id.*

Applying those principles, Roland did not present the jury with sufficient evidence of a reasonable royalty on the claims of the two remaining drum patents, *i.e.*, the '458 patent and the '535 patent.[16]  At trial, Ms. Heinemann advanced a rate of $20 per unit for multi-layer mesh drum heads and pointed the jury to three agreements, none of which reflects a $20 rate: Guitar Center (PTX-464), Pintech (PTX-107), and Hart (PTX-161).  The agreements include patents not at issue in this case and exclude at least one that is, even though Ms. Heinemann was apparently unaware of that fact.  *See, e.g.*, Nov. 17, 2022 Trial Tr. at 97:8-25.  Although "allegedly comparable licenses may cover more patents than are at issue in the action" Roland is "nonetheless required to account for such distinguishing facts when invoking [the licenses] to value the patented invention."  *See Omega Patents*, 13 F.4th at 1380 (internal quotation marks omitted).  In *Omega Patents*, the plaintiff's witnesses "testified that the [comparable] licenses 'cover multiple patents that are even beyond the patents in the hypothetical negotiation,'" but explained the same royalty rate would apply "regardless of 'which patent' was included because 'no patent was any more valuable than the others.'"  *Id.* at 1381.  As a matter of law, that was not enough.  Here, Ms. Heinemann failed to account for the differences in patent claims licensed by the three agreements and those before the jury.

Unlike the hypothetical agreement Roland and inMusic would have negotiated in 2015, Roland and Hart negotiated the non-exclusive Hart Agreement in 2003 as part of a settlement.

---

[16] Ms. Heinemann testified contrary to precedent that "a license is what it is" and "[w]hen you do an analysis of determining what a reasonable royalty is, you try to find licenses that have technology similar to the patents in suit."  Nov. 17, 2022 Trial Tr. at 97:2-5.

PTX-161 at p. 2.  Roland's witness could not testify how Roland arrived at the royalty rate.  Nov. 3, 2022 Trial Tr. at 99:3-10.  Thus, not only does the agreement pre-date the hypothetical negotiation by a decade, but it also is litigation-induced and its relevance merely speculative. *ePlus, Inc. v. Lawson Software*, 764 F. Supp. 2d 807, 813 (E.D. Va. 2011), *aff'd*, 700 F.3d 509, 522-23 (Fed. Cir. 2012) (Any minimal probative value "is even less, where . . . the settlement agreements occurred" years away from the "hypothetical negotiation.").  Despite Ms. Heinemann's apparent inability or unwillingness to respond to a relatively straight-forward question about the weight afforded litigation-based agreements achieved as part of a settlement,[17] the Federal Circuit has expressed a "longstanding disapproval of relying on settlement agreements to establish reasonable royalty damages."  *LaserDynamics*, 694 F.3d at 77.  "Federal Circuit precedent is hostile toward using litigation settlement agreements in proving a reasonable royalty, except in limited circumstances" because they "provid[e] a drastically different backdrop than the hypothetical negotiation involving willing licensors[.]"  *M2M Solutions LLC v. Enfora, Inc.*, 167 F. Supp. 3d 665, 678 (D. Del. Mar. 9, 2016) (citing cases); *see Wordtech Sys., Inc. v. Integrated Network Sols., Inc.*, 609 F.3d 1308, 1320-21 (Fed. Cir. 2010) (noting that "litigation itself can skew the results of the hypothetical negotiation") (internal quotation marks omitted).

And not only is the Hart Agreement years prior to the hypothetical negotiation and litigation-induced, but it also references the '538 patent (not at issue)[18] and only claim 6 of the

---

[17] Nov. 17, 2022 Trial Tr. at 99:16-100:13.  Ms. Heinemann did admit that "the context of" settlement agreements "needs to be considered" when using them in a reasonable royalty analysis, *id.* at 100:12-13, but provided the jury with no framework for how to evaluate or weigh that context in its royalty determination and did not herself adjust for the context of the settlement agreements on which she relied in reaching her reasonable royalty rate opinions.  In fact, as discussed below, her proposed royalty rate was <u>higher than</u> the (overstated) implied per-unit rate she calculated for the Hart agreement.

[18] Nov. 3, 2022 Trial Tr. at 92:13-18.

