**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.: 1:17-cv-22405-MORENO/LOUIS**

ROLAND CORPORATION, a Japanese
Corporation,

     Plaintiff,

        v.

INMUSIC BRANDS, INC., a Florida
Corporation,

     Defendant.

---

## PLAINTIFF ROLAND CORPORATION'S MOTION FOR DETERMINATION THAT ROLAND IS THE PREVAILING PARTY AND FOR ATTORNEYS' FEES PURSUANT TO 35 U.S.C. § 285

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................ 1

II. FACTUAL BACKGROUND ............................................................................. 2

    A.  Summary Of Proceedings ....................................................................... 2

    B.  Roland Successfully Licensed Its Patents To The Music Industry But inMusic Unreasonably Refused To Take A License ................................. 2

    C.  Roland Put inMusic On Notice Of Roland's Patents But inMusic Intentionally Copied A Product Of Roland Covered By Roland Patents .............. 4

    D.  inMusic Presented No Evidence That It Reasonably Believed It Did Not Infringe Or That Roland's Patent Were Invalid ...................................... 6

    E.  inMusic Took Baseless Non-Infringement Positions During Litigation ............... 6

    F.  inMusic Asserted Non-Infringement Positions For "Head Sensor" That Contradicted The Court's Claim Construction Order .............................. 8

    G.  inMusic Maintained Invalidity Positions At Trial That Contradicted Its Own Fabricated Definition Of "Head Sensor" ..................................... 9

    H.  inMusic Refused To Settle The Case For An Amount Dwarfed By The Amount Of Fees inMusic Spent On The Case After inMusic Reneged On Its Settlement Position Taken During Mediation .................................... 9

    I.  inMusic Interfered With Discovery ...................................................... 10

    J.  inMusic Made False Statements To The Court And Baselessly Pursued Its Inequitable Conduct Claim ............................................................... 11

III. APPLICABLE LEGAL STANDARDS ........................................................... 13

    A.  Roland's Motion Is Timely ................................................................... 14

    B.  Roland Should Be Deemed The Only Prevailing Party In This Case ................. 14

    C.  Standards For Finding A Case To Be Exceptional, Warranting An Award Of Attorney's Fee ............................................................................... 15

IV. ROLAND SHOULD BE AWARDED ITS ATTORNEYS' FEES .................................. 16

    A.  Roland Is Entitled To Recover Its Reasonable Attorneys' Fees ...................... 16

i

1.      The Billing Rates Were Reasonable As Counsel Utilized Its

Standard Rates, Or Lower, For Its Highly Experienced Team ................ 17

2.      The Hours Expended and Work Performed Was Reasonable. ................ 19

V.      CONCLUSION ............................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*ACLU v. Barnes*,
    168 F.3d 423 (11th Cir. 1999) ................................................................. 21

*Blum v. Stenson*,
    465 U.S. 886 (1984) .............................................................................. 17, 19

*Cintas Corp. v. Perry*,
    494 F. Supp. 2d 907 (N.D. Ill. 2007) ........................................................ 18

*Costa v. Datapro, Inc.*,
    No. 10-23172-CIV, 2012 WL 591307 (S.D. Fla. Feb. 22, 2012) .............. 21

*Domond v. PeopleNetwork APS*,
    750 F. App'x 844 (11th Cir. 2018) ............................................................ 19

*Duckworth v. Whisenant*,
    97 F.3d 1393 (11th Cir. 1996) .................................................................. 19

*Env't Mfg. Sols., LLC v. Peach State Labs, Inc.*,
    274 F. Supp. 3d 1298 (M.D. Fla. 2017) ..................................................... 20

*Farrar v. Hobby*,
    506 U.S. 103 (1992) .............................................................................. 15, 16

*Gray v. Lockheed Aeronautical Sys. Co.*,
    125 F.3d 1387 (11th Cir. 1997) ................................................................ 20

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983) .............................................................................. 17, 20

*In re 3M Combat Arms Earplug Products Liability Litigation*,
    2021 WL 830309 ......................................................................................... 9

*Lacayo v. Wells Fargo Bank, N.A.*,
    16-23187-CIV, 2020 WL 2488377 (S.D. Fla. Apr. 13, 2020) ................... 15

*Laffey v. Northwest Airlines, Inc.*,
    746 F.2d 4 (D.C. Cir. 1984) ...................................................................... 18

*Loranger v. Stierheim*,
    10 F.3d 776 (11th Cir. 1994) .................................................................. 17, 18

*Manildra Milling Corp.*,
    76 F.3d .................................................................................................... 16

*Norman v. Housing Author. of City of Montgomery*,
    836 F.2d 1292 (11th Cir. 1988) ................................................................. 18, 20, 21

*Nutrivida, Inc. v. Inmuno Vital, Inc.*,
    46 F. Supp. 2d 1310 (S.D. Fla. 1998) ................................................................. 18

*Octane* Fitness*, LLC v. ICON Health & Fitness, Inc.*,
    572 U.S. 545 (2014)................................................................................................. 16

*Perdue v. Kenny A. ex rel. Winn*,
    559 U.S. 542 (2010)................................................................................................. 18

*Polara Eng'g Inc. v. Campbell Co.*,
    894 F.3d 1339 (Fed. Cir. 2018) ............................................................................... 7

*Rumsey v. Department of Justice*,
    866 F.3d 1375 (Fed. Cir. 2017) ............................................................................. 19

*Save Our Cumberland Mountains, Inc. v. Hodel*,
    857 F.2d 1516 (D.C. Cir. 1988) ............................................................................. 18

*Shelden v. United States*,
    41 Fed. Cl. 347 (Fed. Cl. 1998) ............................................................................. 18

*Shipping and Transit, LLC v. 1A Auto, Inc.*,
    283 F. Supp. 3d 1290 (S.D. Fla. 2017) ................................................................. 19

*Shum v. Intel Corp.*,
    629 F.3d 1360 (Fed. Cir. 2010) ............................................................................. 15

*SSL Services, LLC v. Citrix Systems, Inc.*,
    769 F.3d 1073 (2014)............................................................................................... 15

*TC Heartland LLC v. Kraft Food Brands LLC*,
    137 S. Ct. 1514 (2017).............................................................................................. 2

*Therasense, Inc. v. Becton, Dickinson & Co.*,
    649 F. 3d 1276 (Fed. Cir. 2011) ...................................................................... 13, 14

*Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc.*,
    253 F.3d 1332 (11th Cir. 2001) ............................................................................. 15

*Tropical Paradise Resorts, LLC v. JBSHBM, LLC*,
    No. 18-CV-60912, 2021 WL 2269822 (S.D. Fla. Apr. 30, 2021) ......................... 19

**Federal Rules**

Fed. R. Civ. P. 54(d)(2)(B) ........................................................................................ 15

Plaintiff Roland Corporation ("Plaintiff" or "Roland"), pursuant to Fed. R. Civ. P. 54(d)(1) and (2), as well as S.D. Fla. Local Rule 7.3, hereby moves for the entry of a judgment determining that Roland is the prevailing party and for attorneys' fees in favor of Plaintiff and against Defendant inMusic Brands, Inc. ("inMusic" or "Defendant"), and in support thereof states as follows.

