# EXHIBIT A

1        ** ROUGH DRAFT ** ROUGH DRAFT ** ROUGH DRAFT **

2                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
3                         MIAMI DIVISION

4            CASE NUMBER 17-22405-CV-MORENO/LOUIS

5   ROLAND CORPORATION,

6            Plaintiff,                    Courtroom 12-2

7     vs.                                  Miami, Florida

8   INMUSIC BRANDS, INC.,                  **November 3, 2022**

9            Defendant.
   _____

10            **ROUGH DRAFT OF JURY TRIAL PROCEEDINGS**
11        BEFORE THE HONORABLE FEDERICO A. MORENO
             SENIOR UNITED STATES DISTRICT JUDGE
12   _____

13  APPEARANCES:
    FOR THE PLAINTIFF:       VICTOR S. DE GYARFAS, ESQ.
14                           TIFFANY KIM SUNG, ESQ.
                             JUSTIN B. UHLEMANN, ESQ.
15                           LAURA GANOZA, ESQ.
                             KIMBERLY K. DODD, ESQ.
16
    FOR THE DEFENDANT:       CRAIG M. SCOTT, ESQ.
17                           CHRISTINE K. BUSH, ESQ.
                             REBECCA F. BRIGGS, ESQ.
18                           MARK D. HOCHBERG, ESQ.

19                           JODI-ANN R. TILLMAN, ESQ.

20

21

22

23
    REPORTED STENOGRAPHICALLY
24  BY:                      GILDA PASTOR-HERNANDEZ, RPR, FPR, FPR-C
                             gphofficialreporter@gmail.com
25                           305-523-5118

1  but it -- Audette Productions was the name of the company, but

2  they did business under Billy Blast.

3  Q.   How did those litigations end?  Did they get resolved?

4  A.   They all got resolved and in each case the infringer either

5  agreed not to continue to sell the knockoff products, or in the

6  Hart Dynamics case they took a license and sold for many years

7  under the license.  They paid a royalty.

8  Q.   Okay.  Well, outside the context of actually filing a

9  litigation, have you engaged in any enforcement activities on

10  behalf of Roland in connection with the drum patents and cymbal

11  patents?

12  A.   I have.  I've been involved in many of those, what I

13  mentioned as prelitigation enforcement letters, licensing

14  negotiations for these particular patents, yes.

15  Q.   How many would you say?

16  A.   Many.  I mean, we were doing this over a 20-year period, so

17  I don't even know if I can count that many.  There were many.

18  Q.   Well, luckily we have a demonstrative that may be able to

19  help and keep track of these license agreements and enforcement

20  matters.

21       MS. GANOZA:  Your Honor, may I approach the witness?

22  And the parties have agreed on this demonstrative to be able to

23  be shown to the jury.

24       THE COURT:  Go ahead.  Does it is have a number?

25       MS. GANOZA:  Yes.  Sorry about that.  Sorry about that,

1  some revenue from the license.  But they are also keeping

2  unauthorized products, unauthorized knockoffs or copies of their

3  technology off of the market.  It allows certain companies to

4  continue to use the technology, but in an authorized manner, so

5  those now become authorized uses.  So it is a way of managing

6  their intellectual property rights.

7  Q.  Well, let's go to the first license agreement that's on this

8  timeline of licenses, please.  Can we blow that up.  Great.

9  Thank you.

10         Mr. Rittmaster, what is this document?

11  A.  This is the first pages of a license agreement dated June 1,

12  2001, between Roland and a company called Pintech Industries,

13  and this relates to the 538 patent, which is the first -- I

14  should say the second drum patent in the family that were the

15  drum patents.

16  Q.  And for the record, this document is at Plaintiff's Exhibit

17  107 and it's already in the record.

18         So you mentioned this relates to patent number 538?

19  A.  Using the last three digits, I think that's kind of a

20  general convention, but that's correct.

21  Q.  That's not one of the patents that we talked about earlier,

22  the 435 --

23  A.  458.

24  Q.  It's not one of those two patents, though, right?

25  A.  That's correct.  Actually, this is the patent that came

 1   right before the 458.   The drum patents were filed in series to

 2   create a family of patents and this was the second patent in the

 3   family, but just before the 458.