'458 patent, but not the '535 patent.  *See* PTX-161 at p. 13.  "Vigilance" is needed when "performing reasonable royalty calculations" and "when considering past licenses to technologies other than the patent in suit."  *ResQNet*, 594 F.3d at 869.  Notably, it is improper to "rely on unrelated licenses to increase the reasonable royalty rate above rates more clearly linked to the economic demand for the claimed technology."  *Id.* at 872-73.

Relatedly, "license agreements [that] are radically different from the hypothetical agreement under consideration" are not probative.  *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1327-28 (Fed. Cir. 2009).  Here, Ms. Heinemann pitched the jury on a $20/unit rate found nowhere in any of the agreements she selected.  In contrast, the Hart Agreement includes a $20,000 lump sum amount paid over time for past infringement and a royalty of 6% of gross sales price.  PTX-161 at pp. 2-3.  It also includes a minimum yearly royalty of $30,000.  PTX-161 at p. 3.  Licenses are not comparable where the method of payment is different.  *Lucent*, 580 F.3d at 1326 ("[s]ignificant differences exist between a running royalty license and a lump-sum license").  Because of the significance of different payment structures, "lump sum settlement agreements have minimal, if any, probative value in establishing a reasonable running royalty."  *ePlus, Inc.*, 764 F. Supp.2d at 814 (listing cases).  "Even when a lump sum royalty can be extrapolated to suggest a reasonable running royalty, the methodology must itself be sound and not speculative[.]"  *Id.*  Ms. Heinemann, however, offered no analysis or methodology[19] to explain her use of the Hart Agreement to establish a $20/unit running royalty.

Roland's damages claim fares no better with the Pintech Agreement.  PTX-107.  That agreement, too, was negotiated more than a decade before the hypothetical negotiation.  It, too, includes a minimum royalty.  PTX-107 at p. 2.  Although neither discussed nor analyzed by Ms.

---

[19] The jury had no data concerning Hart sales under that agreement and/or sums paid.

Heinemann, Pintech renegotiated a new license agreement with Roland in 2013 without a minimum royalty.  Nov. 3, 2022 Trial Tr. at 73:1-14.  The 2013 agreement (PTX-162) includes a royalty of 10% of the <u>net</u> sales price of licensed products covered by the '458 patent and the '538 patent (not at issue).  PTX-162 at p. 3.  Again, Mr. Heinemann provided no analysis to explain how she converted a 10% royalty on unquantified <u>net</u> sales of drums[20] with single mesh heads to a per unit $20/unit for dual layer mesh.

Finally, Ms. Heinemann touted the 2012 Guitar Center Agreement.  The Guitar Center non-exclusive license covers four non-asserted patents but omits the '458 patent.  PTX-464.  It includes a royalty of $12/unit for single layer mesh drum heads, but Guitar Center never made any payments under that agreement or at that rate.  Nov. 17, 2022 Trial Tr. at 80:10-11.  Not only that, but Ms. Heinemann then took a Roland license proposal to Guitar Center that Guitar Center <u>rejected</u> to concoct a 2:3 ratio and arrive at $20/unit for double layer mesh.[21]  But the evidentiary value of a merely proposed license "is limited . . . by the fact that patentees could artificially inflate the royalty rate by making outrageous offers."  *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 30 (Fed. Cir. 2012).  In fact, no licensee ever agreed to pay $20/unit for Roland's '535 or '458 drum patents, and Guitar Center rejected the proposal Ms. Heinemann used to support her inflated calculations.  At the same time, Ms. Heinemann completely ignored agreements where Roland settled disputes for total payments of $100[22] (PTX-459) or $2,000[23] (PTX-456; PTX-462).

---

[20] Net sales price is defined as gross sales price for licensed products minus actual quantity discounts and returns and excluding freight, shipping, insurance, transportation, taxes and duties, none of which was before the jury.  PTX-162 at p. 3.
[21] Nov. 17, 2022 Trial Tr. at 98:11-20.
[22] Nov. 3, 2022 Trial Tr. at 96:19-97:9.
[23] Nov. 3, 2022 Trial Tr. at 92:23-95:7; 97:18-25.