## I.   INTRODUCTION

The jury reached verdicts for Roland that all remaining asserted claims were infringed and that the claims were not invalid. (ECF Nos. 586 and 587, respectively).. The jury also awarded Roland the full amount of damages sought - $4.6 Million (ECF No. 600).  This Court then issued a Final Judgment consistent with the jury verdicts.  (ECF No. 605).  inMusic sought relief from the Final Judgment pursuant to Rule 60 (ECF No. 614), but this Court denied that motion on December 7, 2022 (ECF No. 620).

This case is exceptional based both on the substantive strength of the parties' litigation positions, as well as the unreasonable manner in which inMusic litigated the case.  The unanimous jury verdict confirmed the strength of Roland's infringement and invalidity positions. Prior to commencement of litigation, inMusic could have taken a license just like every other significant entity in the electronic music industry, but refused and forced a six year litigation to occur. inMusic specifically intended to "go after" Roland's best-selling TD-11K product and copied it. Despite its intentional targeting of Roland's products and technology, inMusic never obtained an opinion of counsel that it did not infringe or that Roland's patents were invalid.

During litigation, inMusic continued its improper tactics by taking baseless non-infringement positions that were so outlandish that even its own professional expert refused to adopt some of them at trial.  Nevertheless, inMusic still urged the jury to find all claims not infringed, even when it knew it had no evidence or even argument for non-infringement of some claims. inMusic made up false claim constructions and was chastised by the Court for doing so and inMusic's made up claim construction rendered its invalidity positions completely untenable.

When inMusic had the chance to settle the litigation for a relative pittance, it refused and put Roland and the Court through years of litigation and millions of dollars in fees.  inMusic's conduct makes this case stand out both with respect to the substantive strength of its litigation positions as well as the unreasonable manner in which it litigated the case. Accordingly, the Court should award Roland its reasonable attorneys' fees of $6,316,634.01.

## II.   FACTUAL BACKGROUND

### A.   Summary Of Proceedings

Roland initially filed this lawsuit in the C.D. Cal. on August 19, 2016 (Case No. 2:16-CV-06256-CBM-AJW).   inMusic initially filed a deficient Answer and Counterclaims. Roland successfully moved to dismiss the counterclaims and strike various affirmative defenses. (C.D. Cal. ECF No. 40). After the Supreme Court's ruling in *TC Heartland LLC v. Kraft Food Brands LLC*, 137 S. Ct. 1514 (2017), the case was transferred to Miami.

Roland propounded discovery, took depositions, served subpoenas, participated in claim construction, and conducted expert discovery.   Roland subsequently moved for summary judgment, made pre-trial motions, and put on a successful jury trial, resulting in unanimous verdicts that all claims asserted at trial were infringed and not invalid, and $4.6 Million in damages.

### B.   Roland Successfully Licensed Its Patents To The Music Industry But inMusic Unreasonably Refused To Take A License

Unlike virtually all other competitors, inMusic was the only party to use Roland's patented technology but not take a license to Roland's patents in suit. Pintech Industries, Inc.[1], Hart Dynamics, Inc.[2], Guitar Center, Inc.,[3] Drum Workshop, Inc., Pintech USA, Inc., Virgin Musical Instrument Company, Inc.,[4] Drum Workshop, Inc.,[5] Pearl Music Instrument Company,[6] Hal Leonard Corporation,[7] Armadillo Distribution Enterprises, Inc.,[8] and SCC Rolando Ltd.[9] all took licenses to Roland's patents.

---

[1] 11/3/22 Rough Tr.  (Ex. A) at 65:7-66:16 & Plaintiff's Exhibit 107 (ECF No.  610-17).
[2] 11/3/22 Rough Tr.  at 63:3-7, 66:17-68:2; & Plaintiff's Exhibit 161 (ECF No.  610-26); 11/3/22 Rough Tr.  at 73:1-14.
[3] 11/3/22 Rough Tr.  at 70:7-72:5 & Plaintiff's Exhibit 159 (ECF No.  610-25); 11/3/22 Rough Tr. at 73:15-74:4 & Plaintiff's Exhibit 464.
[4] 11/3/22 Rough Tr.  at 74:5-11.
[5] 11/3/22 Rough Tr.  at 74:13-16.
[6] 11/3/22 Rough Tr.  at 74:17-20.
[7] 11/3/22 Rough Tr.  at 74:21-23.
[8] 11/3/22 Rough Tr.  at 74:24-75:4.
[9] 11/3/22 Rough Tr.  at 75:5-8.

2

Timeline of Roland Patent Licenses and Enforcement

| Exhibit # | Date | Party | Action |
|---|---|---|---|
| 107, 433, 434, 435, 436 | June 1, 2001 | Pintech Industries, Inc. | Patent License agreement entered (and amendments) |
| 161 | December 16, 2003 | Hart Dynamics, Inc. | Patent License agreement entered |
| 459 | March 27, 2009 | Mitch Herbert DBA UFO Drums | Settlement agreement |
| 456 | March 31, 2009 | Rene Audette | Settlement agreement |
| 462 | May 29, 2009 | Wirges Percussion Systems | Settlement agreement |
| 159 | May 18, 2012 | Guitar Center, Inc. | Patent License agreement entered |
| 162 | August 23, 2013 | Pintech USA, Inc. | Patent License agreement entered |
| 464 | October 13, 2015 | Guitar Center, Inc. | Patent License agreement entered |
| 125 | April 1, 2016 | Virgin Musical Instrument   Company, Inc. | Patent License agreement entered |
| 131 | June 30, 2017 | Drum Workshop, Inc. | Patent License agreement entered |
| 130 | July 1, 2017 | Pearl Music Instrument Company | Patent License agreement entered |
| 132 | January 1, 2018 | Hal Leonard Corporation | Patent License agreement entered |
| 240 | August 19, 2018 | Armadillo Distribution Enterprises, Inc. | Patent License agreement entered |
| 134 | August 29, 2018 | Armadillo Distribution Enterprises, Inc | Patent Release Agreement entered |
| 133 | September 30, 2018 | SCC Audio Ltd | Patent Release Agreement entered |

Other industry participants who did not initially take licenses settled quickly after being sued and ceased infringement, including: Mitch Herbert DBA UFO Drums,[10] Rene Audette,[11] and Wirges Percussion Systems.[12]

inMusic stood alone in refusing to take a license: "[T]here was only one entity who did not take a license and did not stop selling and that's why we are here today. That was Alesis or inMusic."[13] The rest of the electronic music industry that used Roland's patented technology either licensed Roland's technology or simply stopped infringing.  One of the largest entities in the industry, Guitar Center, bought the same cymbals from Medeli that inMusic bought.[14] Unlike inMusic, however, Guitar Center properly paid royalties on the cymbals. inMusic's actions, which were completely inconsistent with the rest of the industry, demonstrate that inMusic should have taken a license and should not have even pushed Roland to file this lawsuit.