 4   Q.   Well, how did this patent license agreement come about?

 5   A.   This license agreement came about from the -- I believe it

 6   was a cease and desist letter that I sent to Pintech Industries,

 7   and in response to that they asked for -- to negotiate a

 8   license.

 9          MR. SCOTT:  Objection, Your Honor.

10          THE COURT:  Grounds.

11          MR. SCOTT:  Hearsay.

12          THE COURT:  Overrule.

13   BY MS. GANOZA:

14   Q.   Ultimately, this is the patent license agreement that was

15   negotiated and executed between the parties?

16   A.   That's correct.

17   Q.   Okay.  Let's go to the next one.  Now, can you describe what

18   this document is?

19   A.   This is the front page of a license agreement dated December

20   16, 2003, between Roland Corporation and Hart Dynamics.  I

21   mentioned Hart earlier, this is that company.

22   Q.   And for the record, this is at Plaintiff's Exhibit 161,

23   which is has been admitted into evidence.

24          So Hart was one of the parties that you mentioned

25   Roland sued?

1  458 patent.  The 458 patent is one of the drum patents in this

2  lawsuit.

3  Q.  Well, that was going to be my next question.  Okay.  Thank

4  you.

5       MS. GANOZA:  We can take that down, Vinnie, and if

6  could you bring back the demonstrative.  Great.  Let's go to the

7  next slide, and for this one as well, Vinnie, can you please

8  bring up the exhibit.

9       And for the record, it's Plaintiff's Exhibit 459 that's

10  already part of the record.

11  BY MS. GANOZA:

12  Q.  Mr. Rittmaster, can you tell the jury what this document is?

13  A.  Yes.  This is a Settlement Agreement dated March 27, 2009,

14  and it's with a company called UFO, or it's Mitch Herbert, doing

15  business as UFO Drums, excuse me.  And it involves also drum

16  patents.  In this case, there were more patents now that had

17  issued in the family and you can see in the -- it's the second

18  paragraph, it says Roland is the owner of, and there it lists

19  one, two, three, four -- five patents.  Those are five now -- by

20  this time five patents have issued in this.  Well, more than

21  five, but these are the five patents that are being asserted.

22  Q.  And does it include the patents that are at issue in this

23  case?

24  A.  Yes, yes.  The 458 and the 535 are included.  They are the

25  second and the third patent numbers listed there.

1  Q.  Right.  Great.  So let's go back to the demonstrative

2  slides, please, and let's go to the next one.

3          Mr. Rittmaster, what is this next document?  And for

4  the record, it's Plaintiff's Exhibit Number 456.

5  A.  Sorry, I got ahead of you.  I was looking at it and started

6  to talk about it.  But this is another Settlement Agreement.

7  This is with Audette Productions or Billy Blast Drums.  This is

8  dated March 31, 2009, and it relates to all those drum patents

9  that I just mentioned, including the two drum patents in this

10 law suit, the 535 and 458:

11 Q.  Let's go to the next slide.

12 A.  This is the Settlement Agreement with Wirges and also

13 involves those same patents, dated May 29, 2009.

14 Q.  For the record -- let me just make the statement for the

15 record, and maybe in the meantime we can get it brought up.

16          For the record, it's Plaintiff's Exhibit Number 462.

17 And let's get that up on the screen.

18 A.  This Settlement Agreement -- in the Audette Productions one

19 we just saw, the UFO one we saw before that, in these agreements

20 the infringer agreed not to continue to sell the product.  In

21 some of these cases they actually had signed a stipulated

22 injunction that was filed with the Court, so the Court enjoined

23 them from continuing to infringe.

24 Q.  And what are the patents that are being licensed under this

25 Settlement Agreement?

1  A.  They are listed also in that paragraph that you just

2  highlighted.  Those are the five drum patents that we were

3  talking about and they include the 458 and the 535 patents, the

4  second and third one listed there.

5  Q.  Okay.  Thank you.  Okay, we can take that down and let's go

6  back.  A little toggling back and forth.

7       Okay.  So now we are in 2012, and let's take a look at

8  the license agreement referenced there.