To merit a reasonable royalty damages award, Roland was required to prove damages by performing the apportionment analysis and prove that licenses are sufficiently comparable. *Omega Patents*, 13 F.4th at 1377.  Far from meeting that burden, Ms. Heinemann did not apportion for the patented versus unpatented features (e.g., drum module), nor did she account for the value of the additional intellectual property in the other licenses.  She ignored key distinguishing facts like the length of time between the agreements' execution and the hypothetical negotiation, the form of royalty, minimum payments and lump sum arrangements, and releases for past infringement as part of settlement.  *ResQNet.com*, 594 F.3d at 869.

As a result, Ms. Heinemann's testimony "amount[ed] to little more than a recitation of royalty numbers," insufficient to support a reasonable royalty for the drums.  *See Omega Patents*, 13 F.4th at 1381; *Lucent*, 580 F.3d at 1329, 1340.  inMusic is entitled to JMOL on the drum reasonable royalty as a result.

### 3. Roland Did Not Present Sufficient Evidence to Support Royalties on the Cymbals.

As with her testimony on the drum patents, Ms. Heinemann's trial testimony referenced licenses far from the date of the hypothetical negotiation and not comparable for other reasons. She also set a hypothetical negotiation date more than a year <u>before</u> Roland accuses inMusic of infringing the cymbal patents.  Nov. 17, 2022 Trial Tr. at 118:17-119:22.

Specifically, even though Roland does not accuse the 2010 cymbals of infringement, Ms. Heinemann assumed infringement began in 2010; she did not know of the redesign in 2011. Nov. 17, 2022 Trial Tr. at 117:8-12, 119:17-22.  Confronted with the fact that the starting point for her royalty analysis is wrong, Ms. Heinemann glibly suggested she might only be off by thousands of units.  Nov. 17, 2022 Trial Tr. at 117:13-118:10.  "Such unreliable testimony frustrates a primary goal of expert testimony in any case, which is meant to place experience

16

from professional specialization at the jury's disposal, not muddle the jury's fact-finding with unreliability and speculation." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1373 (Fed. Cir. 2013).[24]

Not only did Ms. Heinemann mislead the jury with an incorrect hypothetical negotiation date and units at issue, but she also used a non-comparable license for her message to the jury. The 2012 agreement she highlighted provided a lump sum payment of $15,000 in exchange for a release of past infringement plus a running royalty of $1.75 per unit.  PTX-159 at p. 2.  But Ms. Heinemann failed to analyze or explain to the jury how that lump sum impacted the overall royalty rate, and that renders her opinion unreliable.  *See, e.g.*, *ePlus, Inc.*, 764 F.Supp.2d at 814.

Five of the seven agreements Ms. Heinemann advanced were signed after Roland sued inMusic in 2016, meaning they post-dated the hypothetical negotiation by at least 5 years. Roland provided no information to the jury about the negotiations leading to the agreement with Virgin Music (PTX-125) other than the fact it was signed in 2016.  Nov. 3, 2022 Trial Tr. at 74:5-11.  But again, that agreement includes a *de minimis* lump sum payment of $3,000 in exchange for a release associated with past sales, and a running royalty of $2.00 per unit.  All told, VMI paid less than $6,000 total on that license – far less than the "reasonable" royalty Roland claims inMusic would have negotiated.  The other litigation-contrived licenses signed years after the hypothetical negotiation with Drum Workshop, Pearl, Hal Leonard, Armadillo and SSC Audio (PTX-131, PTX-130, PTX-132, PTX-134, PTX-133) resulted in minimal

---

[24] *See, e.g.*, Nov. 17, 2022 Trial Tr. at 74:21-23 (consumers buying inMusic's kits "were paying, let's say, for example, $200 more to buy the identical kit, but with a mesh drum kit"); *id.* at 75:7-10 (testifying there was "a pretty obvious[] change in inMusic's share in the thousand dollar and plus band, but most of the accused products actually are in the 500 to 1,000 band and there's also changes in market share there", without identifying the actual changes in market share); *id.* at 82:19-83:4 (identifying, as the basis for her cymbal royalty, "a whole host of agreements kind of following that," which factored into her opinion "a little bit less"); *id.* at 126:19-21.

payments well below the costs of litigation, and Fender paid nothing.  As Pearl put it: this was a "license of convenience." DTX-1395.