---

[10] 11/3/22 Rough Tr.  at 68:9-25 & Plaintiff's Exhibit 459 (ECF No.  610-84).
[11] 11/3/22 Rough Tr.  at 69:3-10 & Plaintiff's Exhibit 456 (ECF No.  610-83).
[12] 11/3/22 Rough Tr.  at 69:11-70:4 & Plaintiff's Exhibit 462 (ECF No.  610-85).
[13] 11/3/22 Rough Tr.  at 75:15-17.
[14] 11/3/22 Rough Tr.  at 106:13-20.

Even third parties having no connection to the litigants have observed: "inMusic was probably destined to lose this lawsuit the moment it was filed." *See* https://www.youtube.com/watch?v=z18CRn3SAgk at 11:33.

### C. Roland Put inMusic On Notice Of Roland's Patents But inMusic Intentionally Copied A Product Of Roland Covered By Roland Patents

inMusic further admitted that it wanted to "go after" the popular Roland TD-11K electronic drum kit, as it was the best-selling kit on the market.[15]



inMusic cannot claim that its infringement was unintentional. Roland repeatedly sent inMusic cease and desist letters explaining inMusic's infringement and warning inMusic to stop infringing.[16]



---

[15] Plaintiff's Exhibit 392 (ECF No. 610-76).
[16] 11/3/22 Rough Tr. at 75:9-83:24.

4

In 2008, inMusic wrote a letter alleging that its products did not include a mesh or net-like material.[17]



But by 2015, inMusic reversed course and did include a mesh material in its drum heads. Those products with the mesh heads were the subject of the jury's unanimous verdict that all asserted claims at trial were infringed.[18]  With respect to its cymbal products, even when inMusic promised to discontinue infringement with one version of a cymbal,[19] it never informed Roland that inMusic planned to continue infringement by using a different cymbal design.



---

[17] Plaintiff's Exhibit 22 (ECF No. 610-6).
[18] 11/3/22 Rough Tr.  at 79:5-11, 80:22-81:1.
[19] 11/3/22 Rough Tr.  at 80:10-21

inMusic intentionally copied Roland's products and proceeded to infringe even when warned not to do so.  Further, inMusic attempted to hide its infringing behavior and did not disclose to Roland that inMusic would come out with a different infringing design.

### D.    inMusic Presented No Evidence That It Reasonably Believed It Did Not Infringe Or That Roland's Patent Were Invalid

Roland repeatedly warned inMusic not to infringe Roland's patents and explained inMusic's infringement. In light of such warnings, a reasonable party would have obtained an opinion of counsel. *See Polara Eng'g Inc. v. Campbell Co.,* 894 F.3d 1339, 1353-54 (Fed. Cir. 2018) (recognizing the relevance of "reliance on competent opinion of counsel").  inMusic, however, failed to present any evidence of an opinion of counsel that its products either did not infringe Roland's patents or that Roland's patents were invalid.

### E.    inMusic Took Baseless Non-Infringement Positions During Litigation

Even at trial, inMusic effectively conceded infringement of '458 Patent Claims 1, 2, 4, as well as '535 Patent claims 19, 20, 21 by not putting on any evidence of non-infringement.[20]  Indeed the only non-infringement arguments inMusic made with respect to those patents were for '535 Claim 23 and '458 Patent claims 6, 7, 9, 17 as evidenced by its own technical expert's testimony.

Despite the fact that inMusic had absolutely no non-infringement evidence or even argument for '458 Patent Claims 1, 2, 4, as well as '535 Patent claims 19, 20, 21, during closing argument, inMusic still urged the jury to find those claims not infringed![21]

---

[20] 11/14/22 Rough Tr.  (Ex.  **B**) at 82:6-9, 92:14-25; and 11/15/22 Rough Tr.  (Ex.  D) at 25:4-24:
Q: So am I correct I did not hear you give a noninfringement opinion about [458 Patent] Claim 1?
A.  That's correct.
Q.  And am I correct that I did not hear you give a noninfringement opinion about Claim 2?
A.  That's right.
Q.  And then Claim 4.  Am I correct that I did not hear you give a noninfringement opinion about Claim 4?
A.  That's correct.
Q.  All right.  Let's turn to the same exercise with the 535 Patent which is Plaintiff's Exhibit 3. Claim 19.  Am I correct that I did not hear you give a noninfringement opinion about Claim 19?
A.  Yes, Claim 19 and the previous ones, actually, my opinions of these was that they are not valid and I did not -- so let me just check.  That's right, I did not have a noninfringement opinion on this.
Q.  And then what about Claims 20 and 21? Is that correct that you did not give a noninfringement opinion about Claims 20 and 21?
A.  Yes, these were in my invalidity opinions.
[21] 11/15/22 Rough Tr.  (Ex.  D) at 161:7-9.

6

Despite its utter lack of a good faith non-infringement argument, inMusic continuously asserted during pre-trial proceedings that it did not infringe '458 Patent Claims 1, 2, 4, as well as '535 Patent claims 19, 20, 21. inMusic put Roland, the Court, and the jury through an entire trial on infringement. inMusic asserted non-infringement of those claims in its technical expert's initial report (Ex. I dated April 12, 2019 at Exhibit 4 p. 3 & Exhibit 3 p. 10), and again in his "Supplemental" expert report (Ex. J dated March 1, 2022 at Supplemental Ex. 4 p. 3 and Supplemental Ex. 3, p. 3) asserting the baseless position that the accused products do not meet the limitation "frame and a net-like material comprising first and second net members, each supported by said frame, said net-like material having openings through which air may pass" because "each net member is not supported by said frame." Of course each net member was obviously supported by the frame, as Roland's expert explained.[22]   During closing argument, inMusic presented no argument to counter Roland's expert testimony. Of course, Roland's expert testimony was



**Pictured: Mesh head representative of mesh heads on all Accused Drum Products (Lehrman Rep. Ex. KK)**

exactly what the jury concluded and what anyone with eyes could see.

inMusic's position was so untenable that even inMusic's own expert, who has previously been excluded from testifying in another case,[23] could not bring himself to take his own outlandish "each net member is not supported by said frame" position at trial.