9  A.  This is a license agreement -- am I looking at the same one?

10  I think I am ahead one here.  I'm sorry.

11       Yeah.  This is a license agreement between Roland and

12  Guitar Center, and dated May 18, 2012.

13  Q.  And for the record, this is Plaintiff's Exhibit 159, and if

14  we could bring that one up, please.

15       Now, can you describe who Guitar Center is for the

16  jury?

17  A.  Guitar Center is a fairly large company, you may have seen

18  or heard of their stores, and they sell musical instruments made

19  by many different manufacturers, including Roland.  They also

20  have their own brand.  It's called the Simmons brand of musical

21  instrument.

22       This license agreement relates to a license for the

23  cymbal patents that are in this lawsuit, and there they are

24  listed right there, the 989 and the 885 patents.  This was

25  because Guitar Center wanted to make an electronic cymbal under

 1 the Simmons brand and they came to Roland to request a license.

 2 They were aware of Roland's patents, so they came to Roland.

 3          MR. SCOTT:  Your Honor, can we get a question of this

 4 witness?  He is testifying in a narrative with no question

 5 pending.

 6          THE COURT:  If you wish to make an objection you must

 7 state objection and state the grounds for it and I'll make a

 8 ruling.

 9          MR. SCOTT:  Objection, narrative.

10          THE COURT:  Response.

11          MS. GANOZA:  Your Honor, I'm asking him what the

12 document is and he is explaining.

13          THE COURT:  The question is:  What is the document?

14 And your answer is?

15          THE WITNESS:  It's a license agreement between Roland

16 and Guitar Center for the two cymbal patents that are in the

17 lawsuit.

18          THE COURT:  Next question.

19 BY MS. GANOZA:

20 Q.  How did this license agreement come about?

21 A.  Guitar Center came to Roland and asked Roland for a license

22 agreement for their Simmons brand.

23 Q.  And did they already have a product on the market?

24 A.  No.  This was before they introduced their product and they

25 were aware of Roland's patent rights, as were many in the

Rittmaster - Direct

1   industry, and they came and asked Roland if they could get a

2   license for these patents.

3   Q.  So they sought permission before they launched?

4   A.  That's correct.  They respected Roland's patent rights here

5   and came directly to Roland.

6   Q.  Okay.  Let's go back to the demonstrative, if we can, and it

7   looks like the next license agreement is in 2013.

8        What is this license agreement?

9        THE COURT:  The reason we are going through these

10  license agreements is to prove what?

11       MS. GANOZA:  Your Honor, it is one of the elements of

12  the commercial success, evidence of copying, third party

13  copying, and that goes to the non-obviousness defense.

14       THE COURT:  And how many license agreements are we

15  going to go through?

16       MS. GANOZA:  There are nine left, Your Honor.

17       THE COURT:  All right.

18       We could --

19       THE COURT:  I just want the jury to know what's going

20  on.

21       MS. GANOZA:  We can get through these a little bit

22  faster, Your Honor, but --

23       THE COURT:  Go ahead.

24       MS. GANOZA:  I can continue?  Okay.  Thank you.

25  BY MS. GANOZA:

Rittmaster - Direct

1  Q.  Okay.  So, yes, can you please describe what this license

2  is, Mr. Rittmaster?

3  A.  Yes, yes.  I think we are showing that there are a number of

4  licenses here, so I agree, let's try to go through it quickly.

5          But this is an August 23, 2013 license agreement

6  between Roland and Pintech and this relates to the drum patents,

7  including the 458 patent that is of lawsuit.  We had a Pintech

8  agreement earlier.  This is a second agreement with them.

9  Q.  Why is there a second agreement with Pintech?

10 A.  They terminated the first agreement earlier on.  They

11 decided that they weren't going to make the infringing products

12 and they terminated the agreement, but later decided that they

13 did want to get back into the market and they came back and

14 negotiated a further license going forward.

15 Q.  Now, you previously testified that Guitar Center had entered

16 into a license as to the cymbals?

17 A.  Yes.

18 Q.  What about the drums?

19 A.  Yes, that should show on this timeline.  They did also

20 get -- seek a license and got a license for the drum patents.