As with the drum patents, Roland failed to present the jury with a proper basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case.  *Uniloc*, 632 F.3d at 1317.  Again, Ms. Heinemann did not properly determine a starting point for a hypothetical negotiation based on the first *Georgia-Pacific* factor.  She did not adjust the $2.00 found in those licenses up or down using any of the *Georgia-Pacific* factors; rather, she just pitched a bundle of unreliable licenses at the jury with no analysis and gambled they would simply adopt that $2.00 rate.  As a result, the Court should grant inMusic's JMOL on the reasonable royalty calculation for the cymbals.[25]

**C.     The Court Should Grant a New Trial on Damages.**

In the alternative, the Court should grant a new trial for at least three reasons: (1) the damages awarded by the jury are excessive; (2) the court erred in admitting or excluding evidence and in the Jury Verdict Form; and (3) the Court's *sua sponte* decision to abbreviate the damages portion of the trial was patently unfair.

**1.     <u>The Damages Awarded by the Jury Are Excessive</u>.**

Roland's expert improperly (i) urged the jury to award lost profits on sales to U.S. consumers that Roland did not, in fact, actually lose; (ii) failed to analyze the electronic percussion market, acceptable non-infringing substitutes, and the factors driving consumer demand; (iii) failed to account for differences between the benchmark licenses and the

---

[25] inMusic incorporates by reference its Trial Brief on Equitable Estoppel which would preclude any damages for cymbal infringement. ECF No. 624.

hypothetical negotiations,[26] even assuming she started at the right point; (iv) and failed to perform an apportionment analysis to isolate the incremental value of the invention from the other non-patented parts of the products and kits.  Those errors misled the jury by skewing the damages analysis, resulting in an excessive verdict.  *Wordtech*, 609 F.3d at 1322 (reversing denial of Rule 59(a) motion and remanding for new trial after concluding that the verdict was "clearly not supported by the evidence" and "based only on speculation or guesswork").

### 2.    <u>The Court Erred in Admitting Testimony From Ms. Heinemann.</u>

Allowing Mr. Heinemann to testify and assume Mr. Tamura would fill in the required blanks – which he did not – was error.  When he did finally testify, Mr. Tamura undercut the entirety of the lost profits case and was impeached with deposition testimony on the license issues.  Nov. 18, 2022 Trial Tr. at 16:12-17:13.  But by then it was too late - once the jury heard Ms. Heinemann's inflated theories, there was no way to undo that harm except to strike her testimony, which the Court declined to do.  That was error.

The Court did not cure that error with its *sua sponte* insertion in the Jury Verdict Form ("Did Roland prove that expert witness, Suzanne Heinemann, had sufficient credible information to render her opinions?").  ECF No. 600.  That just compounded the problem, as evidenced by the fact that both parties objected to that insertion.  Nov. 18, 2022 Trial Tr. at 93:4-100:16. Having heard less than an hour's worth of testimony from Ms. Heinemann, the jury had no factual or other predicate to make a determination[27] that Supreme Court precedent and Rule 702 make clear is for the trial judge, not the jury.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S.

---

[26] Federal Circuit law requires the patentee to account for distinguishing facts between the proffered licenses and hypothetical negotiation, not merely identify such differences.  *Omega Patents*, 13 F.4th at 1381 (reversing denial of motion for new trial on damages).

[27] Even the jury recognized the gaps by requesting Ms. Heinemann's expert reports and "any other financial report" for deliberations.  Nov. 18, 2022 Trial Tr. at 97:2-98:19.

579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).[28]

> 3. **The Court's *Sua Sponte* Acceleration of the Damages Trial Was Unfair.**

On Thursday November 17, 2022, the Court *sua sponte* set "semi-arbitrary"[29] time limits on testimony from the damages experts: twenty minutes on direct examination and fifteen minutes on cross-examination, ostensibly to accommodate one juror's schedule and Roland's expert's planned vacation. Nov. 17, 2022 Trial Tr. at 19:2- 23; 28:10-23.[30]  Comparing the limits to a 12 minute "TED Talk," the Court suggested it was plenty of time for multi-faceted damages testimony spanning two theories of damages and almost $5 million. *Id.* at 19:18-23.

The Court's arbitrarily shortened time limits were unreasonable and prejudiced inMusic by leading the jury to conclude it is proper for a plaintiff to speed through a complex damages case and present no substance – essentially converting the damages trial to an expert personality contest. The time limits required inMusic to cross examine an expert who presented no analysis and risk the Court reopening Roland's case and allowing it to backfill when it became apparent that there was no predicate for any damages award. At no point prior to November 17th did the Court suggest the parties would be limited to less than half of a day to present the damages case and defenses; that arbitrary compressed time frame was not reasonable and unduly prejudiced inMusic. *Fiscars, Inc. v. Hunt Mfg. Co.*, 279 F.3d 1378, 1382 (Fed. Cir. 2002) (an abuse of discretion exists when the trial court's decision is clearly unreasonable, arbitrary or fanciful).