---

[22] 11/10/22 Rough Tr. (Ex. C) 42:3-15: "Yes, the frame keeps the net members, the layers in place. Without the frame, they would just flop around. . . . Just showing that without the frame, the fabric, the two layers of mesh would have nothing to hold onto and would be flexible and just flop around by themselves. "

[23] *See In re 3M Combat Arms Earplug Products Liability Litigation*, 2021 WL 830309, ("Dr. Kytomaa is not qualified to offer opinion testimony about Dr. Eddins and Juneau's silicone ear replicas or their testing methods because he has never worked in the field of audiology,

Roland brought a motion for summary judgment of '535 Patent Claim 19 earlier in the case (ECF No. 358 at 8-9), and even though inMusic should have conceded non-infringement at summary judgment, just as it eventually effectively did at trial, it made false arguments that allowed it to survive summary judgment (ECF No. 365 at 16-17). inMusic's bad faith conduct of knowingly asserting non-infringement positions prolonged the litigation and made it more expensive.

### F.    inMusic Asserted Non-Infringement Positions For "Head Sensor" That Contradicted The Court's Claim Construction Order

Even though inMusic was chastised by Magistrate Judge Louis in ECF No. 442 at 24 for conflating her claim constructions by misconstruing the phrase "head sensor," inMusic continued the same conduct at trial in an attempt to confuse the jury and the Court. Defendant first improperly attempted to incorporate "transducer," and "cushioning member" into the definition of "head sensor" during summary judgment briefing, stating, without citation to any ruling, evidence, or other authority, that: "A 'head sensor' is a singular part including one transducer and one cushioning member/material." ECF No. 361 at 5 (Defendant's Motion For Partial Summary Judgment).

The Court, in no uncertain terms, rejected Defendant's improper attempt to change the Court's definition of "sensor," defined as "head sensor" to "a singular part including one transducer and one cushioning member/material." The Court expressly stated:

> The term "head sensor" was not submitted for claim construction by the Court. Notwithstanding, Defendant's Motion for Summary Judgment is predicated on Defendant's position that none of the Accused Products contains a "head sensor" as that term has been construed by this Court. See, e.g., Reply (ECF No. 375) at 3-4 ("The R&R made clear that the 'head sensor' includes a 'transducer,' as a different limitation."). Defendant's Motion further advances a construction, purportedly made by this Court, of a "head sensor" defined as "a singular part including one transducer and one cushioning member/material." ECF No. 361 at 5. No citation to the R&R follows this assertion, tellingly, but the discussion from the R&R on which Defendant here relies (ECF No. 252 at 8-9) relates to the analysis of the term "transducer," not "sensor." **While Defendant would impart more significance to the Court's**

---

conducted or evaluated REAT or MIRE testing, otherwise performed research or work with human ears and/or ear molds, or adequately explained how his general engineering background provides a sufficient basis for his proposed opinions on those matters. ")

**discussion of the "head sensor" than was there intended,**[24] [10] **its argument fails to consider that the discussion <u>did not even relate to the Patent claims on which it would now impart that meaning</u>—to reiterate, <u>the analysis of the term "transducer" considered none of the claims on which Defendant seeks summary judgment on this basis because none of those claims use that term, but rather, claim a "sensor."</u>**

ECF No. 442 at 24 (emphasis added).

Despite Magistrate Judge Louis's explanation, and knowing that the word "transducer," did not appear in any asserted claim, or even the specification of the asserted drum patents, inMusic repeated at trial its discredited position that a "head sensor" must include a "transducer" as the word "transducer" was defined for other patents,[25] as well as a "cushioning member." This baseless position by inMusic was taken in bad faith and weighs in favor of a finding that this case is exceptional.

### G.    inMusic Maintained Invalidity Positions At Trial That Contradicted Its Own Fabricated Definition Of "Head Sensor"

Although inMusic conveniently used its definition of "head sensor" to attempt to avoid an infringement finding at trial, it refused to use its made up definition of "head sensor" when arguing invalidity. inMusic knew no prior art disclosed structures corresponding to inMusic's made up "head sensor"[26] definition. inMusic's assertion of objectively baseless positions makes this case exceptional.

### H.    inMusic Refused To Settle The Case For An Amount Dwarfed By The Amount Of Fees inMusic Spent On The Case After inMusic Reneged On Its Settlement Position Taken During Mediation

In December 2019, the parties mediated the case and signed a Term Sheet that would have settled the case and licensed Roland's cymbal patents to inMusic for "$2 per accused cymbal sold

---

[24] [10] "It also bears noting that the cited discussion summarizes *Defendant's* contention and does not even memorialize any finding by this Court. ECF No. 252 at 8 ("Defendant contends that the Patent teaches a single head sensor, of which the transducer is a component. "). "

[25] 11/15/22 Rough Tr. at 29:6-15.

[26] 11/15/22 Rough Tr. at 30:2-33:24 admitting that none of the relied upon prior art, Karch, Ishida, nor Klynas has a "head sensor" per inMusic's made up definition. *See id.* at 33:20-24:

"Q. So you told the jury yesterday that all this prior art renders the claims invalid, but none of it shows a cushioning member with an upward taper. You never even mentioned anything about that in your direct exam for invalidity, right?

A. I'm not --"

by" inMusic. ECF No. 290 at 3. Subsequent to December 6, 2019, the parties worked on preparing a typed, formal settlement agreement and patent license agreement. The parties had various disagreements, but they resolved most of the disagreements. Defendant, however, subsequent to December 6, 2019, indicated that it would not pay the agreed upon $2 per cymbal, for cymbals sold in kits. Instead, Defendant alleged, presumably falsely, that it would be difficult to identify how many cymbals were sold per kit and Defendant only wanted to pay $3 per kit, irrespective of the number of cymbals in the kit. Defendant would still agree to pay $2 per accused cymbal for those sold individually. *Id.* at 5. Had Defendant simply abided by the Term Sheet it signed in December 2019, it would have ended up paying less than $100,000 to settle the case.[27]

Instead of making that obvious business and legal decision that would have saved the parties an enormous amount of legal fees, and the Court an enormous amount of work, inMusic refused to go forward with the settlement agreement. Instead, inMusic aggressively put the parties through three more years of litigation that resulted in a $4.6 Million judgment against inMusic. inMusic has litigated this case irrationally and excessively aggressively the entire time and inMusic's litigation conduct renders this case exceptional.

## I.     inMusic Interfered With Discovery

inMusic's improper litigation tactics were not limited to trial and summary judgment. During discovery, inMusic repeatedly disrupted depositions with inappropriate objections, objecting hundreds of times to proper questions, merely saying "Objection" or worse, coaching the witness. *See* ECF No. 111 at 2-6. The Court held a hearing on Roland's motion for sanctions and addressed inMusic's inappropriate and disruptive objections[28]:

> THE COURT: Ms. Briggs, let me ask you a question. Why did you instruct this witness not to answer the question whether or not he knew he had been identified as a person with knowledge?
>
> MS. BRIGGS: Your Honor, that was -- I instructed him not to answer that question to the extent it required him to disclose information in his conversations with me. And to the extent the Court has any concerns about that, I can certainly address it.