21 Q.  So let's just go to that next slide quickly.

22 A.  Yes.

23 Q.  And for the record, this is Plaintiff's 464.

24          And how did this license agreement between Roland and

25 Guitar Center come about?

Rittmaster - Direct

74

1   A.   Well, the same way that the other Guitar Center license

2   agreement came about.   Guitar Center came to Roland and asked

3   for a license for a new Simmons brand product that they were

4   developing.

5   Q.   Okay.   And in the interest of moving this along, can you

6   tell the jury other patent licenses that Roland entered into in

7   connection with the drum patents and cymbal patents in this

8   case?

9   A.   Yes, I can.   I'm going to look at some of the other pages

10  going forward in the chart.   There was a license to Virgin Music

11  Instrument Company in 2016 for the cymbal patents.

12  Q.   Okay.

13  A.   There was a license in 2017 to a company called Drum

14  Workshop.   It's one of the big drum manufacturers and this was

15  also for the cymbal electronic -- cymbal patents in this

16  lawsuit.

17          There was a license in 2017 with Pearl Music Company.

18  You might have heard of Pearl drums, another big drum

19  manufacturer that licensed the electronic cymbal patents in July

20  2017.

21          In 2018 a license agreement with a company called Hal

22  Leonard Corporation, another entity in the music business, and

23  this was also for the electronic cymbal patents.

24          In 2018 there was finally a signed agreement with

25  Armadillo Distribution Company, doing business as D Drum, also

1  for the cymbal patents.  That same company also paid for a

2  release agreement for use of technology in the drum patents.

3  Going forward, the drum patents by that time had expired, so

4  they were paying for their past use of the drum patents.

5  Q.  And the last one?  We got to the last one.

6  A.  The last one is Roland and SCC Audio, they were doing

7  business as Carlsbro in the United States, and they took a

8  license in 2018 for the cymbal patents that are in the lawsuit.

9  Q.  Now, was there any infringer that was copying Roland's

10  patents that you sent an enforcement letter to who did not enter

11  into a license agreement or stop selling the product?

12  A.  There were many infringers who did not license, but they

13  agreed to stop selling, and that was important to Roland because

14  they were able to get the cheap knockoff off the market, but

15  there was only one entity who did not take a license and did not

16  stop selling and that's why we are here today.  That was Alesis

17  or inMusic.

18  Q.  So what did they do instead?

19  A.  Instead, they wrote back and made arguments to me of why

20  they thought they didn't need a license and I didn't agree with

21  those arguments.  I replied to them to that extent and then,

22  eventually we filed the lawsuit.

23  Q.  So you engaged in enforcement efforts against inMusic?

24  A.  Yes, prelitigation.  Once the lawsuit was filed or as part

25  of the lawsuit file we brought in the litigation team.

Rittmaster - Direct

76

1   Q.   What did that consist of, those enforcement efforts?

2   A.   The enforcement efforts before the lawsuit were me informing

3   them by letter of Roland's patents, identifying the product that

4   they had on the market that were infringing those patents, and

5   oftentimes much more detail about that and asking them to stop.

6   Q.   And how many letters do you think there were between Roland

7   and inMusic?

8   A.   There were a few because this went on over a period of time.

9   There were different products that inMusic or Alesis introduced,

10  would get a letter, would change, and then new product come out,

11  another letter.  So this happened over a period of time and

12  finally until 2015, when we sent them the letter regarding the

13  patents in this suit -- or the products in this suit I should

14  say.

15  Q.   Okay.

16       Your Honor, we have a demonstrative of a timeline of

17  these cease and desist letters.  It's been agreed to by the

18  parties and it is Plaintiff's Demonstrative Number 14.

19       THE COURT:  All right.

20       MS. GANOZA:  May I approach the witness, Your Honor?

21       THE COURT:  You have permanent permission to approach

22  the witness.

23       MS. GANOZA:  Thank you, Your Honor.

24       THE WITNESS:  Thank you.

25  BY MS. GANOZA:

Rittmaster - Direct

1  Q.   Now, if we could put the demonstrative up and if we could

2  bring out the first letter on the demonstrative.

3         Can you tell the jury about how this first letter came

4  about?