---

[28] It was also error for the court to permit the jury to consider lost profits. *See Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286, 1293 (Fed. Cir. 2007) ("[T]he availability of lost profits is a question of law for the court, not the jury.  Only after the court has decided, as a matter of law, that lost profits are available does the jury then get to determine the amount of those lost profits.").

[29] Nov. 17, 2022 Trial Tr. at 106:5-15.

[30] As discussed above, the Court had already once moved the trial to accommodate a Roland witness's unavailability during a scheduled trial period.

## CONCLUSION

For the forgoing reasons, the Court should grant inMusic's Motion and grant JMOL in

favor of inMusic on damages.  In the alternative, the Court should grant inMusic's Motion and

order a new trial on damages or enter a remittitur of nominal damages.

Dated:  December 19, 2022              Respectfully Submitted,

INMUSIC BRANDS, INC.

By Its Attorneys,

**SHUTTS & BOWEN LLP**

*/s/ Joseph W. Bain*

JOSEPH W. BAIN
JBain@shutts.com
525 Okeechobee Boulevard, Suite 1100
West Palm Beach, FL 33401
Tel:  (561) 650-8500 / Fax:  (561) 650-8530

JODI-ANN TILLMAN
JTillman@shutts.com
200 East Broward Blvd., Ste. 2100
Fort Lauderdale, FL 33301
Tel:  (561) 671-5822 / Fax:  (561) 650-8530

**HINCKLEY, ALLEN & SNYDER LLP**

CRAIG M. SCOTT (*pro hac vice*)
cscott@hinckleyallen.com
CHRISTINE K. BUSH (*pro hac vice*)
cbush@hinckleyallen.com
ADAM M. RAMOS (*pro hac vice*)
aramos@hinckleyallen.com
REBECCA F. Briggs (*pro hac vice*)
rbriggs@hinckleyallen.com
100 Westminster Street, Suite 1500
Providence, RI 02903
Tel: (401) 274-2000 / Fax (401) 277-9600

LAUREL M. GILBERT (*pro hac vice*)
lgilbert@hinckleyallen.com
MARK D. HOCHBERG (*pro hac vice*)
mhochberg@hinckleyallen.com

28 State Street
Boston, MA 02109
Tel: (617) 345-9000 / Fax: (617) 345-9020

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 19, 2022, I caused the foregoing to be electronically filed

through the ECF system by which the registered participants identified on the Notice of Electronic

Filing should receive notice, including the following counsel of record:

| | |
|---|---|
| Laura Ganoza, Florida Bar No. 118532<br>**FOLEY & LARDNER LLP**<br>One Biscayne Tower, Suite 1900<br>2 South Biscayne Boulevard<br>Miami, Florida 33131<br>Telephone:  (305) 482-8400<br>Facsimile:  (305) 482-8600<br>lganoza@foley.com | Victor de Gyarfas, *pro hac vice*<br>Tiffany Kim Sung, *pro hac vice*<br>**FOLEY & LARDNER LLP**<br>555 South Flower Street, Suite 3300<br>Los Angeles, California 90071<br>Telephone:  (213) 972-4500<br>Facsimile:  (213) 486-0065<br>vdegyarfas@foley.com<br>tsung@foley.com |
| Justin B. Uhlemann, Florida Bar No. 568872<br>**FOLEY & LARDNER LLP**<br>One Independent Drive, Suite 1300<br>Jacksonville, Florida 32225<br>Telephone:  (904) 359-2000<br>Facsimile:  (904) 359-8700<br>juhlemann@foley.com | Kimberly Kristin Dodd, *pro hac vice*<br>**FOLEY & LARDNER LLP**<br>777 East Wisconsin Avenue<br>Milwaukee, WI<br>Telephone:  (414) 319-7345<br>kdodd@foley.com |
| | ***Attorneys for Roland Corporation*** |

*/s/  Joseph W. Bain*
Joseph W. Bain

MIADOCS 25510254 1