---

[27] *See* Ex.  E, at Exhibit 16. 1, finding total sales of cymbals for a much longer period of time – July 2017-June 2021 when the cymbal patents expired to be 51,949 units.  Rounding down only slightly to assume for the sake of argument, that 50,000 cymbals were sold after since December 2019, the total royalty would have been 50,000 cymbals multiplied by $2/cymbal for $100,000.
[28] Ex.  F, July 18, 2018 Transcript at 9:7-10:21.

However, I would highlight that that is not the complaint that Roland has raised in any of its three motions.

THE COURT: It's one of the reasons that I asked for you to be here today.

MS. BRIGGS: Sure.

THE COURT: Because the objections -- I read all the depositions. I'm not impressed. I got to tell you right at the top, I'm not looking to issue a written order that goes into how improper these objections were. But I did want you here so that you and I could look each other in the eye and agree that these objections don't happen again.

MS. BRIGGS: I understand.

THE COURT: For example, I would like the benefit of hearing your position on how you thought that was an appropriate objection and preventing this witness from answering that question.
    You know he followed -- I hear you when I say I only told him to the extent it would call for counsel's instruction. What part of counsel telling him he's been identified Rule 26 disclosures would include legal advice? How -- even if it came from you, how would that have been privileged information?

MS. BRIGGS: It was part of a -- in my mind, I was thinking about meetings that I had had with him to prepare and discussions that I had had with him. If Roland has an issue with that, we can certainly address it and –

THE COURT: We're not going to get very far in this case if every time a witness is prevented from giving an answer, a party has to bring a motion before the Court.

**J.    inMusic Made False Statements To The Court And Baselessly Pursued Its Inequitable Conduct Claim**

inMusic's counsel falsely stated to the Court that inMusic asked for a covenant not to sue on the '626 patent, implying that Roland refused. [29] The reality, however, is that <u>Roland</u> was the

---

[29] 11/18/22 Rough Tr.  (Ex.  G) at 168:17-196:7:
MR.  SCOTT: Okay.  In any event, earlier in the proceeding we reached out to them because it's the only live patent and asked them for a covenant not to sue because Judge Louis granted, based on their claim construction, our client does not infringe the 626.
    So we have a live patent, we have an aggressive plaintiff, and so we were looking for peace on this patent.
THE COURT: What about that?
MR.  DE GYARFAS: That's completely false, Your Honor.
THE COURT: Well --

one agreed to a covenant not to sue and inMusic rejected it!  *See* Ex. K, 7/15/22 7:22 am email. inMusic never agreed to Roland's proposed covenant not to sue, but instead proceeded to make a false statement to the Court.

Perhaps just as egregious as inMusic's false statement to the Court, inMusic then put the parties and the Court through what it had to have known would be a meritless bench trial on the issue of inequitable conduct. To prove inequitable conduct, inMusic has the burden to prove by clear and convincing evidence that the applicant knew of a withheld reference, knew that it was material, and made a deliberate decision to withhold it from the Patent Office. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F. 3d 1276, 1290 (Fed. Cir. 2011). To meet the clear and convincing evidence standard, the specific intent to deceive must be the single most reasonable inference able to be drawn from the evidence. *Id.* When there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found. *Id.* at 1290-91. Because the party alleging inequitable conduct bears the burden of proof, the patentee need not offer any good faith explanation unless the accused infringer first proves a threshold level of intent to deceive by clear and convincing evidence. *Id.* at 1291.

Despite inMusic's knowledge that no Roland representative or employee identified by inMusic had knowledge of the allegedly withheld references during prosecution of the '626 Patent, and inMusic's extremely high burden to prove inequitable conduct, inMusic proceeded with the inequitable conduct trial instead of taking the covenant not to sue. inMusic then, without any evidence at all, shamelessly asserted that "Mr. Rittmaster, Mr. Sobaje, Mr. Yoshino, and Mr. Arai all knew of the Japanese rejection and its bases, knew that the information was material, and made a deliberate decision to withhold it." ECF No. 625 at 14. inMusic cited nothing whatsoever for that statement. The truth is the opposite. Neither Mr. Sobjae, Mr. Yoshino, nor Mr. Arai ever provided any testimony whatsoever regarding anything in this case and inMusic has no evidence about the knowledge of those individuals. The undisputed testimony from Mr. Rittmaster was that he had "no knowledge of any of the prosecution in Japan. It was all in Japanese and we take our instructions from our client, but we had no knowledge."[30]  Indeed, the undisputed testimony was

---

MR.  DE GYARFAS: We offered a covenant not to sue.  The only provision in it was that they wouldn't seek attorneys' fees for us offering this covenant not to sue, and they rejected that, but we did offer a covenant not to sue.  I have the email if you want to see it.

[30] 11/18/22 Rough Tr.  at 185:25-186:2.

that Mr. Rittmaster did not even know about a Japanese Patent Office rejection until after this litigation started.[31, 32]

inMusic surely knows that it has no possibility of establishing that the four individuals it shamelessly attacks had "the specific intent to deceive," and that it is "the single most reasonable inference able to be drawn from the evidence." *Therasense*, 649 F. 3d at 1290. The far more reasonable inference is that the Japanese Patent Office rejection never got reported by Roland's Japanese patent prosecution firm to Mr. Rittmaster or anyone else identified by inMusic. The fact that at least one other reasonable inference exists dooms inMusic's inequitable conduct claim. Further, the jury found the '626 Patent not invalid over the Takami[33] and Wu[34] references inMusic argued about, and there is no evidence that the withheld references would be found material by the U.S. Patent Office. inMusic utterly failed to prove knowledge, intent, and materiality.

Despite the overwhelming burden inMusic faced, inMusic filed an inequitable conduct brief frequently lacking factual support, and the brief besmirches attorneys and inventors who have never been accused of any wrongdoing previously. inMusic's conduct renders this case exceptional.

## III.   APPLICABLE LEGAL STANDARDS

---

[31] 11/18/22 Rough Tr. at 188:13-15.