5  A.   Sure.   This is the first letter in this timeline, another

6  colorful timeline, it looks like the other one, but this one

7  identifies letters.

8         This first letter is a letter dated November 14, 2007,

9  from me to Jack O'Donnell.  Jack O'Donnell was, I think still

10 is, the owner of inMusic, and it identifies Roland's -- it lists

11 there four patents and those are the drum patents, including the

12 458 and the 535 patent in this law suit.

13 Q.   Why did you write this letter?

14 A.   I wrote this letter because -- it might show further into

15 the letter -- that -- well, there I'm identifying Roland as the

16 owner of those patents and then I say:  We request your response

17 in explaining any reason why you believe that the identified

18 DM-5 pro kit and drum pad product would avoid the claims of

19 these patents, and I even identified some specific claims.

20 Q.   Let me stop you there.  Again, we are not all patent lawyers

21 in this room like you are, Mr. Rittmaster, so when it says

22 "would avoid the claims of the patents," what does that mean?

23 A.   I'm asking them to explain why this product does not

24 infringe those patents.

25 Q.   Did they respond?

Rittmaster - Direct

78

1    A.   They did.   I think that's the next letter.   Yes, this

2    actually shows -- this is a letter from inMusic's counsel, D.

3    Josephs, dated November 26, 2007, and he is identifying the

4    Roland patents that I identified.   He is telling me that he

5    represents Alesis and that my letter was forwarded to him for a

6    response.

7    Q.   And then, did they actually provide a substantive response

8    to this letter?

9    A.   Well, in this letter I think he was just telling me he got

10   my letter and he is reviewing it and he is going to get back to

11   me.   So this didn't have the substantive response, but it shows

12   that he did receive my letter.

13   Q.   Did you get a substantive response?

14   A.   Yes, I did.   I eventually did.

15   Q.   Okay.   What did it say?

16   A.   This was the letter of January 2, 2008, and again, regarding

17   those same patents and here he says that those patents focus on

18   drum pad that includes a mesh or net-like material for a drum

19   head, which is correct.   "The Alesis pro kit does not include

20   this feature."   He was pointing out to me that their new

21   electronic drum does not include a mesh net-like material for

22   the drum head.

23   Q.   Okay.   And what did Roland do upon receipt of this letter

24   saying that this product does not include this feature?

25   A.   Roland took that representation to heart and we wrote back

Rittmaster - Direct

79

1   and said that we will continue to monitor, but, yeah, we

2   appreciate their attention and we will continue to monitor that,

3   you know, in particular their representation that they weren't

4   making a mesh drum head.

5   Q.   To your knowledge, when did inMusic start selling electronic

6   drums with mesh heads?

7   A.   That didn't occur, as far as we know, until 2015, and they

8   introduced, to our surprise because this was a -- contrary to

9   their representation here, that they introduced a mesh head drum

10  product, which are actually the drum products that are at suit

11  here.

12  Q.   Well, this letter is dated 2008.  Did you have any further

13  communications with inMusic between 2008 and 2015?

14  A.   Yes, there was yet another infringement issue that came up

15  in 2011.

16  Q.   And what infringement issue is that?

17  A.   There inMusic or Alesis came out with an electronic cymbal

18  that had rotation stopper and other features covered by Roland's

19  cymbal patents, electronic cymbal patents, the same patents that

20  are in this lawsuit.

21  Q.   Okay.  And up on the scene is a letter dated March 11th,

22  Plaintiff's Exhibit 30, correct?  Do you see that?

23  A.   Correct.  This is that letter that I just mentioned

24  identifying the first two patent numbers, the 989 and 885

25  patents.  Those are the cymbal patents in this suit.

Rittmaster - Direct

80

1 Q.  Okay.  And what are you saying to them in this letter?

2 A.  I'm notifying them of these patents.  The previous letters

3 in 2007 were about the drum patents.  Now I am notifying them of

4 the cymbal patents.  I notified them that at the winter NAMM

5 Show in Anaheim, California their booth displayed electronic

6 cymbals that had -- and then I lay out the rotation stopper

7 configuration.