[32] Regardless of the Court's reference to "Sergeant Schultz" and inMusic's false allegations that Mr. von Sauers testified that that no one knew any specifics about the JPO rejection, the truth is that Mr. von Sauers, a retired U.S. Navy Captain and current serving Colonel in the California State Guard, who is deeply offended by these insinuations, and he did not testify as inMusic alleges. In fact, he testified he did not recall the details of a 12-year-old document with which Mr. Scott ambushed him at trial. This testimony is completely reasonable given the fact that he was never identified as a testifying witness prior to trial and had no opportunity to review this document prior thereto. In any event, as noted, the role of Roland U.S. personnel in patent prospection was limited to passing Japanese language documents to Foley and Lardner for further translation and action. In particular, Roland U.S. did not do any analysis of such documents, and there is no evidence whatsoever that Roland U.S. even knew of the Takami and Wu references. Therefore, any allegation that Roland U.S. had any "intent to deceive" with respect to the '626 patent prosecution is completely baseless and false. inMusic also falsely asserted that it is "undisputed" that files for the application leading to the '626 patent went from Roland Japan to Mr. von Sauers to Foley & Lardner, but the trial testimony was to the contrary. 11/18/22 Rough Tr. at 215:6-16.

[33] Defendant's Exhibit 1445 at 2 – "The device relates to a load-detection with structure that is used in residual oil amount sensor of an oil fan heater or the like. "

[34] Defendant's Exhibit 1443 – "Pressing Type Potentiometer. "

**A.      Roland's Motion Is Timely**

Regarding the timing of a motion for attorneys' fees, Fed. R. Civ. P. 54(d)(2)(B) provides: "**Unless a statute or a court order provides otherwise**, the motion must: (i) be filed no later than 14 days after the entry of judgment" (emphasis added). Local Rule 7.3, however, provides that such a motion may be made within 60 days after entry of judgment. The Eleventh Circuit has held that Local Rule 7.3 is a "court order" that "provides otherwise" such that the requirements of Rule 7.3 apply rather than those of Rule 54(d)(2). *See Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc.*, 253 F.3d 1332, 1335 (11th Cir. 2001); *see Lacayo v. Wells Fargo Bank, N.A.*, 16-23187-CIV, 2020 WL 2488377, at *5 (S.D. Fla. Apr. 13, 2020).  Accordingly, because this motion has been filed within 60 days of the November 21, 2022 "Final Judgment" (ECF No. 605), the motion is timely.

**B.      Roland Should Be Deemed The Only Prevailing Party In This Case**

To be the "prevailing party," the Federal Circuit requires: (1) that the party "received at least some relief on the merits," and (2) "[t]hat relief must materially alter the legal relationship between the parties by modifying one party's behavior in a way that `directly benefits' the opposing party." *See Shum v. Intel Corp.*, 629 F.3d 1360, 1367 (Fed. Cir. 2010). A party "prevails" when "actual relief on the merits of his claim materially alters the legal relationship between the parties ... in a way that directly benefits the [party]." *Farrar v. Hobby*, 506 U.S. 103, 111-12 (1992). For example, the Supreme Court in *Farrar* found that a plaintiff who won nominal damages was still the prevailing party because a judgment for damages in any amount modified the defendant's behavior to the plaintiff's benefit. *Id.* The Court explained that the degree of the overall success impacts only the reasonableness of the fee award. *Id.*

In *SSL Services, LLC v. Citrix Systems, Inc.*, 769 F.3d 1073 (2014), the Federal Circuit found the patent owner who obtained damages on one patent but lost (non-infringement) on a second patent was the prevailing party:

> SSL has a judgment for damages against Citrix. This judgment is a 'relief on the merits [that] materially alters the legal relationship' of the parties. *Farrar*, 506 U.S. at 111, 113 S.Ct. 566; *Manildra Milling Corp*., 76 F.3d at 1182 ("[A] judgment for damages in any amount modifies the defendant's behavior to the plaintiff's benefit."). Even though SSL did not succeed on all of its infringement claims, this does not change the outcome. *See Kemin*, 464 F.3d at 1347-48 (upholding a district court's finding that a patent holder is the prevailing party when it 'prevailed on one of its two infringement claims (resulting in a damages award and a permanent injunction),' and the patent holder 'prevailed on [the accused infringer's]

14

invalidity and unenforceability claims.'). In view of the parties' respective successes, we find SSL is the "prevailing party" for purposes of Federal Rule of Civil Procedure 54(d) and 35 U.S.C. § 285.

Just as the Plaintiff in *SSL Services*, Roland prevailed on patent claims and was awarded money damages, even though Roland did not obtain a judgment of infringement for every patent originally asserted. Accordingly, only Roland is the prevailing party in this case.

### C. Standards For Finding A Case To Be Exceptional, Warranting An Award Of Attorney's Fee

Under 35 U.S.C. § 285, a "court in exceptional cases may award reasonable attorney fees to the prevailing party." An "exceptional" case is "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) **or** the unreasonable manner in which the case was litigated." *Octane* Fitness, *LLC v. ICON Health & Fitness, Inc*., 572 U.S. 545, 554 (2014) (emphasis added). A district court determines whether a case is "exceptional," in the case-by-case exercise of its discretion, by considering "the totality of the circumstances." *Id.* While there is "no precise rule or formula" governing this determination, the court appropriately considers the totality of circumstances, taking into consideration such factors as frivolousness, motivation, objective unreasonableness as to the factual and legal components of the case, and the need in particular circumstances to advance considerations of compensation and deterrence. *Id.* at 554 n.6.

As detailed above, prior to commencement of litigation, inMusic stood alone in the electronic music industry as the only party to use Roland's patented technology but who refused to take a license or stop infringing. inMusic was put on notice of Roland's patents and intentionally copied Roland's best-selling product, the TD-11K. inMusic copied Roland's mesh head technology for drums and rotation stopper technology for cymbals. Despite its intentional targeting of Roland's products and technology, inMusic never obtained an opinion of counsel that it did not infringe or that Roland's patents were invalid.

During litigation, inMusic continued its exceptionally improper tactics by taking baseless non-infringement positions that were so outlandish that even its own professional testifying expert refused to adopt them at trial. Nevertheless, inMusic still urged the jury to find all claims not infringed, even when inMusic knew it had no evidence or even argument for non-infringement of various claims. inMusic made up a false claim construction and was chastised by the Court for

doing so, and inMusic's made up claim construction rendered its invalidity positions completely untenable.

When inMusic had the chance to settle the litigation for a relative pittance, it refused and put Roland and the Court through years of litigation and millions of dollars in fees. inMusic's true purpose for refusing to settle has never been disclosed, but no rationale litigant would have conducted itself as inMusic did.

inMusic made false statements to the Court and baselessly pursued an inequitable conduct claim with no evidence of any wrongdoing whatsoever by the attorneys and inventors it besmirched. All of inMusic's conduct makes this case exceptional and stand out both with respect to the substantive strength of its litigation positions as well as the unreasonable manner in which inMusic litigated the case. Accordingly, the Court should award Roland its reasonable attorneys' fees.