8 Q.  Did inMusic respond to this letter?

9 A.  Yes, they did.

10 Q.  Ultimately, how did this issue of the cymbals in 2011 -- or

11 did this issue of the cymbals in 2011 get resolved?

12 A.  Well, in Roland's view it did because they came back to us

13 and they told us they were discontinuing this product.  They

14 initially raised some arguments and asked for a claim chart,

15 which I gave to them, but then, right after that they told us

16 they were going to discontinue this cymbal and that they only

17 had what is a small inventory in the industry, they would be

18 liquidated by Christmas, a couple of months later.

19        This was what was important to Roland.  They wanted the

20 knockoffs off the market and here they are telling us they are

21 going to take them off the market.

22 Q.  Okay.  And did they keep that promise that they were going

23 to take it off the market?

24 A.  As far as we knew, but then in 2015, we saw the drum set

25 kits that are in the lawsuit today, and they do have electronic

1    cymbals with rotation stopper technology.

2    Q.  And so this is in 2015.  So then, what did you do in 2015

3    when you learned about that?

4    A.  I sent them a letter as soon as we saw that they were going

5    to introduce the infringing products and I pointed out -- this

6    is the letter of February 3, 2015.  I pointed out that I believe

7    they are aware of these patents because we made them aware of

8    them several years ago, and I pointed out that we saw their

9    products that are now infringing these patents being introduced.

10   I think I identified that we saw them at the NAMM Show in 2015.

11            I think there's more in this letter though.  Yeah.  See

12   I --

13            THE COURT:  Okay.  Wait for a question.  We are not

14   here forever, so next question.

15   BY MS. GANOZA:

16   Q.  Okay.  Did inMusic --

17            THE COURT:  You need a restroom break?

18            JUROR NUMBER 2:  Yes.

19            THE COURT:  Same juror.  No problem.  You gotta go, you

20   gotta go.  Okay.  Take a recess, all of you, and we will bring

21   you back.

22            THE COURT SECURITY OFFICER:  All rise to the jury.

23            THE COURT:  No problem.  We have all been there.  Don't

24   feel bad.

25       (The jury retired from the courtroom at 2:57 p.m.)

Rittmaster - Direct

82

1        THE COURT:  Okay.  Wait for them.

2    (There was a brief recess.)

3        THE COURT:  Let's see if they are ready.  If not, we

4   will wait, no problem.

5        THE COURT SECURITY OFFICER:  They said two minutes,

6   Your Honor.

7        THE COURT:  No problem.  Two minute warning.

8    (There was a brief recess.)

9        THE COURT SECURITY OFFICER:  They're ready, Your Honor.

10       THE COURT:  Okay.  Bring them in.

11       THE COURT SECURITY OFFICER:  All rise for the jury.

12     (The jury returned to the courtroom at 3:08 p.m.)

13       THE COURT:  Okay.  We have everybody I think.  Great.

14   Go ahead.

15       MS. GANOZA:  Thank you, Your Honor.

16   BY MS. GANOZA:

17   Q.  So, Mr. Rittmaster, when we left off we were discussing your

18   2015 communication to inMusic, and what was this letter about?

19   A.  So this letter again was me telling Alesis that we saw their

20   mesh head drum product and electronic cymbal at the NAMM Show.

21   We were surprised about it because this was exactly what they

22   had represented they weren't going to do and we told them to

23   cease and desist.

24   Q.  And did they?

25   A.  No, they did not.

Rittmaster - Direct

83

1   Q.   What did they do next?

2   A.   This letter was sent before they actually introduced the

3   product for sale because we had seen them at the NAMM Show, so

4   the next thing that we knew was they went ahead and introduced

5   their product and they sent us a letter responding to go my

6   letter and made arguments about why they did not need to take a

7   license or stop selling.

8   Q.   And up through today, has inMusic ever stopped selling the

9   products that are accused of infringement?

10  A.   No.   They continue to sell those products.

11  Q.   Have you ever negotiated a patent license agreement -- have

12  they -- has inMusic ever entered into a patent license agreement

13  with Roland in connection with the drums and cymbal patents?

14  A.   No, they did not.   They continue to infringe those patents

15  without authorization.

16  Q.   Now, did you ever express to inMusic in writing that Roland

17  was not going to enforce its patent rights against them?