## IV.   ROLAND SHOULD BE AWARDED ITS ATTORNEYS' FEES

### A.   Roland Is Entitled To Recover Its Reasonable Attorneys' Fees

The fee award Roland seeks is based on reasonable billing rates, the work expended, that the work performed was reasonable, and that the total fees and expenses incurred were reasonable. The Eleventh Circuit uses the "lodestar" method to determine the reasonableness of a fee application, where the "lodestar" is calculated by multiplying the number of hours reasonably expended by a reasonable hourly rate. *See Loranger v. Stierheim*, 10 F.3d 776, 781 (11th Cir. 1994) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). The lodestar amount reflects certain factors, including the novelty and complexity of the issues, the special skill and experience of counsel, the quality of representation, and the results obtained from the litigation. *See Blum v. Stenson*, 465 U.S. 886, 889-90 (1984). Further, "[i]n intellectual property cases, . . . courts have held that 'a party should be entitled to retain the most competent counsel available' because the issues are difficult and require great skill and experience on the part of the attorneys." *Nutrivida, Inc. v. Inmuno Vital, Inc.*, 46 F. Supp. 2d 1310, 1318 (S.D. Fla. 1998) (citation omitted).

In this case, the appropriate lodestar figure is $6,316,634.01, which corresponds to the total attorneys' fees billed to Roland for litigating this patent lawsuit to date.[35] *See* de Gyarfas Dec. ¶

---

[35] This lodestar figure includes fees billed through November 30, 2022, but it does not reflect all fees billed for the work relating to the instant motion nor work done in December 2022 and beyond.

24. There is a strong presumption that the lodestar figure is reasonable. *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 553-54 (2010). As demonstrated below, this figure is entirely reasonable.  As the court observed in *Cintas Corp. v. Perry*, 494 F. Supp. 2d 907, 908 (N.D. Ill. 2007), *aff'd*, 517 F.3d 459 (7th Cir. 2008), however, "the best evidence of whether attorneys' fees are reasonable is whether a party has paid the fees." Here, Plaintiff has paid all of its bills in full through the end of August 2022. *See* de Gyarfas Dec. ¶ 25.

   **1.**  **The Billing Rates Were Reasonable As Counsel Utilized Its Standard Rates, Or Lower, For Its Highly Experienced Team**

   "A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Norman v. Housing Author. of City of Montgomery*, 836 F.2d 1292, 1299 (11th Cir. 1988). The Court is deemed an expert on the issue of hourly rates and may consider "its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of witnesses as to value." *Loranger*, 10 F.3d at 781.

   The standard rates used by a firm and customary rates used in an industry and geographical location are both appropriate indicia of reasonable rates. In *Shelden v. United States*, 41 Fed. Cl. 347, 351 (Fed. Cl. 1998), this Court held that "it is proper to use current rates as long as they are reasonable." The established billing rates of a firm are customarily presumed to be reasonable. *See Laffey v. Northwest Airlines, Inc*., 746 F.2d 4, 24-26 (D.C. Cir. 1984) ("[W]hen fixed market rates already exist, there is no good reason to tolerate the substantial costs of turning every attorneys['] fee case into a major ratemaking proceeding. In almost every case, the firms' established billing rates will provide fair compensation.") (emphasis in original), *overruled in part on other grounds* by *Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516 (D.C. Cir. 1988) (en banc)). In such cases, "[s]ubmission of invoices and billing records is [sufficient to] satisfy this burden." *Rumsey v. Department of Justice*, 866 F.3d 1375, 1379 (Fed. Cir. 2017). Here, Roland has provided copies of the invoices covering its fees and expenses sufficient to show that the standard rates applied are reasonable. This is particularly true in light of the qualifications of the team, the highly specialized area of their expertise, and the complexity of the patent issues which gave rise to this litigation.

---

For example, the lodestar excludes a large portion of the fees incurred from work that went into determining a reasonable fee award and drafting the instant motion.

The U.S. Supreme Court has reasoned that current market rates are the primary reference points for ascertaining rates that are reasonable. *Blum v. Stenson*, 465 US 886, 895 (1984) (indicating that reasonable hourly rates are "the prevailing market rates in the relevant community"). A reasonable hourly rate is considered the prevailing market rate in the relevant legal community for similar services provided by lawyers of reasonably comparable skills, experience, and reputation. *See Duckworth v. Whisenant*, 97 F.3d 1393, 1396 (11th Cir. 1996). Courts generally look to the experience and reputation of similarly-situated lawyers within the community. *Id*.

In *Shipping and Transit, LLC v. 1A Auto, Inc.*, 283 F. Supp. 3d 1290, 1303-1304 (S.D. Fla. 2017), the court held that hourly rates of $830 for a 30-year intellectual property litigator, $530 for a sixth year attorney, and $515 for a 17-year attorney who served as local counsel were reasonable. In particular, the court held the hourly rates were higher than normal because "as a specialized area of the law, patent litigation continues to command high attorney rates, even in South Florida." Id. at 1303. Similarly, in *Tropical Paradise Resorts, LLC v. JBSHBM, LLC*, No. 18-CV-60912, 2021 WL 2269822, at *9 (S.D. Fla. Apr. 30, 2021), *report and recommendation adopted*, No. 18-CV-60912, 2021 WL 2024424 (S.D. Fla. May 21, 2021) the court found that hourly rates of $787 and $841 were reasonable, recognizing that "patent and intellectual property are specialized areas of law, which continue to command high attorney rates in South Florida." *See also Domond v. PeopleNetwork APS*, 750 F. App'x 844, 848 (11th Cir. 2018) (affirming district court's finding, in an "exceptional" case brought pursuant to the Lanham Act for trademark infringement, that attorneys' hourly rates of $650 were reasonable in light of evidence about Miami rates and in light of counsel's skill, experience, and reputation).

Roland retained the national firm Foley & Lardner LLP ("Foley"). Foley is a law firm with renowned expertise in intellectual property litigation. Given the specialized knowledge, expertise, and experience of Plaintiff's counsel, the most meaningful measure of the appropriate legal market for intellectual property billing rates may be found in a biennial national survey conducted by the American Intellectual Property Law Association (AIPLA), which provides hourly rates for intellectual property attorneys in the Metro Southeast region and throughout the country, last known published in 2021. *See* Ex. H. Courts have relied on survey data, and specifically AIPLA survey data, in assessing whether billing rates are reasonable. *See Env't Mfg. Sols., LLC v. Peach State Labs, Inc.*, 274 F. Supp. 3d 1298, 1322 (M.D. Fla. 2017) (accepting attorneys' hourly rates

18

as reasonable based on AIPLA survey data); *see also Gray v. Lockheed Aeronautical Sys. Co*., 125 F.3d 1387, 1389 (11th Cir. 1997) (concluding that the district court did not abuse its discretion in relying on survey data in determining a reasonable hourly rate).