18  A.   No, actually the opposite.   We continued to tell them that

19  we disagreed with their arguments and we felt that they should

20  stop.

21  Q.   What about orally, did you ever on a phone call say to

22  inMusic, no, that's okay, we are not going to enforce our

23  patents?

24  A.   No, never did.

25  Q.   And one last question that I'm remiss that I didn't ask you

Rittmaster - Cross

84

1  at the beginning when you were explaining your background.

2        You work at Foley & Lardner?

3  A.  Yes.

4  Q.  Right, Mr. Rittmaster?

5  A.  Yes.

6  Q.  And I work at Foley & Lardner, right, Mr. Rittmaster?

7  You're my partner at Foley & Lardner, correct?

8  A.  Yes.

9  Q.  Okay.  All right.

10        MS. GANOZA:  Your Honor, I pass the witness.

11        THE COURT:  Cross-examination.

12                    CROSS-EXAMINATION

13  BY MR. SCOTT:

14  Q.  Mr. Rittmaster, you are also a partner of Ms. Dodd,

15  Mr. Uhlemann, and a colleague at Foley & Lardner, Tiffany Sung

16  as well, right?

17  A.  Yes, that's correct.

18  Q.  And in fact, you have represented Roland in court related to

19  a couple of litigation matters concerning Roland patents,

20  correct?

21  A.  Well, I mentioned I am not a litigation attorney.  I have

22  worked on matters that involved litigation like this and I might

23  have named on a pleading as --

24  Q.  Or two, yes.  So you have appeared in court as an attorney

25  of record for Roland in trying to enforce Roland patents,

1  correct?

2  A.   I personally have not been in the courtroom.  My name might

3  have been on pleadings that were.

4  Q.   I didn't ask you if you were in the courtroom.

5       Now, you've mentioned quite a few times in front of the

6  jury that inMusic is an infringer, or these other infringers or

7  knockoff companies didn't respect Roland's patents.

8       Do you recall those questions in response -- do you

9  recall those responses to Ms. Ganoza's questions?

10 A.   Yes.

11 Q.   But it's true, isn't it, that no judge or jury has ever made

12 a determination as to the application of Roland's patents

13 relative to drums or cymbal products, right?

14 A.   The lawsuits didn't get to a jury stage, they settled before

15 but --

16 Q.   So there's been no determination of infringement against

17 anybody.  That's your verbiage, your words, as Roland's lawyer

18 for over 25 years; isn't that right?

19 A.   It is my words, but it's verified by the evidence that we

20 have presented, including the licenses.

21 Q.   But you are not testifying here today that the jury needs to

22 accept your testimony that there's infringement, right?  That's

23 for them to decide, isn't it?

24 A.   That is correct.

25 Q.   Based on the full record of the evidence that's presented

Rittmaster - Cross

1   Q.   And this is one of the cymbals that Roland alleges inMusic

2   to have infringed in this case, correct?

3   A.   What I'm seeing in the picture here -- I can't tell what

4   you're holding, but what I see in the picture here looks like it

5   has the design of the accused cymbal here, correct.

6           MR. SCOTT:   Your Honor, may I hand Defendant's

7   Demonstrative 5 to the jury?

8           THE COURT:   Sure.

9           MR. SCOTT:   Thank you.

10          THE COURT:   Go ahead.   The court security officer will

11  help you.   Thanks.   Okay.   Any questions?

12  BY MR. SCOTT:

13  Q.   Now, that cymbal design that was used by Fender, KAT, Pearl,

14  and Alesis, and made by Medeli in 2011 and forward, was never

15  the subject of any litigation until Roland filed suit against

16  inMusic in 2016, correct?

17  A.   That statement implies that we knew Medeli was -- or that

18  Alesis was using this design, and we knew that Guitar Center was

19  and a few others, Pearl, but that wasn't our -- we were looking

20  at those entities at that time.

21  Q.   Well, you in fact -- the correspondence that was exchanged

22  that Ms. Ganoza over with you included that cymbal design by

23  Alesis --

24  A.   That's incorrect.

25  Q.   -- going all the way back to 2011, and then again in 2015,