The 2021 AIPLA survey shows that the 2020 hourly rates of intellectual property partners at private firms in the Metro Southeast region had a range of $358/hour to $1,026/hour and in Los Angeles, where most of the Roland legal work was conducted, the rates ranged from $372/hour to $1,200/hour. *See* page I-37 of Ex. H.

The rates charged by Roland's counsel in this case are consistent with these rates, even without adjusting for inflation over the last three years, in both the Metro Southeast region and Los Angeles markets. Lead counsel, Victor de Gyarfas, a Foley partner and veteran intellectual property litigator who has been litigating patent cases since 1994, charged $670 per hour and that rate was frozen for Roland during the litigation. Other timekeeper's rates are identified in the de Gyarfas declaration as well. These rates are well within the ranges of the hourly rates of intellectual property partners both in the Metro Southeast region, as well as Los Angeles, where much of the work on the case was done.  Summaries of Foley lawyer credentials are attached hereto as Exhibits L-V.

## 2.     The Hours Expended and Work Performed Was Reasonable.

After assessing hourly rates, "[t]he next step … is the ascertainment of reasonable hours." *Norman*, 836 F.2d at 1301. District courts must exercise independent judgment when reviewing a claim for hours reasonably expended. *See id.* at 1301-02. A fee application must provide contemporaneous and accurate records of time spent on a case. *See Hensley*, 461 U.S. at 437. The records must identify the subject matter of the attorney's time expenditures. *Id.*

"Local Rule 7.3(a) requires that the respondent to a motion for attorneys' fees and costs describe with reasonable particularity each time entry or nontaxable expense to which it objects, both as to issues of entitlement and as to amount, and shall provide supporting legal authority." *Costa v. Datapro, Inc.*, No. 10-23172-CIV, 2012 WL 591307, at *4 (S.D. Fla. Feb. 22, 2012) (quotations omitted); *see also ACLU v. Barnes*, 168 F.3d 423, 428 (11th Cir. 1999) ("Those opposing fee applications have obligations, too. In order for courts to carry out their duties in this area, 'objections and proof from fee opponents' concerning hours that should be excluded must be specific and 'reasonably precise.'") (quoting *Norman*, 836 F.2d at 1301).

The time spent working on this matter was reasonable. The time records of Roland's counsel, kept contemporaneously with the work performed, provide concrete and reliable evidence of the reasonable time spent on individual issues. To assist the Court's review, the actual monthly invoices sent from Foley to Plaintiff for this work—including a complete listing of the narrative descriptions of work performed for such fees, listed by date and timekeeper, are included in the accompanying de Gyarfas Declaration. *See* de Gyarfas Dec., ¶¶ 23-24, Exs. 1-72 and W. As reflected in these particularized records and described in the accompanying declaration: (1) the work in this case was allocated to attorneys and other staff judiciously, and the ultimate division of labor was efficient; (2) the time billed was directed towards the resolution of legal issues; (3) toward that end, the work included conducting legal research and drafting legal correspondence, motions, briefs, and supporting materials, and a trial.[36]  *See id.* at ¶ 28. When counsel provided detailed monthly invoices to Roland, Roland paid them.

Moreover, the time spent is documented with sufficient particularity so that the Court can assess the time claimed for each of the activities undertaken in this matter. This case involved all aspects of a patent infringement lawsuit, involving protracted discovery, motion practice, jury trial, and bench trial. Specifically, among other things, Roland's counsel filed and served the complaint, served written discovery upon Defendant, conducted fact and corporate depositions, briefed claim construction and participated in a claim construction hearing, conducted multiple mediations, moved for summary judgment, participated in jury and bench trials, drafted Roland's Proposed Findings of Fact and Conclusions of Law, and expended substantial efforts drafting the instant motion and reviewing its fees billed in reaching a fee award. The jury granted summary judgment in favor of Roland on infringement of all asserted claims, lack of invalidity of all asserted claims, and awarded substantial monetary damages as a result of Defendant's illegal activities following the jury trial in this matter.

## V.    CONCLUSION

For the foregoing reasons, the Court should grant deem Roland to be the prevailing party, find that this case is an exceptional case, and award Roland its reasonable attorney' fees of $6,316,634.01.

---

[36] Further, as is often the case, the accompanying time records—and this fee request—do not reflect all of the time recorded to this case.  For example, Foley wrote off some time spent, and provided courtesy discounts, in recognition of the financial impact of the litigation.

## CERTIFICATE OF CONFERENCE

Pursuant to Local Rules 7.1 and 7.3, I hereby certify that counsel for Plaintiff has conferred telephonically with counsel for Defendant on December 12, 2022 and again on January 11,, 2023regarding the substance of the instant Motion  in a good faith effort to resolve by agreement the issues to be raised in the motion but were unable to come to agreement.

By: */s/   Victor de Gyarfas*

## VERIFICATION

Under penalties of perjury, the undersigned hereby swears and affirms that the factual information contained within this motion and exhibits is true and correct to the best of the undersigned's knowledge and belief.

By: */s/Victor de Gyarfas*

Dated: February 14, 2023                    Respectfully submitted,

By: */s/Laura Ganoza*

**FOLEY & LARDNER L.L.P**
Laura Ganoza, Esq. (Florida Bar No. 118532)
One Biscayne Tower, Suite 1900
2 South Biscayne Boulevard
Miami, Florida 33131
(305) 482-8400
(305) 482-8600 (fax)
*lganoza@foley.com*

Justin B. Uhlemann, Esq. (FBN 568872)
*juhlemann@foley.com*
One Independent Drive
Suite 1300
Jacksonville, Florida 32225
Telephone: 904.359.2000
Facsimile: 904.359.8700

Victor de Gyarfas, Esq. (*pro hac vice*)
555 South Flower Street, Suite 3300
Los Angeles, CA 90071
(213) 972-4500
(213) 486-0065 (fax)
*vdegyarfas@foley.com*
***Attorneys for Roland Corporation***

21

22

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing document is being served this day, February 14, 2023, via email, including to the below listed counsel of record:

*/s/ Laura Ganoza*
Laura Ganoza

## <u>SERVICE LIST</u>

| | |
|---|---|
| Joseph Bain | Craig M. Scott (pro hac vice) |
| Robert Rodriguez | Christine K. Bush (pro hac vice) |
| **SHUTTS & BOWEN** | **HINCKLEY, ALLEN & SNYDER, LLP** |
| 525 Okeechobee Blvd. | 100 Westminster Street, Suite 1500 |
| Suite 1100 | Providence, Rhode Island 02903 |
| West Palm Beach, Florida 33401 | Tel:   401.274.2000 |
| Tel:     561.650.8523 | Fax:     401.277.9600 |
| Fax:     561.650.8350 | cscott@hinckleyallen.com |
| jbain@shutts.com | cbush@hinckleyallen.com |
| rrodriguez@shutts.com | |

23